| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Michael Jay Berger (SBN 100291)**<br>**Law Offices of Michael Jay Berger**<br>**9454 Wilshire Boulevard, 6th floor**<br>**Beverly Hills, CA 90212**<br>**(310) 271-6223 Fax:  (310) 271-9805**<br>**michael.berger@bankruptcypower.com** | |

☐ Respondent appearing without attorney
☒ Attorney for Respondents: Creditors Kobzeff Construction;
Coastline Santa Monica Investments, LLC; Vierergruppe
Management Inc.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>        **Tesoro Redlands DE, LLC** | CASE NO.: **8:25-bk-12319-SC**<br>CHAPTER: **11** |
|---|---|
| | **RESPONSE TO MOTION REGARDING THE AUTOMATIC STAY AND DECLARATION(S) IN SUPPORT** |
| | DATE:  **September 17, 2025**<br>TIME:  **1:30 p.m.**<br>COURTROOM:  **5C**<br>PLACE:  **411 West Fourth Street, Santa Ana, CA 92701** |
| Debtor(s). | |
| **Movant:**    **Preferred Bank** | |

**Respondent:**    ☐ Debtor    ☐ trustee    ☒ other: Creditors/ Involuntary Bankruptcy Petitioners

NOTE REGARDING FILING AND SERVICE OF RESPONSE, EXHIBITS AND DECLARATIONS:
    A copy of the Response, exhibit(s) and declaration(s) must be served upon:
    (1) Movant's attorney (or Movant, if Movant does not have an attorney);
    (2) the trustee; and
    (3) the judge who presides over this bankruptcy case.
    Then the document must be filed with the court.

1. ☐ **NONOPPOSITION**

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                                    Page 1                    **F 4001-1.RFS.RESPONSE**

The Respondent does not oppose the granting of the Motion.

2. ☐ **LIMITED OPPOSITION**

   a. ☐ Respondent opposes the Motion only to the extent that it seeks immediate relief from stay. Respondent requests that no lock out, foreclosure, or repossession take place before (*date*):_____ and the reason for this request is (*specify*):

   b. ☐ As set forth in the attached declaration of the Respondent or the Debtor, the motion is opposed only to the extent that it seeks a specific finding that the Debtor was involved in a scheme to hinder, delay or defraud creditors.

      The Debtor:
      (1) ☐ has no knowledge of the Property.
      (2) ☐ has no interest in the Property.
      (3) ☐ has no actual possession of the Property.
      (4) ☐ was not involved in the transfer of the Property.

   c. ☐ Respondent opposes the Motion and will request a continuance of the hearing since there is an application for a loan modification under consideration at this time. Evidence of a pending loan modification is attached as Exhibit _____.

3. ☒ **OPPOSITION** The Respondent opposes granting of the Motion for the reasons set forth below.

   a. ☐ The Motion was not properly served (*specify*):

      (1) ☐ Not all of the required parties were served.
      (2) ☐ There was insufficient notice of the hearing.
      (3) ☐ An incorrect address for service of the Motion was used for (*specify*):

   b. ☒ Respondent disputes the allegations/evidence contained in the Motion and contends as follows:
      (1) ☒ The value of the Property is $ __65,200,000.00__ , based upon (*specify*): **Appraisal report dated February 10, 2022, prepared by BBG, Inc., for Movant Preferred Bank, estimates the prospective market value of the Property (stabilized at market rents) as $65,200,000.00 (the "Appraisal"). The Appraisal estimates the Property's market value as-is as $58,300,000.00. A true and correct copy of the Appraisal is attached to the Declaration of Ioannis Xilikakis as "Exhibit 1."**
      (2) ☐ Total amount of debt (loans) on the Property is $_____.
      (3) ☐ More payments have been made to Movant than the Motion accounts for. True and correct copies of canceled checks proving the payments that have been made are attached as Exhibit _____.
      (4) ☐ There is a loan modification agreement in effect that lowered the amount of the monthly payments. A true and correct copy of the loan modification agreement is attached as Exhibit _____.
      (5) ☐ The Property is necessary for an effective reorganization. Respondent filed or intends to file a plan of reorganization that requires use of the Property. A true and correct copy of the plan is attached as Exhibit _____.
      (6) ☐ The Property is fully provided for in the chapter 13 plan and all postpetition plan payments are current. A true and correct copy of the chapter 13 plan is attached as Exhibit _____ and proof that the plan payments are current through the chapter 13 trustee is attached as Exhibit _____.
      (7) ☐ The Property is insured. Evidence of current insurance is attached as Exhibit _____.
      (8) ☐ Movant's description of the status of the unlawful detainer proceeding is not accurate.
      (9) ☒ Respondent denies that this bankruptcy case was filed in bad faith. **The instant bankruptcy case was filed as an involuntary Chapter 11 bankruptcy, by multiple creditors of the Debtor ("Filing Creditors"). The bankruptcy case was filed as a good-faith effort by Filing Creditors to protect their secured interests in the Debtor's Property.**
      (10) ☐ The Debtor will be prejudiced if the Nonbankruptcy Action is allowed to continue the nonbankruptcy forum.
      (11) ☒ Other (*specify*): **Contrary to Movant's assertion in the Motion, section 4.b., the Debtor has significant equity in the Property, and because the Property is Debtor's sole significant asset, sale of the Property is crucial for Debtor to pay its creditors and reorganize. Contrary to Movant's assertion in its Motion section 4.d., the Debtor did not file the bankruptcy petition as a scheme to delay, hinder, or defraud creditors; the instant bankruptcy was filed as an involuntary Chapter 11 by creditors of the Debtor.**

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                                   Page 2                                   **F 4001-1.RFS.RESPONSE**

c. ☒ Respondent asserts the following as shown in the declaration(s) filed with this Response:

   (1) ☐ The bankruptcy case was converted from chapter _____ to chapter _____.
   (2) ☐ All postpetition arrearages will be cured by the hearing date on this motion.
   (3) ☐ The Property is fully provided for in the chapter 13 plan and all postpetition plan payments ☐ are current, or
       ☐ will be cured by the hearing date on this motion.
   (4) ☒ The Debtor has equity in the Property in the amount of $ __$22,803,206.65__.
   (5) ☒ Movant has an equity cushion of __$24,302,602.49__ or __37.27__% which is sufficient to provide adequate
       protection.
   (6) ☒ The Property is necessary for an effective reorganization because (specify): **The Property is Debtor's sole
       significant asset, therefore sale of the Property is the only way for Debtor to pay its creditors and
       reorganize.**
   (7) ☒ The motion should be denied because (specify): **Debtor has an interested buyer for the Property, the
       sale of which will allow Debtor to pay its creditors. A true and correct copy of the Notice of
       Successful Bidder ("Notice") filed to Debtor's prior bankruptcy case in the U.S. Bankruptcy Court
       for the District of Delaware, case no. 25-10321 (docket no. 468) is attached to the Declaration of
       Ioannis Xilikakis as "Exhibit 2." The Notice contains a Purchase and Sale Agreement and Joint
       Escrow Instructions ("Sale Agreement") between Debtor and buyer Patrick Theodora ("Buyer"),
       with a purchase price of $55,000,000. Under information and belief, the Buyer has already made a
       deposit with escrow in accordance with the terms of the Sale Agreement, and Buyer remains
       interested in purchasing the Property, which purchase could be completed within 30 days. Debtor's
       sale of the Property would allow the Debtor to pay its creditors, including Movant, and so it is in the
       interest of the Debtor's estate and all creditors that Debtor and Buyer be allowed to complete the
       contemplated sale of the Property.**

       **Movant provides no affirmative reason or cause for the Court to waive the 14-day stay prescribed by
       FRBP 4001(a)(4), and so the 14-day stay should not be waived.**

   (8) ☐ An optional memorandum of points and authorities is attached in support of this Response.

## 4. EVIDENCE TO AUTHENTICATE EXHIBITS AND TO SUPPORT FACTS INSERTED IN THE RESPONSE:

Attached are the following documents in support of this Response:

☐ Declaration by the Debtor                    ☐ Declaration by the Debtor's attorney
☐ Declaration by trustee                       ☐ Declaration by trustee's attorney
☐ Declaration by appraiser                     ☒ Other (specify): Declaration of Advisor to the Debtor

Date: __9/3/2025__

**Law Offices of Michael Jay Berger**
Printed name of law firm for Respondent (if applicable)

**Michael Jay Berger**
Printed name of individual Respondent or attorney for Respondent

**/s/Michael Jay Berger**
Signature of individual Respondent or attorney for Respondent

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014*                    Page 3                    **F 4001-1.RFS.RESPONSE**

## DECLARATION OF IOANNIS XILIKAKIS

I, Ioannis Xilikakis, declare and state as follows:

1.      I am the manager of Coastline Santa Monica Investments, LLC, one of the creditors ("Filing Creditors") of the involuntary Chapter 11 bankruptcy for Tesoro Redlands DE, LLC ("Debtor"). I have personal knowledge of the facts set forth below and if called to testify as to those facts, I could and would competently do so.

2.      Appraisal report dated February 10, 2022, prepared by BBG, Inc., for Movant Preferred Bank, estimates the prospective market value of the Property (stabilized at market rents) as $65,200,000.00 (the "Appraisal"). The Appraisal estimates the Property's market value as-is as $58,300,000.00. A true and correct copy of the Appraisal is attached hereto as "Exhibit 1."

3.      The instant bankruptcy case was filed as an involuntary Chapter 11 bankruptcy, by multiple creditors of the Debtor ("Filing Creditors"). The bankruptcy case was filed as a good-faith effort by Filing Creditors to protect their secured interests in the Debtor's Property.

4.      On information and belief, contrary to Movant's assertion in the Motion, section 4.b., the Debtor has significant equity in the Property, and because the Property is Debtor's sole significant asset, sale of the Property is crucial for Debtor to pay its creditors and reorganize. Contrary to Movant's assertion in its Motion section 4.d., the Debtor did not file the bankruptcy petition as a scheme to delay, hinder, or defraud creditors; the instant bankruptcy was filed as an involuntary Chapter 11 by creditors of the Debtor.

5.      On information and belief, the Debtor has equity in the Property in the amount of $22,803,206.65.

6.      On information and belief, Movant has an equity cushion of $24,302,602.49, or 37.27%, which is sufficient to provide adequate protection.

7.      On information and belief, Debtor has an interested buyer for the Property, the sale of which will allow Debtor to pay its creditors. A true and correct copy of the Notice of Successful Bidder ("Notice") filed to Debtor's prior bankruptcy case in the U.S. Bankruptcy Court for the District of Delaware, case no. 25-10321 (docket no. 468) is attached hereto as "Exhibit 2." The Notice contains a Purchase and Sale Agreement and Joint Escrow Instructions ("Sale Agreement") between Debtor and buyer Patrick Theodora ("Buyer"), with a purchase price of $55,000,000. On information and belief, the Buyer has already made a deposit with escrow in accordance with the terms of the Sale Agreement, and Buyer remains interested in purchasing the Property, which purchase could be completed within 30 days. Debtor's sale of the Property would allow the Debtor to pay its creditors, including Movant, and so it is in the interest of the Debtor's estate and all creditors that Debtor and Buyer be allowed to complete the contemplated sale of the Property.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on September 3, 2025 in Newport Beach, California.

_____
Ioannis Xilikakis

2

# EXHIBIT 1



# BBG
REAL ESTATE SERVICES

# APPRAISAL REPORT

The insight you need. The independence you trust.

**Tesoro Apartments**
106 West Pennsylvania Avenue
Redlands, California  92374

BBG File #0122002232

**Prepared For**
Ms. Sindy Shieh
Preferred Bank
41-60 Main Street
Flushing, NY  11355

**Report Date**
February 10, 2022

**Prepared By**
BBG, Inc., Costa Mesa Office
3070 Bristol Street
Costa Mesa, CA  92626
714-415-4750

Client Manager:  Mark Haskell
mhaskell@bbgres.com

**Valuation + Assessment**



February 10, 2022

Ms. Sindy Shieh
Preferred Bank
41-60 Main Street
Flushing, NY  11355

Re:    Appraisal of Real Property
       **Tesoro Apartments**
       106 West Pennsylvania Avenue
       Redlands, California  92374
       **BBG File No.** 0122002232

Dear Ms. Shieh:

In accordance with your authorization, BBG, Inc. is pleased to submit an appraisal of the above-referenced property. The purpose of this appraisal is to develop the following opinions of value:

- Market Value As Is as of February 7, 2022 - Leased Fee

- Prospective Market Value Stabilized at Market Rents as of March 1, 2023 - Leased Fee

The subject property is a 188 -unit garden apartment complex located in the city of Redlands, San Bernardino County, CA. Constructed in 1989, the subject property consists of a 22-building, 2-story garden apartment complex (152,996 square feet NRA) built on a 10.99-acre parcel of land. The subject's unit mix is comprised of one- and two-bedroom units. Unit sizes range from 683 to 882 square feet, with an average unit size of 814  square feet. As of the effective date, the subject was 95.7% occupied.

This report was prepared for Preferred Bank (client and intended user), and is intended only for its specified use. The appraisal report that follows sets forth the identification of the property, the assumptions and limiting conditions, pertinent facts about the area and the subject property, comparable market data, the results of the investigation, and the reasoning leading to the conclusions set forth.

This appraisal report was prepared to conform with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP), the appraisal guidelines set forth in Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), and the December 2010 Interagency Appraisal and Evaluation Guidelines. This report has been written in accordance with the Code of Ethics and the Standards of Professional Practice of the Appraisal Institute. In addition, this report is intended to be in compliance with additional standards of our client, Preferred Bank.

**ORANGE COUNTY**

P + 714 415 4750

3070 BRISTOL STREET
+ STE  615
COSTA MESA, CA 92626

BBGRES.COM

VALUATION + ADVISORY + ASSESSMENT + ZONING

Preferred Bank
February 10, 2022
Page 2

Based on our inspection of the property and the investigation and the analysis undertaken, we have developed the following value opinion(s).

| MARKET VALUE CONCLUSION(S) | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Market Value As Is | Leased Fee | February 7, 2022 | $58,300,000 |
| Prospective Market Value - Stabilized at Market Rents | Leased Fee | March 1, 2023 | $65,200,000 |

Based on recent market transactions, as well as discussions with market participants, a sale of the subject property at the above-stated opinion of market value would have required an exposure time of approximately 3-6 months. Furthermore, a marketing time of approximately 3-6 months is currently warranted for the subject property.

**Note:** Our opinion of market value is subject to the following Extraordinary Assumptions and/or Hypothetical Conditions:

| EXTRAORDINARY ASSUMPTION(S) AND HYPOTHETICAL CONDITION(S) | |
|---|---|
| The values presented within this appraisal report are subject to the extraordinary assumptions and hypothetical conditions listed below. Pursuant to the requirement within Uniform Standards of Professional Appraisal Practice Standards, it is stated here that the use of any extraordinary assumptions and/or hypothetical conditions might have affected the assignment results. | |
| Extraordinary Assumption(s) | This appraisal employs no extraordinary assumptions. |
| Hypothetical Condition(s) | This appraisal employs no hypothetical conditions. |

This letter must remain attached to the report, which should be transmitted in its entirety, in order for the value opinion set forth to be considered valid.

Our firm appreciates the opportunity to have performed this appraisal assignment on your behalf. If we may be of further service, please contact us.

Sincerely,
**BBG, Inc.**

Giselle Nguyen, MAI
CA Certified General Appraiser
License #: AG 043831
818-371-8910
gnguyen@bbgres.com

**LOS ANGELES**

P + 213 634 1380

527 W. 7ᵀᴴ STREET
+ STE. 902
LOS ANGELES, CA 90014

BBGRES COM

VALUATION + ADVISORY + ASSESSMENT + ZONING

# TABLE OF CONTENTS

Subject Property ................................................................................................................. 1

Summary of Salient Facts ................................................................................................... 6

Property History .................................................................................................................. 8

Scope of Work ..................................................................................................................... 9

Regional Analysis ............................................................................................................... 13

Neighborhood Analysis ...................................................................................................... 20

Site Description ................................................................................................................... 23

Improvements Description ................................................................................................. 27

Property Taxes and Assessment ......................................................................................... 30

Market Analysis .................................................................................................................. 31

Highest and Best Use .......................................................................................................... 38

Valuation Process ............................................................................................................... 40

Sales Comparison Approach .............................................................................................. 41

Income Capitalization Approach ....................................................................................... 49

Prospective Market Valuation –Stabilized at Market Rents ............................................ 62

Reconciliation ..................................................................................................................... 64

Insurable Value ................................................................................................................... 66

Certification ......................................................................................................................... 68

Standard Assumptions and Limiting Conditions ............................................................. 69

Addenda ............................................................................................................................... 73

# SUBJECT PROPERTY



Front view of subject property



Typical building exterior



Typical building exterior



Typical building exterior



Typical building exterior



Typical building exterior

BBG

SUBJECT PROPERTY 2



Typical living room



Typical living room



Typical kitchen



Typical kitchen



Typical bedroom



Typical bedroom

TESORO APARTMENTS APPRAISAL

BBG



Typical bathroom



Typical walk-in closet



Typical balcony



Typical patio



Typical common area laundry room



Playground

SUBJECT PROPERTY 4



View of garages



Typical carport parking



Fitness center



View of pool/spa area



Street scene looking east along Pennsylvania Ave



Street scene looking west along Pennsylvania Ave

## AERIAL PHOTOGRAPH



# SUMMARY OF SALIENT FACTS

| PROPERTY DATA | |
|---|---|
| Property Name | Tesoro Apartments |
| Address | 106 West Pennsylvania Avenue<br>Redlands, California  92374 |
| Property Description | Apartment |
| Parcel Number | 0167-151-24 |
| Census Tract No. | 80.01 |
| Site Area | |
| Primary Site | 478,724 square feet    (10.99 acres) |
| Zoning | R-2; Multiple Family Residential |
| Flood Status | Zone X (Unshaded) is a Non-Special Flood Hazard Area (NSFHA) of minimal flood hazard, usually depicted on Flood Insurance Rate Maps (FIRM) as above the 500-year flood level. This is an area in a low to moderate risk flood zone that is not in any immediate danger from flooding caused by overflowing rivers or hard rains. In communities that participate in the National Flood Insurance Program (NFIP), flood insurance is available to all property owners and renters in this zone. |
| Year Built | 1989 |
| Type of Construction | Wood frame |
| Number of Buildings | 22 |
| Gross Building Area | 169,312 square feet |
| Net Rentable Area | 152,996 square feet |
| Total Number of Units | 188 |
| Overall Condition | Average |
| Overall Quality | Average |
| Overall Design/Functionality | Average |

| SUBJECT RENT SUMMARY | | | QUOTED RENTAL RATES | | IN-PLACE RENTAL RATES | |
|---|---|---|---|---|---|---|
| Type | No. | Size (SF) | Rent/Mo. | Rent/SF | Rent/Mo. | Rent/SF |
| 1BR-1BA | 40 | 683 | $1,675 | $2.45 | $1,529 | $2.24 |
| 2BR-2BA | 108 | 837 | $1,850 | $2.21 | $1,681 | $2.01 |
| 2BR-2BA | 40 | 882 | $1,950 | $2.21 | $1,786 | $2.02 |
| Total/Avg | 188 | 814 | $1,834 | $2.25 | $1,671 | $2.05 |

| VALUE INDICATIONS | | | |
|---|---|---|---|
| **As Is as of February 7, 2022** | | | |
| Cost Approach | Not Developed | | |
| Land Value | Not Developed | | |
| Sales Comparison Approach | $56,400,000 | $300,000 | Per Dwelling Unit |
| Income Capitalization Approach | | | |
| Direct Capitalization | $58,300,000 | $310,106 | Per Dwelling Unit |
| Approach Reliance | Direct Capitalization | | |
| Value Conclusion - As Is | **$58,300,000** | **$310,106** | **Per Dwelling Unit** |
| Insurable Value | $17,700,000 | | |
| Exposure Time (Months) | 3-6 | | |
| Marketing Time (Months) | 3-6 | | |
| **Stabilized At Market Rents as of March 1, 2023** | | | |
| Cost Approach | Not Developed | | |
| Land Value | Not Developed | | |
| Sales Comparison Approach | Not Developed | | |
| Income Capitalization Approach | | | |
| Direct Capitalization | $65,200,000 | $346,809 | Per Dwelling Unit |
| Approach Reliance | Direct Capitalization | | |
| Value Conclusion - Stabilized At Market Rents | **$65,200,000** | **$346,809** | **Per Dwelling Unit** |

BBG

# PROPERTY HISTORY

Title to the subject is currently vested in Tesoro Redlands DE LLC. To the best of our knowledge, there have been no sales or transfers involving the subject within the past three years, and the property is not currently listed for sale, in-contract, or encumbered by an option to purchase.

# SCOPE OF WORK

| APPRAISAL INFORMATION | |
|---|---|
| Client | Preferred Bank |
| | 41-60 Main Street, |
| | Flushing, NY 11355 |
| Intended User(s) | Preferred Bank |
| Intended Use | This appraisal is to be used for Internal credit decision making purposes. |
| Premise Summary | As Is Market Value - February 7, 2022 |
| | Stabilized At Market Rents  Prospective Market Value - March 1, 2023 |
| Date of Inspection | February 7, 2022 |
| Report Date | February 9, 2022 |
| Marketing Time | 3-6 |
| Exposure Time | 3-6 |
| Owner of Record | Tesoro Redlands DE LLC |
| Property Contact(s) | Michael Kluchin |
| Highest and Best Use | |
| If Vacant | Multifamily development |
| As Improved | As currently developed |

| PROPERTY IDENTIFICATION | |
|---|---|
| Property Name | Tesoro Apartments |
| Address | 106 West Pennsylvania Avenue |
| | Redlands, California  92374 |
| Property Description | Apartment |
| Parcel Number | 0167-151-24 |
| Census Tract No. | 80.01 |

BBG

| SCOPE OF THE INVESTIGATION | |
|---|---|

| **General and Market Data Analyzed** | ▪ Regional economic data and trends |
|---|---|
| | ▪ Market analysis data specific to the subject property type |
| | ▪ Published survey data |
| | ▪ Neighborhood demographic data |
| | ▪ Comparable cost, sale, rental, expense, and capitalization rate data |
| | ▪ Floodplain status |
| | ▪ Zoning information |
| | ▪ Assessor's information |
| | ▪ Interviewed professionals knowledgeable about the subject's property type and market |

**Inspection Details**

Giselle Nguyen, MAI performed an interior and exterior inspection on February 7, 2022.

| SUMMARY OF UNITS INSPECTED | | | | |
|---|---|---|---|---|
| Unit No. | Floorplan Type | Size (SF) | Status | Make-Ready Cost |
| 303 | 2BR-2BA | 837 | Vacant | Ready |
| 808 | 1BR-1BA | 683 | Vacant | Ready |
| 1108 | 2BR-2BA | 837 | Vacant | Ready |
| 1308 | 1BR-1BA | 683 | Vacant | Ready |

**Property Specific Data Requested and Received**

| PROPERTY DATA RECEIVED |
|---|
| Historical operating statements |
| Current year operating statement |
| Rent roll |
| Proforma |

**Data Requested, but not Provided**

| DATA REQUESTED, BUT NOT PROVIDED |
|---|
| None |

**Data Sources**

| DATA SOURCES | |
|---|---|
| Site Size | San Bernardino County Assessor |
| Building Size | San Bernardino County Assessor |
| Tax Data | San Bernardino County Treasurer-Tax Collector |
| Zoning Information | City of Redlands Planning Division |
| Flood Status | FEMA |
| Subject Historical Expenses | Property Contact |
| Rent Roll | Property Contact |

| VALUATION METHODOLOGY | |
|---|---|
| **Most Probable Purchaser** | To apply the most relevant valuation methods and data, the appraiser must first determine the most probable purchaser of the subject property. |
| | The most probable purchaser of the subject property "As Is" is an investor because it is leased to third-party tenants. |
| **Valuation Methods Utilized** | This appraisal employs the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that these approaches would be considered applicable and/or necessary for market participants. The subject's age makes it difficult to accurately form an opinion of depreciation and tends to make the Cost Approach unreliable. Investors do not typically rely on the Cost Approach when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach to develop an opinion of market value; this exclusion does not affect the credibility of the assignment results herein. The client also requires an insurable value of the improvements. |

| EXTRAORDINARY ASSUMPTION(S) AND HYPOTHETICAL CONDITION(S) | |
|---|---|

The values presented within this appraisal report are subject to the extraordinary assumptions and hypothetical conditions listed below. Pursuant to the requirement within Uniform Standards of Professional Appraisal Practice Standards, it is stated here that the use of any extraordinary assumptions and/or hypothetical conditions might have affected the assignment results.

| **Extraordinary Assumption(s)** | This appraisal employs no extraordinary assumptions. |
|---|---|
| **Hypothetical Condition(s)** | This appraisal employs no hypothetical conditions. |

| DEFINITIONS | |
|---|---|

Pertinent definitions, including the definition of market value, are included in the glossary, located in the Addenda to this report. The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

| **Market Value** | The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: |
|---|---|

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

[1] (Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472)

### LEVEL OF REPORTING DETAIL

Standards Rule 2-2 (Real Property Appraisal, Reporting) contained in USPAP requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report.

This report is prepared as an **Appraisal Report.** An Appraisal Report must at a minimum summarize the appraiser's analysis and the rationale for the conclusions. This format is considered most similar to what was formerly known as a Self-Contained Appraisal Report in prior versions of USPAP.

BBG

# REGIONAL ANALYSIS

## AREA OVERVIEW

The subject is located in the city of Redlands, in the Riverside-San Bernardino-Ontario, CA Metropolitan Statistical Area (Riverside MSA or Inland Empire). The Riverside MSA is located in southern California and includes Riverside and San Bernardino Counties. While the metro area covers a vast geographical area, the bulk of the land is desert, and the region's population is concentrated in the western portion of both counties, adjacent to the population centers of Los Angeles and Orange Counties.

The Inland Empire's location "inland" from the Pacific Ocean and the coastal regions of Los Angeles and Orange Counties has dictated its level growth in industry and in community. In comparison to the latter mentioned regions, the Inland Empire's relatively inexpensive land prices combined with an unprecedented supply of vacant land propelled the region into a key distribution and manufacturing center nationally and globally.

## REGIONAL MAP



## ECONOMIC & DEMOGRAPHIC PROFILE

Economic influences provide insight into the ability of a given geographic area to rent or own real property in a financially prudent manner. Implied in this is the wherewithal to properly maintain a property and to renovate it as needed to allow for continued viability in the marketplace. The following pages are extracted from Moody's Economy.com November 2021 metro area economic summary for the Riverside MSA.



# RIVERSIDE-SAN BERNARDINO-ONTARIO CA

Moody's ANALYTICS

Data Buffet® MSA code: IUSA_MRIV

## ECONOMIC DRIVERS
LOGISTICS    DEFENSE

## EMPLOYMENT GROWTH RANK
**99** 2020/2022 2nd quintile
**55** 2020/2025 1st quintile
Best=1, Worst=410

## RELATIVE COSTS
LIVING **114%**
BUSINESS **103%**
U.S.=100%

## VITALITY
RELATIVE **0.36** Rank, 90
Best=1, Worst=403

## QUALITY
OF LIFE **82**
Best=1, Worst=378

## BUSINESS CYCLE STATUS

Mid Expansion
Recovery / Late Expansion
In Recession / At Risk

## STRENGTHS & WEAKNESSES

### STRENGTHS
- Comparative advantage in transportation, distribution and warehousing.
- Lower business and housing costs than in nearby California coastal areas.
- Young population; positive net migration.

### WEAKNESSES
- Lack of vibrant central core, downtown
- Low per capita income; poorly educated workforce.
- Dearth of knowledge-based industries

## FORECAST RISKS

SHORT TERM ⬆    LONG TERM ⬆

COVID-19 EXPOSURE NOVEMBER 2021 **339** 5th quintile
Most=1 Least=403

### UPSIDE
- Exorbitant costs in southern California drive more firms and migrants into RIV.
- Sustained online shopping even after the pandemic further stokes logistics growth.

### DOWNSIDE
- Deteriorating affordability dings in migration
- Low incomes weigh on consumer services

## MOODY'S RATING

**A1** COUNTY AS OF APR 02, 2020

## ANALYSIS

**Recent Performance.** Riverside-San Bernardino-Ontario's recovery is leading both the state and the U.S. Transportation/warehousing job growth slowed in 2021 but is still powering ahead. Leisure/hospitality and healthcare round out the top three leaders in employment growth this year, but the latter has faltered slightly in the past few months. The unemployment rate is not falling as rapidly as earlier in the recovery, but this is due to labor force gains. House prices are soaring, outpacing even the heady U.S. average.

**Logistics.** Transportation/warehousing employment strength will set RIV on a higher trajectory than most California metro areas, though industry growth will moderate in the near term. Goods spending soared during the early days of the pandemic, but consumers have a fixed need for many goods, especially durable goods, so at some point consumers' needs for those goods will be met. Service spending outpaced goods spending earlier this year, before the Delta variant again dissuaded service spending, and suggests consumers' desire to switch back to service spending. However, online shopping is here to stay and RIV is well-positioned to benefit. Competitive business costs paired with proximity to large population centers, major highways, and the Ports of Los Angeles and Long Beach make the metro area an ideal logistics hub.

**Defense.** The military will prove a stalwart secondary driver. Defense spending is set to hover around decade-long highs after the 2018 buildup—good news for Southern California in general but especially RIV. The military employs an outsize share of the population, which is unusual for a large economy such as RIV. The U.S. Marine Corps Combat Center, Fort Irwin, and March Air Reserve Base draw defense dollars and provide vital support to local consumer demand. The military also ensures steady population growth, a key advantage in a state that as a whole is losing residents.

**Population.** RIV will outshine the Golden State. Unlike most of its peers, RIV's population base is expanding. This is largely due to costs. Though both living and business costs are a bit high compared with the U.S. average, by California standards the metro area is quite inexpensive. As population growth continues at a healthy clip, RIV's consumer industries will fare better than in peer metro areas, particularly those along the coast. The housing market also stands to outperform. Builders will scramble to keep up with newcomers, and permitting will advance at a robust pace. High demand will also stoke above-average house price appreciation in the next few years, but this will moderate. Long-term house price growth will fall in line behind the state average.

The metro area also boasts a slightly higher-than-average concentration of prime-working-age adults, a plus for employment gains. However, educational attainment is way below average, making investment from firms offering huge salaries for highly skilled workers unlikely. So while job growth will handily outpace the state and national averages, wage growth will be subpar in the long run.

**Riverside-San Bernardino-Ontario will complete its employment recovery next year alongside the U.S. Online shopping will render the logistics industry indispensable. An influx of migrants will ensure steady population growth and housing demand. Look for RIV to outperform the state and the nation in terms of employment growth.**

*Laura Ratz*
*November 2021*

1-866-275-3266
help@economy.com

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | INDICATORS | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 162.9 | 167.2 | 174.5 | 181.2 | 189.1 | 184.1 | Gross metro product (C12$ bil) | 196.8 | 206.9 | 214.6 | 222.2 | 229.6 | 236.4 |
| | 5.1 | 2.6 | 4.3 | 3.9 | 4.4 | -2.6 | % change | 6.8 | 5.1 | 3.8 | 3.5 | 3.3 | 2.9 |
| | 1,353.3 | 1,401.3 | 1,452.8 | 1,506.0 | 1,552.1 | 1,487.5 | Total employment (ths) | 1,530.4 | 1,600.4 | 1,639.3 | 1,666.8 | 1,686.9 | 1,700.9 |
| | 4.9 | 3.5 | 3.7 | 3.7 | 3.1 | -4.2 | % change | 2.9 | 4.6 | 2.4 | 1.7 | 1.2 | 0.8 |
| | 6.6 | 6.0 | 5.1 | 4.3 | 4.1 | 9.8 | Unemployment rate (%) | 7.2 | 4.7 | 4.0 | 4.2 | 4.6 | 4.9 |
| | 6.6 | 4.7 | 5.8 | 4.3 | 5.4 | 12.5 | Personal income growth (%) | 8.2 | 1.0 | 5.4 | 5.2 | 4.7 | 4.2 |
| | 56.3 | 58.8 | 62.0 | 66.2 | 71.0 | 70.3 | Median household income ($ ths) | 72.5 | 71.7 | 73.9 | 76.3 | 78.8 | 81.2 |
| | 4,461.2 | 4,512.0 | 4,565.9 | 4,612.5 | 4,650.6 | 4,673.6 | Population (ths) | 4,713.8 | 4,759.8 | 4,813.4 | 4,856.1 | 4,891.5 | 4,926.1 |
| | 1.0 | 1.1 | 1.2 | 1.0 | 0.8 | 0.5 | % change | 0.9 | 1.0 | 1.1 | 0.9 | 0.7 | 0.7 |
| | 13.4 | 19.5 | 24.0 | 20.9 | 12.7 | 0.7 | Net migration (ths) | 21.2 | 21.7 | 29.4 | 19.1 | 12.1 | 11.9 |
| | 7,816 | 8,837 | 10,955 | 11,591 | 11,147 | 12,897 | Single-family permits (#) | 12,915 | 20,181 | 21,940 | 20,887 | 19,726 | 18,030 |
| | 2,110 | 2,084 | 3,721 | 3,218 | 3,452 | 2,335 | Multifamily permits (#) | 2,800 | 3,072 | 3,190 | 3,023 | 2,634 | 2,126 |
| | 240.2 | 255.2 | 274.2 | 294.0 | 305.1 | 321.2 | FHFA house price (1995Q1=100) | 368.7 | 405.1 | 408.1 | 404.8 | 398.2 | 393.6 |

MOODY'S ANALYTICS / Précis® U.S. Metro / November 2021

## PRÉCIS® U.S. METRO · Riverside-San Bernardino-Ontario CA



## PRÉCIS® U.S. METRO · Riverside-San Bernardino-Ontario CA



### EMPLOYMENT AND INDUSTRY

**TOP EMPLOYERS**

| | |
|---|---|
| Stater Brothers Markets | 18,000 |
| Arrowhead Regional Medical Center | 18,000 |
| U.S. Marine Corps. Air Ground Combat Center | 16,266 |
| Fort Irwin | 13,805 |
| Walmart Inc. | 12,263 |
| U.C. Riverside | 8,735 |
| Loma Linda University | 8,582 |
| Ontario International Airport | 7,510 |
| Amazon | 7,500 |
| March Air Reserve Base | 7,000 |
| VA Loma Linda Healthcare System | 6,147 |
| Target Brands Inc | 4,800 |
| Kaiser Permanente | 4,346 |
| Pechanga Resort & Casino | 4,000 |
| Eisenhower Medical Center | 3,665 |
| San Manuel Band of Mission Indians | 3,261 |
| Morongo Casino, Resort & Spa | 3,000 |
| JW Marriott Desert Springs Resort & Spa | 2,304 |
| Desert Regional Medical Center | 2,230 |
| Agua Caliente Band of Cahuilla Indians | 2,229 |

Sources: City of Riverside, 2017 Riverside County Economic Development Agency 2017

**PUBLIC**

| | |
|---|---|
| Federal | 22,157 |
| State | 31,062 |
| Local | 195,814 |

2020

**INDUSTRIAL DIVERSITY**

Most Diverse (U.S.) 0.64

Least Diverse

**EMPLOYMENT VOLATILITY**

Due to U.S. fluctuations: 89%
Relative to U.S.: 127 / 100

Not due to U.S. / Due to U.S. / RIV / U.S.

### COMPARATIVE EMPLOYMENT AND INCOME

| Sector | % OF TOTAL EMPLOYMENT RIV | CA | U.S. | AVERAGE ANNUAL EARNINGS RIV | CA | U.S. |
|---|---|---|---|---|---|---|
| Mining | 0.1 | 0.1 | 0.4 | $103,294 | $91,376 | $149,227 |
| Construction | 7.1 | 5.3 | 5.1 | $71,035 | $85,588 | $72,704 |
| Manufacturing | 6.3 | 7.8 | 8.6 | $70,618 | $114,244 | $87,349 |
| Durable | 63.3 | 64.8 | 62.2 | nd | $131,654 | $90,269 |
| Nondurable | 36.7 | 35.2 | 37.8 | nd | $84,049 | $82,480 |
| Transportation/Utilities | 11.4 | 4.5 | 4.3 | $54,255 | $67,667 | $64,132 |
| Wholesale Trade | 4.3 | 4.0 | 4.0 | $76,594 | $94,038 | $93,314 |
| Retail Trade | 11.3 | 9.4 | 10.4 | $39,551 | $45,619 | $38,497 |
| Information | 0.6 | 3.3 | 1.9 | $68,429 | $209,720 | $138,543 |
| Financial Activities | 2.9 | 5.1 | 6.1 | $34,897 | $75,533 | $63,325 |
| Prof. and Bus. Services | 10.3 | 16.1 | 14.2 | $43,343 | $90,236 | $76,981 |
| Educ. and Health Services | 16.7 | 16.9 | 16.3 | $52,019 | $60,561 | $59,276 |
| Leisure and Hosp. Services | 9.4 | 9.2 | 9.4 | $29,059 | $40,122 | $31,583 |
| Other Services | 2.7 | 2.9 | 3.8 | $39,045 | $42,369 | $39,692 |
| Government | 16.7 | 15.4 | 15.4 | $92,137 | $103,372 | $82,503 |

Sources: Percent of total employment — BLS, Moody's Analytics, 2020, Average annual earnings — BEA, Moody's Analytics, 2019

### ENTREPRENEURSHIP

**BROAD-BASED START-UP RATE**
U.S.=100, 4-QTR MA
2019

RIV / CA

Sources: Census Bureau, Moody's Analytics

### EXPORTS

| Product | $ mil |
|---|---|
| Food and kindred products | 751.2 |
| Chemicals | 928.1 |
| Primary metal manufacturing | ND |
| Fabricated metal products | ND |
| Machinery, except electrical | ND |
| Computer and electronic products | 1,490.4 |
| Transportation equipment | 1,193.6 |
| Miscellaneous manufacturing | 1,788.3 |
| Other products | 3,586.1 |
| Total | 9,737.6 |

| Destination | $ mil |
|---|---|
| Africa | 86.8 |
| Asia | 3,987.6 |
| European Union | 1,852.2 |
| Canada & Mexico | 2,600.3 |
| South America | 407.4 |
| Rest of world | 803.3 |
| Total | 9,737.6 |

| | |
|---|---|
| % of GDP | 4.5 |
| Rank among all metro areas | 184 |

Sources: BEA, International Trade Administration, Moody's Analytics, 2019

### PRODUCTIVITY

**REAL OUTPUT PER WORKER, $**

RIV 88,040 / CA 117,116 / U.S. 96,368

RIV / CA / U.S.

Sources: BEA, Moody's Analytics, 2020

### BUSINESS COSTS

U.S.=100

Total / Unit labor / Energy / State and local taxes / Office rent

2015 / 2020

Source: Moody's Analytics

### HIGH-TECH EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| RIV | 27.4 | 1.8 |
| U.S. | 7,540.4 | 5.3 |

### HOUSING-RELATED EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| RIV | 159.1 | 10.7 |
| U.S. | 14,373.7 | 10.1 |

Source: Moody's Analytics, 2020

### LEADING INDUSTRIES BY WAGE TIER

| | NAICS | Industry | Location Quotient | Employees (ths) |
|---|---|---|---|---|
| HIGH | 6221 | General medical and surgical hospitals | 0.8 | 36.5 |
| | 6211 | Offices of physicians | 0.9 | 22.1 |
| | GVF | Federal Government | 0.8 | 20.2 |
| | 5416 | Mgmnt., scientific & technical consult srvcs | 0.7 | 9.3 |
| MID | GVL | Local Government | 1.4 | 186.4 |
| | GVS | State Government | 0.6 | 29.1 |
| | 2382 | Building equipment contractors | 1.1 | 21.5 |
| | ML | Total Military Personnel | 1.1 | 21.4 |
| LOW | 7225 | Restaurants and other eating places | 1.2 | 115.9 |
| | 5613 | Employment services | 1.7 | 59.6 |
| | 6241 | Individual and family services | 2.5 | 53.1 |
| | 4931 | Warehousing and storage | 5.0 | 42.6 |

Source: Moody's Analytics, 2020

MOODY'S ANALYTICS / Précis U.S. Metro / November 2021

## PRÉCIS® U.S. METRO · Riverside-San Bernardino-Ontario CA



PRÉCIS® U.S. METRO · Riverside-San Bernardino-Ontario CA



## CONCLUSION

The Inland Empire is one of the largest and fastest growing logistics hubs in the United States due to its proximity to the southern California ports and its relatively affordable land. Nearly a third of all U.S. imports come through the port complex, and much of that cargo's eventual destination is further Inland, making the metro's rail and highway connections extremely valuable. Housing is also affordable by southern California standards, and many residents commute west and south to job nodes Los Angeles, Orange County, and San Diego.

The metropolitan area comprises two counties, Riverside and San Bernardino, and 52 incorporated cities. Riverside County has the fastest growing by population in the state, according to data from the most recent U.S. Census. Nevertheless, there are limited opportunities for high-wage sector workers. There are no Fortune 500 companies headquartered in the metro.

The pandemic recovery has been intermittent, but unemployment fell as state restrictions eased. One of the industries most impacted by the pandemic is tourism, but tourism is a relatively small industry outside of Palm Springs, Big Bear, and Temecula. The unemployment rate spike to 14.9% during the pandemic, but has since fallen to 5.7%, in line with the state's rate, but still above pre-pandemic levels that were below 4%.

Job growth in the logistics sector has accelerated as a result of the pandemic. Consumers increases spending, and the share of ecommerce increased. Amazon is a major employer in the Inland Empire, and third-party logistics companies have been growing over the past decade. Many retailers have manufacturing and distribution facilities in the Inland Empire, as well. The industrial sector has added nearly 200 million SF since the end of the great recession to push inventory levels to 700 million SF. Development moved east during that time, but higher land prices have changed the economics, and infill developments in the more densely populated urban areas near Ontario and Riverside have moved forward.

The office sector has been limited by low asking rates that have plateaued near $24/SF/year. Retail developments have had more success due to the proliferation of new master-planned home developments such as Ontario Ranch, one of the largest home development sites in the state. The city of Ontario recently approved The Great Park, a 370-acre horizonal-shaped green space stretching 3.5 miles east to west from Haven Avenue to Campus Avenue, between Ontario Ranch Road and Eucalyptus Avenue. The park will have open space, trails, cultural and recreational uses for the residents of Ontario Ranch that will eventually be developed with 47,000 residential units, more than 15.5 million square feet of commercial and office space and 20 million square feet of industrial buildings. In the city of Riverside, officials approved plans to add more than 20,000 housing units over the next decade to comply with a statewide mandate to add housing. Cities are grappling with the mandate and could lose funding for other services and projects should they fail to meet housing guidelines. Many of the parcels would require zoning changes to accommodate new housing.

# NEIGHBORHOOD ANALYSIS

## OVERVIEW

The subject property is located within the northern portion of the city of Redlands, near the University of Redlands. Redlands is approximately 60 miles east of Los Angeles and 10 miles southeast of downtown San Bernardino. The subject's neighborhood is generally bounded by the Santa Ana River to the north, Wabash Avenue to the east, Interstate 10 to the south, and State Route 210 to the east.

Below is a local area map with the subject property identified.



## ACCESS

The city of Redlands has good regional freeway access. Interstate 10 bisects the city as it runs east/west. This freeway begins near the Pacific Ocean in Santa Monica and extends across the continental U.S., ending in Jacksonville, Florida. State Route 210 begins at Interstate 10 and runs north/south through the northwestern portion of Redlands.

Primary passenger and airfreight service are accommodated by the Ontario International Airport, located approximately 25 miles west of the city. Nearby San Bernardino features a Metrolink station that allows for further access throughout Southern California.

## DEMOGRAPHIC TRENDS

Population characteristics and income levels were obtained from Claritas, Inc. for 1-, 3- and 5-mile radii from the subject's location.

| COMPARATIVE DEMOGRAPHIC ANALYSIS FOR PRIMARY TRADE AREA | | | | |
|---|---|---|---|---|
| Description | 1 Mile Radius Totals | 3 Mile Radius Totals | 5 Mile Radius Totals | Riverside County Totals |
| **Population** | | | | |
| 2027 Projection | 17,117 | 75,947 | 178,979 | 2,606,190 |
| 2022 Estimate | 16,802 | 74,827 | 175,709 | 2,514,194 |
| 2010 Census | 15,855 | 71,275 | 165,756 | 2,189,641 |
| 2000 Census | 14,105 | 65,981 | 147,748 | 1,545,387 |
| 2022 Est. Median Age | 33.6 | 37.6 | 36.6 | 36.7 |
| 2022 Est. Average Age | 36.0 | 39.4 | 38.5 | 38.3 |
| **Households** | | | | |
| 2027 Projection | 5,184 | 27,082 | 59,355 | 803,779 |
| 2022 Estimate | 5,086 | 26,665 | 58,309 | 777,731 |
| 2010 Census | 4,789 | 25,328 | 55,170 | 686,260 |
| 2000 Census | 4,461 | 24,071 | 50,945 | 506,220 |
| **2022 Est. Average Household Size** | 3.30 | 2.71 | 2.93 | 3.19 |
| **2022 Est. Households by Household Income** | | | | |
| Income Less than $15,000 | 10.5% | 6.6% | 7.2% | 7.8% |
| Income $15,000 - $24,999 | 8.8% | 5.9% | 6.9% | 6.6% |
| Income $25,000 - $34,999 | 7.4% | 6.6% | 7.7% | 7.0% |
| Income $35,000 - $49,999 | 10.9% | 9.3% | 10.1% | 10.0% |
| Income $50,000 - $74,999 | 16.5% | 15.4% | 15.9% | 15.5% |
| Income $75,000 - $99,999 | 11.6% | 12.5% | 12.2% | 12.9% |
| Income $100,000 - $124,999 | 10.3% | 11.4% | 10.4% | 10.7% |
| Income $125,000 - $149,999 | 7.5% | 8.8% | 8.2% | 8.4% |
| Income $150,000 - $199,999 | 7.9% | 9.8% | 9.1% | 9.3% |
| Income $200,000 - $249,999 | 3.7% | 5.1% | 4.5% | 5.0% |
| Income $250,000 - $499,999 | 3.7% | 5.8% | 5.2% | 4.6% |
| Income $500,000 and more | 1.4% | 2.7% | 2.6% | 2.2% |
| **2022 Est. Average Household Income** | $94,341 | $116,806 | $110,665 | $108,407 |
| **2022 Est. Median Household Income** | $68,424 | $86,704 | $79,106 | $80,571 |
| **2022 Est. Tenure of Occupied Housing Units** | | | | |
| Owner Occupied | 58.5% | 58.0% | 58.1% | 67.7% |
| Renter Occupied | 41.6% | 42.0% | 41.9% | 13.5% |
| **2022 Est. Median All Owner-Occupied Housing Value** | $422,987 | $487,514 | $467,601 | $458,339 |
| Source: 2022 Claritas, Inc. | | | | |

The subject neighborhood has a moderate population density with 74,827 residents within a 3-mile radius. Population within a 3-mile radius has increased 6.0% since 2010, compared to 14.8% for Riverside County overall. Population growth within a 3-mile radius is projected to increase by 1.9% by 2027. The median age within the 3-mile radius is 37.6 years. Average household income within a 3-mile radius is 13.0% lower than in Riverside County overall, and the median household income is 15.1% lower. The percentage of renters in the 3-mile radius is 42.0% in comparison to 32.3% in Riverside County.

## LAND USE PATTERNS

The majority of land in the city of Redlands is improved with single-family homes. Some farmland remains active in the northern part of the city. The southern third of the city consists of rural, undeveloped land. The University of Redlands is located in the northern portion of the city, approximately one mile southeast of the subject property.

Adjacent land uses include single-family residential properties to the north, south and west; vacant land and neighborhood shopping center to the east

## CONCLUSION

The subject is well located for multifamily residential development. It has good transportation access to highways and freeways that provide quick access to community and regional employment centers. It is near shopping and good recreational facilities. This locality is desirable and in strong demand due to its locational amenities.

# SITE DESCRIPTION

## INTRODUCTION

The description of the site is based upon our physical inspection of the property, information available from the client, and public sources. The site area utilized herein is taken from San Bernardino County records.

| GENERAL SITE DESCRIPTION OVERVIEW | |
|---|---|
| Location | 106 West Pennsylvania Avenue<br>Redlands, California 92374 |
| Parcel Number | 0167-151-24 |
| Site Area | |
|   Primary Site | 478,724 square feet        (10.99 acres) |
| Configuration | Irregular |
| Topography | Level |
| Drainage | Appears adequate |
| Utilities/Municipal Services | Typical utilities and municipal services available to site. |
| Floodplain | **Zone**    **Map**    **Date**<br>Zone X (Unshaded)  06071C8708H  August 29, 2008<br>Zone X (Unshaded) is a Non-Special Flood Hazard Area (NSFHA) of minimal flood hazard, usually depicted on Flood Insurance Rate Maps (FIRM) as above the 500-year flood level. This is an area in a low to moderate risk flood zone that is not in any immediate danger from flooding caused by overflowing rivers or hard rains. In communities that participate in the National Flood Insurance Program (NFIP), flood insurance is available to all property owners and renters in this zone. |
| Soil/Subsoil Conditions | We did not receive nor review a soil report. However, we assume that the soil's load-bearing capacity is sufficient to support existing and/or proposed structure(s). We did not observe any evidence to the contrary during our physical inspection of the property. |
| Environmental Concerns | No unusual conditions observed. No studies were provided. Site is assumed to be free of any environmental concerns. |
| Land Use Restrictions | We were provided with a title report, prepared by Chicago Title Company, dated May 26, 2021. The report cites various public and private easements that are typical of its type and location, and do not adversely impact value. This appraisal report assumes that the subject property has a clear and marketable title. |
| Hazards Nuisances | None observed |
| Frontage | 464' Pennsylvania Ave, 1238' Orange St, 464' San Bernardino Ave |
| Access | Access is average via several curb cuts along Pennsylvania Ave and San Bernardino Ave |
| Visibility | Average |
| Surrounding Land Uses | Single-family residential to the north, south and west; vacant land and neighborhood shopping center to the east |

| ZONING | |
|---|---|
| **General** | |
| Property Jurisdiction | City of Redlands |
| Zoning Classification | R-2 |
| Description | Multiple Family Residential |
| Zoning Intent/Purpose | The purpose of the R-2 Multiple-Family Residential District is to provide for the development of medium-density multiple-family housing and the community services appurtenant thereto, with no mixing of incompatible uses. |
| Compliance Conclusion | The subject appears to be a legal non-conforming grandfathered use in this zoning district due to its density. |
| Reconstruction Clause | According to the city of Redlands municipal code, "nonconforming multi-family dwelling units (including the residential component of a mixed-use project) that have been involuntarily damaged or destroyed by more than fifty percent (50%) by a catastrophic event (e.g., fire or other calamity, by act of God, or by the public enemy) may be reconstructed or replaced with a new structure using the same development standards applied to the damaged or destroyed structures (e.g., setbacks, square footage, building height, and density standards) in compliance with State law." |

| ZONING REQUIREMENTS | | | |
|---|---|---|---|
| **Category** | **Required** | **Actual** | **Conforming?** |
| Current Use: | Multifamily residential | Multifamily residential | Legal Conforming |
| Maximum Density/Units: | 14.52 units per acre | 17.11 units per acre | Legal Non-conforming |
| Minimum Lot Size: | 8,000 SF | 478,724 SF | Legal Conforming |
| Minimum Lot Width: | 80 feet | 464 feet | Legal Conforming |
| Minimum Lot Depth: | 100 feet | 1,238 feet | Legal Conforming |
| Maximum Bldg. Height: | 35 feet; 2.5 stories | 2 stories | Legal Conforming |
| Minimum Front Yard: | 25 feet | Appears adequate | Legal Conforming |
| Minimum Rear Yard: | 25 feet | Appears adequate | Legal Conforming |
| Minimum Side Yard: | 10 feet | Appears adequate | Legal Conforming |
| Maximum Site Coverage: | 0.45 | 0.176836758 | Legal Conforming |
| Minimum Parking: | 356 spaces total, or 1.89 spaces per dwelling unit, based on the following requirements: 1BR: 1.5 spaces per unit<br><br>2 BR: 2.0 spaces per unit | 2.46 spaces per dwelling unit. | Legal Conforming |

## CONCLUSION

The subject property is functional for its current use. The site is amenable for Multi-Family development and is provided ample access and utilities. As discussed in the Zoning section, the subject is a legal, nonconforming use, but may be rebuilt if destroyed. The current use of the property is consistent with the surrounding development. No adverse conditions are known to exist with regard to floodplain or environmental issues.

BBG

SITE DESCRIPTION 25

## PARCEL MAP



BBG

SITE DESCRIPTION 26

## ZONING MAP



## FLOOD MAP



# IMPROVEMENTS DESCRIPTION

| GENERAL IMPROVEMENT DESCRIPTION OVERVIEW | |
|---|---|
| Address | 106 West Pennsylvania Avenue<br>Redlands, California 92374 |
| Property Description | Garden Apartment Complex |
| Year Built | 1989 |
| Number of Buildings | 22 |
| Number of Stories | 2 |
| Total Number of Units | 188 |
| Building Construction Class | Class D |
| Net Rentable Area | 152,996 square feet |
| Gross Building Area | 169,312 square feet |
| Density | 17.11 units per acre |
| Ingress/Egress | Access is average via several curb cuts along Pennsylvania Ave and San Bernardino Ave |
| Ceiling Heights | 8' to 10' |
| Utility Metering | Units individually metered for electricity and gas. |
| Parking Ratio | 2.46 spaces per dwelling unit. |
| Elevator(s) | 0 |
| ADA Compliance | The property was constructed prior to implementation of Federal ADA regulations; we assume the property is not fully ADA compliant. |
| Amenities (Unit) | Vinyl Flooring, Carpet, Standard Appliances, Dishwasher, In-Unit Washer/Dryer, Central Air Conditioning, Ceiling Fans, Walk-In Closets, Patio/Balcony |
| Amenities (Project) | Pool, Spa, Fitness Center, Laundry Facilities, Playground, Security Gate, Carport Parking |

| UNIT SUMMARY | | | |
|---|---|---|---|
| Type | No. | Size (SF) | NRA (SF) |
| 1BR-1BA | 40 | 683 | 27,320 |
| 2BR-2BA | 108 | 837 | 90,396 |
| 2BR-2BA | 40 | 882 | 35,280 |
| Total/Avg | 188 | 814 | 152,996 |

| CONSTRUCTION DETAIL | |
|---|---|
| General Layout | The subject is a Class B, garden apartment complex. |
| Foundation | Poured concrete slab |
| Construction | Wood frame |
| Floor Structure | Reinforced concrete |
| Exterior Walls | Stucco |
| Roof Type | Gabled |
| Roof Cover | Shingle |
| Balcony/Patios: | Ground floor units have patios with a privacy fence. Above ground units have balconies with a metal rail. |

BBG

## INTERIOR DETAIL

| | |
|---|---|
| **Walls** | Drywall |
| **Ceilings** | Drywall |
| **Floor Coverings** | Vinyl and carpet |
| **Doors** | Hollow-core wood with wood frames |
| **Lighting** | Fluorescent and Incandescent |
| **Ceiling Heights** | 8' to 10' |
| **Kitchen Finish** | Standard black or white appliances (gas range with hood, dishwasher) |
| **Bathroom Finish** | Single-sink in laminated vanity, porcelain commode, tub/shower combination |

## MECHANICAL DETAIL

| | |
|---|---|
| **Heating** | Central HVAC |
| **Cooling** | Central HVAC |
| **Plumbing** | Assumed to code and adequate. |
| **Electrical** | Assumed to code and adequate. |
| **Fire Protection** | No sprinklers |

## SITE IMPROVEMENTS

| | |
|---|---|
| **Parking Type** | Surface, carports, detached garage |
| **Surface Parking Spaces** | 100 |
| **Carports/Other** | 343 |
| **Garages** | 20 |
| **Total Parking Spaces:** | 463 |
| **Landscaping** | A variety of trees, shrubbery and grass |
| **Signage** | Ground-mounted signage at entry |
| **Fencing** | Iron gate around perimeter |

## RENOVATION/DEFERRED MAINTENANCE

| | |
|---|---|
| **Recent Renovations or Replacements** | None |
| **Deferred Maintenance** | None |
| **Cost to Cure** | $0 |

| SUMMARY | |
|---|---|
| Building Condition | Average; The subject property has been adequately maintained and competes well relative to other properties in the neighborhood. |
| Building Quality | Average; The subject property is of overall average quality and offers similar amenities as other properties in the neighborhood. |
| Design and Functionality | Average |
| Actual Age | 33 years |
| Expected Economic Life | 50 years |
| Effective Age | 20 years |
| Remaining Economic Life | 30 years |

## CALIFORNIA TENANT PROTECTION ACT OF 2019 (CA ASSEMBLY BILL-1482)

In October 2019, the State of California passed Assembly Bill 1482 which restricts landlords from raising rents more than 5% in one year, plus the local cost of inflation; or 10%, whichever is lower. In most cities, this formula equates to an approximate 7% annual increase. The bill further requires landlords to have "just cause," such as failure to pay rent, when terminating a lease. Under the bill, this ordinance extends to units built prior to the 15 years from the issuance of the certificate of occupancy, statewide. In municipalities with pre-existing rent control regulations, the more restrictive law will stand. Most condominiums and single-family homes are exempt. Condominiums, operating as rental property, which are 100% owned by the same entity and has an ownership structure that is not a REIT, corporation, or a corporation of an LLC in which at least one member is a corporation are also exempt.

Notably, landlords are allowed increases in excess of the caps if they substantially renovate a property and pay relocation fees that are equal to one month of the current rental rate. More specifically, "substantially remodel" means "the replacement or substantial modification of any structural, electrical, plumbing, or mechanical system that requires a permit from a government agency or the abatement of hazardous materials, including lead-based paint, mold, or asbestos, in accordance with applicable federal, state, and local laws, that cannot be reasonably accomplished in a safe manner with the tenant in place and that requires the tenant to vacate the residential real property for at least 30 days. Cosmetic improvements alone, including painting, decorating, and minor repairs, or other work that can be performed safely without having the residential real property vacated, do not qualify as substantial rehabilitation.

The measure expires in 2030, at which time it will be subject to reapproval by lawmakers. It is also important to note that Assembly Bill 1482 will be retroactively reinforced for any rent increases in excess of the cap that have been implemented since March 15, 2019.

- The property is subject to AB 1482 and rent increases on existing tenants will be restricted going forward.

# PROPERTY TAXES AND ASSESSMENT

## PROPERTY ASSESSMENT

Real estate taxes for the subject property are assessed and collected by the County of San Bernardino. In 1978, California voters approved the Jarvis-Gann Amendment, popularly known as "Proposition 13." Proposition 13 abolished the practice of periodic reassessment of properties, based on market value appraisals, and limited increases on assessed values to 2% per year. The only circumstances under which properties are reassessed to current market value are upon a market sale, or completion of new construction or substantial renovation of a property. Ad valorem tax rates are limited to a general rate of 1%, plus the rates needed to service any bonded indebtedness. Voter-approved direct assessments can also be added and are often related to the installation of infrastructure.

This appraisal assumes a market sale of the subject property, rendering the current total ad valorem tax amount irrelevant to our analysis. In projecting real estate tax expenses for the subject property, we apply the ad valorem tax rate to our stabilized market value conclusion, and add direct assessments as reported on the most recent tax bill; however, for reporting purposes, as well as a test of reasonableness for the current assessed values, we summarize the subject's most recent tax bill below:

| REAL ESTATE ASSESSMENT AND TAXES | |
|---|---|
| **Assessed Values** | |
| **Tax ID/APN** | 0167-151-24 |
| **Land** | $4,702,678 |
| **Improvements** | $25,646,003 |
| **Total** | $30,348,681 |

| Real Estate Taxes - 2021-2022 | |
|---|---|
| **Tax ID/APN** | 0167-151-24 |
| **Ad Valorem Taxes @ 1.000000%** | $303,487 |
| **Direct Assessments** | $81,344 |
| **Total Real Estates Taxes** | $384,831 |

## CONCLUSION

Taxes for the following 12 months are as shown in the following table.

| TAX PROJECTION | |
|---|---|
| Direct Cap Conclusion | $58,200,000 |
| Tax Rate | 1.000000% |
| **Property Taxes** | $582,000 |
| Special Assessments | $81,344 |
| **Total Property Taxes** | $663,344 |
| per Unit | $3,528 |

BBG

# MARKET ANALYSIS

## INLAND EMPIRE MULTIFAMILY MARKET

Costar is the source for the following data. The data reflects conditions of Q4 2021, the most recent data available. The initial discussion provides information on the overall Inland Empire multifamily market, followed by the subject's submarket. The subject is located within the San Bernardino submarket, which will be discussed later in this report.

Costar rates multi-family properties using a star rating, in which 1 and 2-star properties generally equate to the more traditional Class C rating; 3-star properties generally equate to Class B; and 4 and 5-star properties generally equate to Class A.

- Class A – They are characterized by high quality construction and finishes, high occupancy levels, sophisticated amenities, and top rental rates. A+ properties would suggest "trophy" properties with the characteristics noted above.

- Class B – These apartment properties are regarded as modern (although not necessarily new) buildings, or old (i.e., Class C) structures recently renovated to modern standards. Good locations, reasonably high occupancy levels, and competitive rental rates characterize these buildings.

- Class C – The lowest quality apartments available in the market are found in Class C buildings. These buildings are generally old, but in fair condition. Rental rates are the lowest within the market and amenities are minimal.

The subject property is categorized as a Class B property per the definitions presented above.

## INLAND EMPIRE MULTIFAMILY MARKET STATISTICS

| PERIOD | EXISTING INVENTORY (UNITS) | VACANCY % | NET ABSORPTION (UNITS) | NET COMPLETIONS (UNITS) | UNDER CONST. (UNITS) | QUOTED RATES ($/UNIT/MONTH) |
|---|---|---|---|---|---|---|
| Q4 2021 | 167,138 | 2.30% | -303 | 125 | 4,100 | $1,863 |
| Q3 2021 | 167,013 | 2.04% | 405 | 487 | 3,727 | $1,835 |
| Q2 2021 | 166,526 | 2.00% | 678 | 361 | 2,261 | $1,764 |
| Q1 2021 | 166,165 | 2.19% | 653 | 0 | 2,622 | $1,684 |
| 2021 | 167,138 | 2.30% | 1,433 | 973 | 4,100 | $1,863 |
| 2020 | 166,165 | 2.59% | 6,076 | 1,553 | 1,655 | $1,614 |
| 2019 | 164,612 | 5.36% | 1,232 | 2,099 | 2,690 | $1,497 |
| 2018 | 162,513 | 4.89% | 1,405 | 2,236 | 3,580 | $1,435 |
| 2017 | 160,277 | 4.44% | 922 | 1,082 | 2,828 | $1,374 |
| 2016 | 159,195 | 4.37% | 1,293 | 983 | 1,688 | $1,309 |
| 2015 | 158,212 | 4.59% | 2,408 | 1,368 | 1,568 | $1,238 |
| 2014 | 156,844 | 5.30% | 3,277 | 2,924 | 1,966 | $1,165 |
| 2013 | 153,920 | 5.63% | 1,224 | 50 | 3,244 | $1,123 |

The Inland Empire multifamily market ended Q4 2021 with a vacancy rate of 2.30%. The vacancy rate increased over the previous quarter, with net absorption totaling -303 units in Q4 2021. Rental rates increased compared to the previous quarter, ending Q4 2021 at $1,863. A total of 125 units was delivered to the market, with 4,100 units still under construction at the end of the quarter.

BBG

## ABSORPTION



Net absorption for the overall Inland Empire multifamily market was -303 units in Q4 2021. Net absorption in the market over the prior 12 months totaled 1,433 units.

## VACANCY



The Inland Empire has long had strong population growth as renters move from more expensive, urban areas. Those trends were accelerated during the pandemic, as people escaped city centers throughout the West Coast.

Vacancies are historically low in the market, and pre-pandemic vacancies held steady alongside supply growth. Most larger parcels are utilized for industrial space, but new housing developments are being added in concert with single-family home developments as more people choose to rent instead of own. The statewide housing shortage and lack of affordability in coastal markets also support renter demand.

Vacancy for the overall Inland Empire multifamily market increased from 2.04% in Q3 2021 to 2.30% in Q4 2021.

## RENTAL RATES



The Inland Empire is considered an affordable market relative to its coastal neighbors Los Angeles, Orange County, and San Diego. Yet rent gains have been growing at historic levels during the pandemic. Over the past 12 months, rents have increased by 14.0%, compared with the 10-year average of 5.6% per year. Concessions remain rare in the Inland Empire due to elevated demand.

The average asking rental rate for available apartments, all classes, was $1,863 per unit per month as of Q4 2021 in the Inland Empire market area. This represented a 1.5% increase in quoted rental rates from Q3 2021, when rents were reported at $1,835 per unit.

## INVENTORY & CONSTRUCTION

The construction pipeline is active in the Inland Empire, driven by the state's highest population growth and plentiful opportunities for large-scale development. Nevertheless, master-planned communities of single-family homes far outpace multifamily construction in the Inland Empire.

As of Q4 2021, there were 4,100 units of apartment units under construction.

| SUBTYPE | EXISTING INVENTORY (UNITS) | NET DELIVERIES (12 MONTHS) | UNDER CONSTRUCTION (UNITS) |
|---|---|---|---|
| Class A (4 & 5 Star) | 34,872 | 773 | 4,019 |
| Class B (3 Star) | 71,730 | 182 | 53 |
| Class C (1 & 2 Star) | 60,536 | 18 | 28 |
| **Total** | **167,138** | **973** | **4,100** |

## SAN BERNARDINO MULTIFAMILY MARKET

The subject is located in the San Bernardino submarket, as defined by Costar. Demand for apartments in the San Bernardino Submarket is mainly derived from low and medium-income households. Rents are relatively affordable compared to the metro average, even after several years of robust gains.

Most of the apartment supply in the San Bernardino Submarket consists of workforce housing that was built in the 1970s and 1980s and spread across cities like San Bernardino, Fontana, Rialto, and Grand Terrace. New construction can be found in Redlands, where rents are 20% above the submarket average.

## SAN BERNARDINO MULTIFAMILY MARKET STATISTICS

| PERIOD | EXISTING INVENTORY (UNITS) | VACANCY % | NET ABSORPTION (UNITS) | NET COMPLETIONS (UNITS) | UNDER CONST. (UNITS) | QUOTED RATES ($/UNIT/MONTH) |
|---|---|---|---|---|---|---|
| Q4 2021 | 40,351 | 1.97% | -56 | 0 | 394 | $1,567 |
| Q3 2021 | 40,351 | 1.84% | 115 | 184 | 66 | $1,545 |
| Q2 2021 | 40,167 | 1.67% | 253 | 143 | 222 | $1,496 |
| Q1 2021 | 40,024 | 1.95% | 105 | 0 | 365 | $1,451 |
| 2021 | 40,351 | 1.97% | 417 | 327 | 394 | $1,567 |
| 2020 | 40,024 | 2.21% | 1,287 | 0 | 365 | $1,413 |
| 2019 | 40,024 | 5.43% | 75 | 662 | 191 | $1,317 |
| 2018 | 39,362 | 4.03% | -79 | 15 | 853 | $1,240 |
| 2017 | 39,347 | 3.79% | 56 | 98 | 22 | $1,182 |
| 2016 | 39,249 | 3.69% | 83 | -1 | 104 | $1,112 |
| 2015 | 39,250 | 3.91% | 580 | 306 | 109 | $1,044 |
| 2014 | 38,944 | 4.64% | 216 | 0 | 312 | $965 |
| 2013 | 38,944 | 5.19% | 324 | -60 | 0 | $932 |

The San Bernardino multifamily market ended Q4 2021 with a vacancy rate of 1.97%. The vacancy rate increased over the previous quarter, with net absorption totaling -56 units in Q4 2021. Rental rates increased compared to the previous quarter, ending Q4 2021 at $1,567. A total of 0 units was delivered to the market, with 394 units still under construction at the end of the quarter.

## ABSORPTION



Net absorption for the overall San Bernardino multifamily market was -56 units in Q4 2021. Net absorption in the market over the prior 12 months totaled 417 units.

## VACANCY



The submarket usually contains a lower vacancy rate than the metro average, and strong demand has led to a record low vacancy rates. Vacancies briefly spiked in 2020 after several apartments delivered, including The Crossings at Redlands and The Summit in Redlands.

Vacancy for the overall San Bernardino multifamily market increased from 1.84% in Q3 2021 to 1.97% in Q4 2021.

## RENTAL RATES



**Market Rent Growth (YOY)**

Apartment rents grew by 10.2% in the San Bernardino Submarket over the past 12 months, but annual rent growth is below the Inland Empire average of 14.0%. The submarket has averaged annual rent growth of 5.6% over the past 10 years.

Although the rent growth is at a historical high, the submarket trails nearly all other Inland Empire submarkets. That's because the submarket lacks the Class A properties that have the highest growth rates since the onset of the pandemic.

Affordability is a key issue for residents, who can turn to single-family residences should rents accelerate quickly, especially in a low interest rate environment. The average asking rental rate for available apartments, all classes, was $1,567 per unit per month as of Q4 2021 in the San Bernardino market area. This represented a 1.4% increase in quoted rental rates from Q3 2021, when rents were reported at $1,545 per unit.

## INVENTORY & CONSTRUCTION

Supply levels have been steady over the past 20 years, with apartment developers occasionally adding large-scale projects. Most new apartments completed over the past three years are located in Redlands — where incomes justify higher rents. The area's unique downtown community and proximity to the area's largest private university are attractive features for renters.

There were 394 units of multifamily space under construction at the end of Q4 2021. Over the past decade, 250 units have been under construction on average.

| SUBTYPE | EXISTING INVENTORY (UNITS) | NET DELIVERIES (12 MONTHS) | UNDER CONSTRUCTION (UNITS) |
|---|---|---|---|
| Class A (4 & 5 Star) | 3,071 | 320 | 366 |
| Class B (3 Star) | 18,517 | 7 | 0 |
| Class C (1 & 2 Star) | 18,763 | 0 | 28 |
| **Total** | **40,351** | **327** | **394** |

## MARKET AND SUBMARKET OUTLOOK

Despite outsized rent gains over the past year, the Inland Empire is a relatively affordable market by southern California standards, and demand is supported by an influx of residents from coastal Southern California metros moving for affordable housing costs.

The pandemic led to accelerated demand as renters sought apartments that are generally bigger with plentiful amenities in garden-style developments, all qualities of the newer developments dotting the landscape across Riverside and San Bernardino counties. The vacancy rate has fallen to 2.4%, and every submarket has vacancy below 3% except the Outlying Riverside County Submarket.

The highest rent gains are in submarkets with recent construction, such as Southwest Riverside County/Temecula and Greater Ontario/Rancho Cucamonga. Overall metro rents jumped 14.0% year over year, and double-digit gains are projected through the middle of the year.

# HIGHEST AND BEST USE

## INTRODUCTION

The highest and best use is the reasonable, probable, and legal use of vacant land or an improved property that is physically possible, legally permissible, appropriately supported, financially feasible and that results in the highest value. These criteria are often considered sequentially. The tests of legal permissibility and physical possibility must be applied before the remaining tests of financial feasibility and maximal productivity. A financially feasible use is precluded if it is legally prohibited or physically impossible. If a reasonable possibility exists that one of the prior, unacceptable conditions can be changed, is it appropriate to proceed with the analysis with such an assumption.

## HIGHEST AND BEST USE CRITERIA

The site's highest and best use is analyzed both as vacant and as improved, and if improvements are proposed then an as proposed analysis is required. In all cases, the property's highest and best use must meet four criteria: (1) legally permissible; (2) physically possible; (3) financially feasible; and (4) maximally productive.

## HIGHEST AND BEST USE AS VACANT

### LEGALLY PERMISSIBLE

Legal restrictions include deed restrictions, CC&R's, lease encumbrances, zoning requirements, building codes, historic district controls and environmental regulations, and were previously analyzed to determine legally permitted uses. Legally, the subject is zoned R-2. Permitted uses include multifamily residential. No other legal restrictions have been identified that would limit development of the property beyond the development standards stipulated by municipal code.

### PHYSICALLY POSSIBLE

Size, shape, topography, soil condition, availability of utilities, transportation access, surrounding uses, and locational characteristics were previously analyzed to determine which legal land uses are physically possible and which are best to conform to the physical and locational aspects of the site and its setting with respect to the neighborhood and community. Overall, the physical site attributes result in adequate utility, and the property could be developed with a variety of legally-conforming uses. Given the surrounding uses and location, the site is best suited for multifamily property use.

### FINANCIALLY FEASIBLE

Financial feasibility is determined by the relationship of supply and demand for the legally probable land uses versus the cost to create them. The market analysis section reveals that multifamily uses in the subject's market are generally stabilized. Recent and planned multifamily developments in the market area serve as direct evidence that new multifamily development is financially feasible. Comparisons of rental rates, operating expenses and construction costs indicate the property is capable of providing an adequate return on investment to warrant new multifamily development in the current market. This assertion is supported by the fact that the property has the potential to generate rental income as shown in the income approach. Therefore, multifamily use is considered financially feasible.

### MAXIMALLY PRODUCTIVE

The final test of highest and best use of the site as vacant is that the use be maximally productive, yielding the highest return to the land. In order to determine the maximally productive use, a comparison of rental rates, occupancy, operating expenses, and rates of return for the financially feasible uses have been made. Based on this analysis,

multifamily use renders the highest residual land value; therefore, multifamily development on the subject's site is the maximally productive use of the subject as vacant.

## HIGHEST AND BEST USE AS IMPROVED

### PHYSICALLY POSSIBLE

The subject is currently improved with a 188-unit multifamily property on a 10.99-acre site that conforms to its surrounding uses. Continued used of the improvements for multifamily use is physically possible.

### LEGALLY PERMISSIBLE

The subject appears to be a legal non-conforming use in this zoning district due to its density. According to the city of Redlands municipal code, "nonconforming multifamily dwelling units (including the residential component of a mixed-use project) that have been involuntarily damaged or destroyed by more than fifty percent (50%) by a catastrophic event (e.g., fire or other calamity, by act of God, or by the public enemy) may be reconstructed or replaced with a new structure using the same development standards applied to the damaged or destroyed structures (e.g., setbacks, square footage, building height, and density standards) in compliance with State law."

### FINANCIALLY FEASIBLE

Financial feasibility as an income-producing investment is based on the amount of rental income it can generate net of the required operating expenses. If the resulting net operating income motivates continued operation, then the land is being put to a productive and financially feasible use. The subject is capable of producing positive net cash flow to an investor. The existing improvements provide contributory value to the site, and there is no alternate use that would result in a greater value. Therefore, utilization of the existing improvements is financially feasible.

### MAXIMUM PRODUCTIVITY

The maximally productive use should conform to neighborhood trends and be consistent with existing nearby land uses. The single use that produces the greatest return on investment and usually the highest price and value is typically the highest and best use. As shown in the applicable valuation sections, properties like the subject have been acquired and continue to be used for multifamily use. None of the comparable properties were acquired for conversion to an alternative use. This provides evidence suggesting that the current multifamily use is maximally productive.

## MOST PROBABLE PURCHASER

The most probable purchaser of the subject property "As Is" is an investor because it is leased to third-party tenants.

# VALUATION PROCESS

## OVERVIEW

The three traditional approaches to valuing improved properties are:

- Sales Comparison Approach - a comparison of the property appraised with reasonable similar, recently conveyed properties for which the price, terms and conditions of sale are known;

- Income Capitalization Approach - the processing of a projected net income into a value opinion via one or more capitalization techniques; and

- Cost Approach - an estimate of the replacement cost of all structural improvements as if new, less loss in value attributable to depreciation from all causes plus the value of the land as if vacant.

The Sales Comparison Approach is founded upon the principle of substitution that holds that the cost to acquire an equally desirable substitute property without undue delay ordinarily sets the upper limit of value. At any given time, prices paid for comparable properties are construed by many to reflect the value of the property appraised. The validity of a value indication derived by this approach is heavily dependent upon the availability of data on recent sales of properties similar in location, size, and utility to the appraised property.

The Income Capitalization Approach is based on the principle of anticipation that recognizes the present value of the future income benefits to be derived from ownership in a particular property. The Income Capitalization Approach is most applicable to properties that are bought and sold for investment purposes, and is considered very reliable when adequate income and expense data are available. Since income producing real estate is most often purchased by investors, this approach is valid and is generally considered the most applicable when the property being appraised was designed for, or is easily capable of producing a rental income.

The Cost Approach is based on the premise that the value of a property can be indicated by the current cost to construct a reproduction or replacement for the improvements minus the amount of depreciation evident in the structures from all causes plus the value of the land and entrepreneurial profit. This approach to value is particularly useful for appraising new or nearly new improvements.

## SUMMARY

This appraisal employs the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that these approaches would be considered applicable and/or necessary for market participants. The subject's age makes it difficult to accurately form an opinion of depreciation and tends to make the Cost Approach unreliable. Investors do not typically rely on the Cost Approach when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach to develop an opinion of market value; this exclusion does not affect the credibility of the assignment results herein. The client also requires an insurable value of the improvements.

The valuation process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value, or is a correlation of all the approaches used in the appraisal.

BBG

# SALES COMPARISON APPROACH

## METHODOLOGY

In the Sales Comparison Approach, we developed an opinion of value by comparing the subject property with similar, recently sold properties in the surrounding or competing area. Inherent in this approach is the principle of substitution, which states that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arm's-length transactions between willing and knowledgeable buyers and sellers, we can identify value and price trends. The basic steps of this approach are:

- Research recent, relevant property sales and current offerings throughout the competitive area;

- Select and analyze properties that are similar to the property appraised, analyzing changes in economic conditions that may have occurred between the sale date and the date of value, and other physical, functional, or locational factors;

- Identify sales that include favorable financing and calculate the cash equivalent price;

- Reduce the sale prices to a common unit of comparison such as price per dwelling unit or per square foot;

- Make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

- Interpret the adjusted sales data and draw a logical value conclusion.

The most widely used and market-oriented unit of comparison for properties such as the subject is the sales price per $ per Unit. All comparable sales were analyzed on this basis.

On the following pages, we present a summary of the improved properties that we compared to the subject property, a map showing their locations, and the adjustment process. Due to the nature of the subject property and the level of detail available for the comparable data, we have elected to analyze the comparables through application of a traditional adjustment grid utilizing percentage adjustments.

## COMPARABLE IMPROVED SALES MAP



| | SUMMARY OF IMPROVED SALES | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| No. | Property / Location | Date of Sale | Transaction Status | Year Built/ Renovated | No. Units | Avg Unit Size (SF) | Occup. | Sales Price $/SF $/Unit | NOI /Unit | Overall Rate |
| 1 | Berkdale Apartments 1234 West Blaine Street Riverside, CA | Dec-21 | Closed | 1986 / 2021 | 291 | 573 | 98% | $71,000,000 $414.40 $243,986 | $10,999 | 4.00% |
| 2 | ReNew on 14th 4555 Pine Street Riverside, CA | Nov-21 | Closed | 1986 | 100 | 874 | 99% | $31,411,000 $359.06 $314,110 | $13,933 | 4.44% |
| 3 | Sorelle Apartments 12159 Calle Sombra Moreno Valley, CA | Oct-21 | Closed | 1986 | 330 | 858 | 99% | $85,000,000 $300.01 $257,576 | $12,405 | 4.82% |
| 4 | ReNew Redlands 1250 North University Street Redlands, CA | Oct-21 | Closed | 1982 | 124 | 1,025 | 100% | $46,200,000 $363.49 $372,581 | $13,413 | 3.60% |
| 5 | The Vue Apartment Homes 1660 Kendall Drive San Bernardino, CA | Oct-21 | Closed | 1989 / 2016 | 197 | 836 | 100% | $53,600,000 $325.18 $272,081 | $10,859 | 3.99% |
| 6 | The District at Grand Terrace 1315 & 1316 South Meadow Lane Colton, CA | Apr-21 | Closed | 1979 | 352 | 872 | 95% | $88,000,000 $286.63 $250,000 | $10,494 | 4.20% |
| Subj. | Tesoro Apartments 106 West Pennsylvania Avenue Redlands, California | --- | --- | 1989 | 188 | 814 | 96% | --- | $12,395 | 4.00% |

| COMMENTS |
|---|

Sale Comp 1 - The seller had lightly renovated 214 units and contract rents were near market assuming no additional units are renovated. The buyer intends to renovate all of the units to a higher standard. Assuming all of the units are renovated to a higher scope, contract rents were approximately 14% below market. The capitalization rate shown is derived using actual, in-place income and expenses.

Sale Comp 2 - The seller had renovated 60 units (60%) prior to the date of sale. The capitalization rate shown is derived using actual, in-place income and expenses. Assuming all units are renovated, contract rents were approximately 20% below market

Sale Comp 3 - This off-market transaction was completed on behalf of the seller by Tyler Sinks, Ed Rosen, and John Chu, a brokerage team with Berkadia. This is a value-add deal and the buyer intends to spend $5M on renovations. The broker would not disclose the in-place capitalization rate. The capitalization rate shown is derived using asking rents reported by CoStar and pro forma expenses.

Sale Comp 4 - SB Real Estate Partners "SBREP" has acquired ReNew Redlands. The property has been renamed Portola Redlands, and SBREP intends to execute a $2.5 million capital improvement program. Blake Rogers and Hunter Combs of Walker & Dunlop represented the seller. Capitalization rate reported at 3.60%

Sale Comp 5 - Dean Zander and Eric Thompson of CBRE were the listing brokers for this transaction. Per the brokers, the buyer made a non-contingent offer prior to the property hitting the market.

The seller had lightly renovated 183 of the units prior to sale. The buyer intends to renovate all units to a higher quality than what the seller had done; thus, this is considered a value-add deal for the buyer. Actual, in-place income and expenses were used to calculate the capitalization rate.

Sale Comp 6 - This is the sale of two apartment complexes totaling 352 units, located across the street from one another along Meadow Lane in Colton. The properties are managed and operated together. This was an off-market transaction. District I includes 144 units and District II includes 208 units. The property has been recently upgraded/renovated. 129 unit interiors have been renovated with new vinyl sheeting flooring, two-tone paint, re-glazed countertops, new kitchen cabinet faces, and updated hardware and fixtures. In addition, 38 of these renovated interiors include stainless-steel kitchen appliances. The remaining renovated units feature black kitchen appliances. The remaining 223 units are in original condition with dated appliances and fixtures. 208 units feature in-unit laundry appliances

## ADJUSTMENT PROCESS

The sales that we have utilized represent the best available information that could be compared to the subject property. The major elements of comparison for an analysis of this type include the property rights conveyed, the financial terms incorporated into a particular transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its physical traits and the economic characteristics of the property.

## PROPERTY RIGHTS CONVEYED

This adjustment accounts for any impact that the property rights transferred to the buyer may have on sale price. For leased fee properties, the length of leases in place and the relationship of market to contract rent could impact value. Some properties may have stronger appeal to an owner-user or an investor, resulting in a premium or discount associated with fee simple property rights. If a buyer acquires the leasehold interest in a comparable, then an adjustment may be necessary that accounts for the impact to the of ground rent and/or risk associated with the expiration of the ground lease to the sale price.

Our valuation is based upon the leased fee interest. The comparables were all leased at time of sale, and each transaction represents the leased fee interest in the associated property. No adjustments are necessary.

## FINANCING

This category accounts for other factors that may have influenced the sale price, primarily pertaining to seller motivation, such as seller distress (short sale, REO, auction) or buyer motivation, such as assemblage. In the case of active listings, this adjustment can also capture the disparity between asking prices and the achievable sale price expected by the appraiser or a party to the sale.

To the best of our knowledge, with the exception of Sale 1, the sales utilized in this analysis were accomplished with cash or market-oriented financing, and/or the cash equivalent sale price has been reported. Sale 1 was encumbered by an assumable mortgage held by Freddie Mac. The listing broker stated a defeasance of approximately $4.5 million would be incurred should the property be purchased free and clear of existing debt; however, based on the actions of potential purchasers, it appears that the value deduction due to the defeasance is approximately double the cost quoted by the broker, or $9 million.

## TERMS/CONDITIONS OF SALE

Adjustments for conditions of sale typically reflect various motivations of the buyer and/or seller. In many situations, the conditions of sale may significantly affect transaction prices. Properties that are listed for sale may require adjustments herein.

All of the comparables reflect arm's-length transactions of adequately exposed properties involving knowledgeable buyers and sellers. No adjustments are applied.

## EXPENDITURES AFTER SALE

In order to arrive at the effective sale price, the actual sale price of each comparable is adjusted to account for any expenditures planned by the buyer immediately after sale, such as capital expenditures, cost to cure deferred maintenance, or lease-up costs.

None of the comparables were impacted by planned expenditures immediately after sale, and no adjustments are applied.

## MARKET CONDITIONS

This adjustment category accounts for differences in economic conditions between the effective date of appraisal and the transaction date of the comparable, such as may be caused by changing supply and demand factors, rental rates, vacancy rates and/or capitalization rates.

The sales included in this analysis transacted between Apr-21 and Dec-21. Market conditions have improved significantly over this period. Vacancies are historically low in the Inland Empire market, and pre-pandemic vacancies held steady alongside supply growth. According to Costar, apartment rents grew by 10.2% in the San Bernardino submarket over the past 12 months; the submarket has averaged annual rent growth of 5.6% over the past 10 years. As such, we apply a 5% upward annual adjustment to the comparable data set in order to account for improving market conditions over the period during which the comparable sales occurred.

## LOCATION

The appeal of a property's location to users of and/or investors in a particular property type can influence value significantly. This factor broadly considers the impact of demographics, geographical attributes, access to transportation networks and/or employment centers and local land use trends on pricing. Comparisons of location can often be derived, or even quantified, by examining rent, vacancy, capitalization rate, and land value trends in the subject and directly competitive areas.

The subject is located in the city of Redlands. Sales 3, 5 and 6 are located in submarkets with lower average rents compared to Redlands; thus, upward adjustments are warranted.

## PROJECT SIZE - UNITS

Normally, all other characteristics being equal, the per square foot value of a property is affected by its size. Building size and price per square foot typically have an inverse relationship. Larger buildings tend to achieve lower pricing on a per-unit basis due to their economies of scale, and smaller pool of prospective buyers.

The subject is a 188 -unit project. All of the comparables are similar in size to the subject and do not require adjustment.

## AVERAGE UNIT SIZE (SF)

The average unit size of a property may affect the sales price.  Typically, the smaller the average unit size, the higher the price per square foot and the lower the price per unit.

The subject's unit sizes average of 814  square feet. An upward adjustment is applied to Sale 1 for its significantly smaller average unit size. Conversely, a downward adjustment is required for Sale 4 for its considerably larger average unit size.

## YEAR BUILT

The absolute physical/chronological age differences between properties can impact achievable pricing.  This category may reflect such differences, irrespective of other related differences in property condition and/or effective age, which considers maintenance and renovations that have occurred since the property's original construction date.

All of the comparables were considered similar to the subject and do not require adjustment.

## CONDITION

Older properties that have been well maintained could be considered to be in better condition than newer properties that have not been well maintained or that have incurred deferred maintenance.

The subject's overall condition is rated Average. All of the comparables were rated superior to the subject and require downward adjustments accordingly.

## PROJECT AMENITIES

This adjustment category recognizes differences in project amenities amongst properties. Such project amenities may include clubhouses, swimming pools, jacuzzis, spas, fitness centers, tennis courts, security gates, laundry facilities, elevators/escalators, et cetera.

The subject property amenities include Pool, Spa, Fitness Center, Laundry Facilities, Playground, Security Gate, Carport Parking. All of the comparables were considered similar to the subject and do not require adjustments.

## UNIT AMENITIES

The adjustment for unit amenities allows for recognition of unit differences such as appliance packages, fireplaces, security systems, finish-out, washer/dryers or connections, et cetera.

The subject's unit amenities include Vinyl Flooring, Carpet, Standard Appliances, Dishwasher, In-Unit Washer/Dryer, Central Air Conditioning, Ceiling Fans, Walk-In Closets, Patio/Balcony. All of the comparables were considered similar to the subject and no adjustments were required for this category.

## OCCUPANCY

All other factors being equal, properties that exhibit higher occupancy command premiums over those with lower occupancy ratios.

As of the effective date, the subject was 95.7% occupied. All of the comparables were stabilized at the time of sale. Thus, no adjustments were required for this category.

## SUMMARY OF ADJUSTMENTS

| COMPARABLE SALE SUMMARIES AND ADJUSTMENTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
| Property / Location | Tesoro Apartments 106 West Pennsylvania Avenue Redlands, California | Berkdale Apartments 1234 West Blaine Street Riverside, CA | ReNew on 14th 4555 Pine Street Riverside, CA | Sorelle Apartments 12159 Calle Sombra Moreno Valley, CA | ReNew Redlands 1250 North University Street Redlands, CA | The Vue Apartment Homes 1660 Kendall Drive San Bernardino, CA | The District at Grand Terrace 1315 & 1316 South Meadow Lane Colton, CA |
| Date of Sale | ----- | Dec-21 | Nov-21 | Oct-21 | Oct-21 | Oct-21 | Apr-21 |
| Bldg. Size (SF Net) | 152,996 | 171,334 | 87,480 | 283,320 | 127,100 | 164,830 | 307,012 |
| No. Units | 188 | 291 | 100 | 330 | 124 | 197 | 352 |
| Avg. Unit Size (SF) | 814 | 573 | 874 | 858 | 1,025 | 836 | 872 |
| Occup. | 96% | 98% | 99% | 99% | 100% | 100% | 95% |
| Sale Price | ----- | $71,000,000 | $31,411,000 | $85,000,000 | $46,200,000 | $53,600,000 | $88,000,000 |
| Overall Rate | 4.00% | 4.00% | 4.44% | 4.82% | 3.60% | 3.99% | 4.20% |
| Unadjusted Price ($ per Unit) | ----- | $243,986 | $314,110 | $257,576 | $372,581 | $272,081 | $250,000 |
| **Transactional Adjustments** | | | | | | | |
| Property Rights Conveyed | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee | Leased Fee |
| Adjustment | | $0 | $0 | $0 | $0 | $0 | $0 |
| Financing | | $9,000,000 | | | | | |
| Adjustment | | $30,928 | $0 | $0 | $0 | $0 | $0 |
| Terms/Conditions of Sale | | | | | | | |
| Adjustment | | $0 | $0 | $0 | $0 | $0 | $0 |
| Expenditures After Sale | | | | | | | |
| Adjustment | | $0 | $0 | $0 | $0 | $0 | $0 |
| Market Conditions | Feb-22 | Dec-21 | Nov-21 | Oct-21 | Oct-21 | Oct-21 | Apr-21 |
| Adjustment | | 1% | 1% | 2% | 2% | 2% | 4% |
| Total Transactional Adjustment | | $0 | $0 | $0 | $0 | $0 | $0 |
| Adjusted Price ($ per Unit) | | $277,663 | $317,251 | $262,727 | $380,032 | $277,523 | $260,000 |
| **Property Adjustments** | | | | | | | |
| Location | | 0% | 0% | 15% | 0% | 15% | 15% |
| Project Size - Units | 188 | 291 | 100 | 330 | 124 | 197 | 352 |
| | | 0% | 0% | 0% | 0% | 0% | 0% |
| Average Unit Size (SF) | 814 | 573 | 874 | 858 | 1,025 | 836 | 872 |
| | | 15% | 0% | 0% | -15% | 0% | 0% |
| Year Built | 1989 | 1986 | 1986 | 1986 | 1982 | 1989 | 1979 |
| | | 0% | 0% | 0% | 0% | 0% | 0% |
| Condition | Average | Average/Good | Good | Average/Good | Good | Average/Good | Good |
| | | -2.5% | -5% | -2.5% | -5% | -2.5% | -5% |
| Project Amenities | | 0% | 0% | 0% | 0% | 0% | 0% |
| Unit Amenities | | 0% | 0% | 0% | 0% | 0% | 0% |
| Occupancy | 96% | 98% | 99% | 99% | 100% | 100% | 95% |
| | | 0% | 0% | 0% | 0% | 0% | 0% |
| Total Property Adjustments | | 13% | -5% | 13% | -20% | 13% | 10% |
| Indication for Subject: | | $312,371 | $301,389 | $295,568 | $304,026 | $312,213 | $286,000 |

## CONCLUSION OF SALES COMPARISON APPROACH

| SALES SUMMARY | UNADJUSTED | ADJUSTED |
|---|---|---|
| Minimum | $243,986 | $286,000 |
| Maximum | $372,581 | $312,371 |
| Average | $285,056 | $301,928 |

After adjustment, the comparables support a range of value indications from $286,000 - $312,371 per unit, and average $301,928 per unit. Sale 2 required the least amount of adjustment; thus, most emphasis is placed on this comparable. Our conclusion via the Sales Comparison Approach are presented in the following table.

| SALES COMPARISON APPROACH VALUE CONCLUSION | |
|---|---|
| Indicated Value Per Unit | $300,000 |
| No. Units | x 188 |
| **Indicated Value** | **$56,400,000** |
| **Rounded to nearest $100,000** | **$56,400,000** |
| **Per Unit** | **$300,000** |

# INCOME CAPITALIZATION APPROACH

## GENERAL PROCESS

In the Income Capitalization Approach, the value indication is based on the property's capacity to generate income. The following steps are taken to capitalize estimated net operating income into an opinion of value.

- Estimate potential gross income.
- Estimate vacancy and collection loss.
- Estimate anticipated operating expenses.
- Select and apply the appropriate capitalization and discount techniques.

## INCOME ANALYSIS

The subject's potential gross income is a function of rental payments under the terms of current and anticipated leases. This can include base rent as well as expense reimbursements and ancillary income.

All of the units have standard appliances (gas range with hood, dishwasher). Following is a summary of the rents currently being quoted by the property management and the average in-place rents from the provided rent roll dated February 6, 2022.

| SUBJECT RENT SUMMARY | | | QUOTED RENTAL RATES | | IN-PLACE RENTAL RATES | |
|---|---|---|---|---|---|---|
| Type | No. | Size (SF) | Rent/Mo. | Rent/SF | Rent/Mo. | Rent/SF |
| 1BR-1BA | 40 | 683 | $1,675 | $2.45 | $1,529 | $2.24 |
| 2BR-2BA | 108 | 837 | $1,850 | $2.21 | $1,681 | $2.01 |
| 2BR-2BA | 40 | 882 | $1,950 | $2.21 | $1,786 | $2.02 |
| Total/Avg | 188 | 814 | $1,834 | $2.25 | $1,671 | $2.05 |

## MARKET ANALYSIS

The comparable rentals are all located within close proximity to the subject property. None of the comparable properties offer concessions. All of the comparable properties feature unit finishes and common area amenities to the subject.

The comparable rentals (reflecting base quoted rents) are summarized in the table on the following page.

BBG

## COMPARABLE RENTAL MAP



| COMPARABLE RENTAL SURVEY | | | | | | | |
|---|---|---|---|---|---|---|---|
| No. | Property Name | No. Units | Year Built | Avg Unit Size (SF) | Avg Asking Rent ($/mo.) | ($/SF) | Avg Effective Rent ($/mo.) | ($/SF) |
| 1 | Brookside Park | 324 | 1980 | 958 | $2,085 | $2.18 | $2,085 | $2.18 |
| 2 | Citrus Grove Apartments | 198 | 1988 | 853 | $2,084 | $2.44 | $2,084 | $2.44 |
| 3 | Del Flora Apartments | 152 | 1985 / 2017 | 889 | $2,071 | $2.33 | $2,071 | $2.33 |
| 4 | Countrywood Apartments | 161 | 1972 / 2011 | 1,129 | $2,131 | $1.89 | $2,131 | $1.89 |
| | Minimum | 152 | --- | 853 | $2,071 | $1.89 | $2,071 | $1.89 |
| | Maximum | 324 | --- | 1,129 | $2,131 | $2.44 | $2,131 | $2.44 |
| | Average | 209 | --- | 957 | $2,093 | $2.21 | $2,093 | $2.21 |
| | **Subject** | 188 | 1989 | 814 | $1,834 | $2.25 | $1,834 | $2.25 |

The preceding comparable properties are analyzed in the tables on the following pages in order to estimate market rent for the subject property. The subject's asking rents are shown in the following tables, and a market rent is then concluded for each unit type.

*1BR-1BA Units*

| Comp No. | Property Name | Year Built / Renovated | Unit Type | Size (SF) | Rental Rate ($/mo.) | ($/SF) |
|---|---|---|---|---|---|---|
| | **UNIT-BY-UNIT ANALYSIS – One-Bedroom** | | | | | |
| 1 | Brookside Park | 1980 | 1BR/1BA | 650 | $1,900 | $2.92 |
| 2 | Citrus Grove Apartments | 1988 | 1BR-1BA | 677 | $1,604 | $2.37 |
| **Subject** | **Tesoro Apartments** | **1989** | **1BR-1BA** | **683** | **$1,675** | **$2.45** |
| 3 | Del Flora Apartments | 1985/2017 | 1BR-1BA | 700 | $1,850 | $2.64 |
| 4 | Countrywood Apartments | 1972/2011 | 1BR-1BA | 900 | $1,835 | $2.04 |
| Rental Range ($/mo.): $1,604 to $1,900 | | | Average: $1,773 | | | |
| Rental Range ($/SF): $2.04 to $2.92 | | | Average: $2.48 | | | |
| Unit Size (SF): 650 to 900 | | | Average: 722 | | | |

The subject's average 1BR-1BA unit size is within the range of the rent comparables. As shown in the above table, the comparables range from $1,604 to $1,900 per month. According to the subject's rent roll, the subject's 1BR-1BA units are leased with contract rents averaging $1,529 per month, with recent leasing (within the past 3 months) ranging from $1,600 to $1,675 per month, which is in line with the subject's current asking rent of $1,675 per month.

With most emphasis on the subject's recent leasing and current asking rate, we reconciled to a market rent for this unit type at $1,675 per month, or $2.45 per square foot.

*2BR-2BA Units*

| Comp No. | Property Name | Year Built / Renovated | Unit Type | Size (SF) | Rental Rate ($/mo.) | ($/SF) |
|---|---|---|---|---|---|---|
| | **UNIT-BY-UNIT ANALYSIS – Two-Bedroom** | | | | | |
| **Subject** | **Tesoro Apartments** | **1989** | **2BR-2BA** | **837** | **$1,850** | **$2.21** |
| 1 | Brookside Park | 1980 | 2BR/2BA | 838 | $2,030 | $2.42 |
| 2 | Citrus Grove Apartments | 1988 | 2BR-2BA | 859 | $2,099 | $2.44 |
| **Subject** | **Tesoro Apartments** | **1989** | **2BR-2BA** | **882** | **$1,950** | **$2.21** |
| 3 | Del Flora Apartments | 1985/2017 | 2BR-2BA | 1,000 | $2,200 | $2.20 |
| 4 | Countrywood Apartments | 1972/2011 | 2BR-1BA | 1,050 | $2,045 | $1.95 |
| 1 | Brookside Park | 1980 | 2BR/2BA | 1,074 | $2,140 | $1.99 |
| 4 | Countrywood Apartments | 1972/2011 | 2BR-2BA | 1,200 | $2,240 | $1.87 |
| Rental Range ($/mo.): $1,850 to $2,240 | | | Average: $2,069 | | | |
| Rental Range ($/SF): $1.87 to $2.44 | | | Average: $2.16 | | | |
| Unit Size (SF): 837 to 1,200 | | | Average: 968 | | | |

The subject's 2BR unit sizes are towards the lower end of the range of the comparable properties with regard to size. As shown in the above table, the comparables range from $2,030 to $2,240 per month. According to the subject's rent roll, the subject's 837 SF units are leased with contract rents averaging $1,681 per month, with recent leasing (within the past 3 months) ranging from $1,775 per to $1,950 month. The subject's current asking rent for this unit type is $1,850 per month.

The subject's 882 SF units are leased with contract rents averaging $1,786 per month, with recent leasing (within the past 3 months) ranging from $1,721 per to $1,950 month. The subject's current asking rent for this unit type is $1,950 per month.

BBG

With most emphasis on the subject's current asking rate, we reconciled to a market rent of $1,850 per month for the 837 SF units, or $2.21 per square foot, and $1,950 per month for the 882 SF units, or $2.21 per square foot. The concluded market rents are within the range of the comparable data on a per square foot basis.

### MARKET RENT CONCLUSIONS

Following are the concluded market rents for the subject property:

| MARKET RENTAL RATES | | | | | |
|---|---|---|---|---|---|
| Type | No. | Size (SF) | Rent/Mo. | Rent/SF | Total |
| 1BR-1BA | 40 | 683 | $1,675 | $2.45 | $67,000 |
| 2BR-2BA | 108 | 837 | 1,850 | $2.21 | $199,800 |
| 2BR-2BA | 40 | 882 | 1,950 | $2.21 | $78,000 |
| **Total/Avg** | 188 | 814 | $1,834 | $2.25 | $344,800 |

The concluded average rental rate per square foot is within the range presented by the comparable rental properties, which is consistent with the market position of the subject property.

## INCOME AND EXPENSE ANALYSIS

### POTENTIAL GROSS RENT

The table below summarizes indications of potential gross rent. We have included the occupied units at the contract rents and any vacant or employee/model units at market rents. It is noted that there is currently one employee unit and one model unit. Market rent is assigned to the employee and model units in our income projections. Later, in our projection of expenses, rent loss attributable to employee unit is deducted as a payroll expense. Rent loss attributable to model units is deducted as an advertising/marketing expense.

| POTENTIAL GROSS INCOME - VACANT UNITS AT MARKET RENTS | | | | | | |
|---|---|---|---|---|---|---|
| | No. Units | | | Market | Total Rent | |
| Type | Total | Leased | Vacant* | Rent/Mo. | per Mo. | per Year |
| 1BR-1BA | 40 | 38 | 2 | $1,675 | $ 3,350 | $ 40,200 |
| 2BR-2BA | 108 | 101 | 7 | $1,850 | 12,950 | 155,400 |
| 2BR-2BA | 40 | 39 | 1 | $1,950 | 1,950 | 23,400 |
| **Total/Avg** | 188 | 178 | 10 | | $ 18,250 | $ 219,000 |

* Includes non-revenue and employee units

| TOTAL POTENTIAL GROSS INCOME | | |
|---|---|---|
| | Monthly | Annual |
| Contract Rent* | $297,499 | $ 3,569,988 |
| Vacancies | 18,250 | 219,000 |
| **Total** | $ 315,749 | $ 3,788,988 |

*per Rent Roll

Potential rent based on contract rent is 92% of market (monthly contract rent of $315,749 , assuming all vacant and employee units are at market, compared to monthly market rent of $344,800 ). For purposes of this analysis,

potential gross rent is estimated based upon contract rents in place, and the impact of below market contract rent is considered in our capitalization rate selection.

## REIMBURSEMENTS

Income is generated from tenant obligations to reimburse the owner for water, sewer and trash. We estimate expense reimbursements at $1,250 per unit per year, which equates to $235,000 per year, which is in line with the subject's historical collections, and is within the typical range for similar properties.

## MISCELLANEOUS INCOME

This income category includes services such as application fees, late fees, pet rent, parking and other miscellaneous sources. This income category can fluctuate due to any number of reasons including rental market, the economy, or increased turnover. We have forecast other income revenue for the subject at $650 per unit per year, which is in line with the subject's historical collections, and is within the typical range for similar properties.

## VACANCY AND COLLECTION LOSS

Vacancy data for the market, submarket and subject is summarized in the following table.

| VACANCY & COLLECTION LOSS CONCLUSION | |
|---|---|
| Indicator | Vacancy Rate |
| **Market** | |
| Regional | 2.3% |
| Submarket | 2.0% |
| **Subject** | |
| Current | 4.3% |
| **Concluded Vacancy & Collection Loss** | **5.0%** |

We project a vacancy rate of 4.00% for the subject, which considers typical occupancy over a normal holding period, accounting for frictional vacancy. We also consider a collection loss factor of 1.00%. Thus, the total vacancy collection loss factor is 5.0%.

## EFFECTIVE GROSS INCOME

The summation of the preceding income analysis results in what is commonly referred to as the effective gross income (EGI). We have estimated the market rents and ancillary income based on comparable data.

| EGI COMPARISON | | |
|---|---|---|
| Year | Amount | Change |
| 2019 | $3,402,613 | — |
| 2020 | $3,516,702 | 3.4% |
| 2021 | $3,658,016 | 4.0% |
| Budget | $4,032,115 | 10.2% |
| **Forecast** | **$3,938,879** | **7.7%** |

The forecasted EGI is in line with the subject's historical and forecasted performance.

BBG

## OPERATING EXPENSE ANALYSIS

Typically, the best source of information to estimate pro forma operations for the property is the actual historical performance of the subject. We have been provided with two years of historical operations (2019 through 2021), as well as the owner's pro forma operating budget.

A summary of historical operations for the subject, as well as our projections, are found on the following page. Each of the respective expense items is estimated in the following analysis with consideration given to comparable expense data from the local market.

BBG

| HISTORICAL & PRO FORMA OPERATING ANALYSIS | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2020 | | 2021 | | Budget | | BBG Projection* | |
| | Total | per Unit | Total | per Unit | Total | per Unit | Total | per Unit | Total | per Unit |
| **INCOME** | | | | | | | | | | |
| Base Rental Income | $3,169,300 | $16,858 | $3,344,760 | $17,791 | $3,267,850 | $17,382 | $3,841,801 | $20,435 | $3,788,988 | $20,154 |
| Reimbursements | 222,783 | 1,185 | 254,386 | 1,353 | 222,097 | 1,181 | 300,048 | 1,596 | 235,000 | 1,250 |
| Miscellaneous | 130,405 | 694 | 123,432 | 657 | 168,069 | 894 | 119,887 | 638 | 122,200 | 650 |
| **Total Potential Gross Income** | $3,522,488 | $18,737 | $3,722,578 | $19,801 | $3,658,016 | $19,458 | $4,261,736 | $22,669 | $4,146,188 | $22,054 |
| Vacancy & Collection Loss | (119,875) | (638) | (205,876) | (1,095) | 0 | 0 | (229,621) | (1,221) | (207,309) | (1,103) |
| **EFFECTIVE GROSS INCOME** | $3,402,613 | $18,099 | $3,516,702 | $18,706 | $3,658,016 | $19,458 | $4,032,115 | $21,447 | $3,938,879 | $20,951 |
| **OPERATING EXPENSES** | | | | | | | | | | |
| Real Estate Taxes | $304,711 | $1,621 | $346,134 | $1,841 | $494,986 | $2,633 | $350,516 | $1,864 | $663,344 | $3,528 |
| Insurance | 88,309 | 470 | 82,636 | 440 | 60,161 | 320 | 34,216 | 182 | 61,100 | 325 |
| Utilities | 227,323 | 1,209 | 270,177 | 1,437 | 247,477 | 1,316 | 248,385 | 1,321 | 249,100 | 1,325 |
| Maintenance & Repairs | 71,625 | 381 | 176,700 | 940 | 270,027 | 1,436 | 108,100 | 575 | 141,000 | 750 |
| Management | 86,873 | 462 | 129,037 | 686 | 117,235 | 624 | 76,341 | 406 | 118,166 | 629 |
| Payroll | 276,516 | 1,471 | 330,087 | 1,756 | 238,510 | 1,269 | 84,000 | 447 | 235,000 | 1,250 |
| Security | 6,200 | 33 | 19,691 | 105 | 9,600 | 51 | 0 | 0 | 9,400 | 50 |
| Advertising | 15,949 | 85 | 20,414 | 109 | 19,071 | 101 | 28,200 | 150 | 28,200 | 150 |
| General Administration | 58,222 | 310 | 61,817 | 329 | 12,899 | 69 | 56,400 | 300 | 56,400 | 300 |
| Replacement Reserves | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47,000 | 250 |
| **TOTAL EXPENSES** | $1,135,728 | $6,041 | $1,436,693 | $7,642 | $1,469,966 | $7,819 | $986,158 | $5,246 | $1,608,710 | $8,557 |
| **NET OPERATING INCOME** | $2,266,885 | $12,058 | $2,080,009 | $11,064 | $2,188,050 | $11,639 | $3,045,957 | $16,202 | $2,330,169 | $12,395 |

* Fiscal Year Beginning Feb-22

## COMPARABLE EXPENSE DATA

Each of the respective expense items is projected in consideration of actual historical operations and market data. The following table summarizes the expenses from other multifamily properties in the market area. Although an attempt was made to categorize expenses on a similar basis to the subject, the nature of the raw data prevented such in some categories, especially with regard to the level of detail. The management fee for a property is typically based upon a percentage of the EGI, which is denoted separately. Property insurance is also shown on the basis of per square foot of building area, which is shown separately in the following table.

| COMPARABLE EXPENSES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County, St | Riverside, CA, CA | | Riverside, CA, CA | | Riverside, CA, CA | | Riverside, CA, CA | |
| Year Built | 1987 | | 1975/2021 | | 1986 | | 1989/2021 | |
| No. Units | ~140 | | ~145 | | ~295 | | ~210 | |
| Average Unit Size (SF) | 820 | | 749 | | 579 | | 822 | |
| Year Operations | T-12 2021 | | T-12 2021 | | T-12 2021 | | T-12 2021 | |
| Expense | per Unit | | per Unit | | per Unit | | per Unit | |
| Real Estate Taxes | 2,480 | | 42 | | 1,786 | | 1,817 | |
| Insurance | 361 | 0.44 | 215 | 0.29 | 482 | 0.83 | 202 | 0.25 |
| Utilities | 1,144 | | 559 | | 626 | | 1,559 | |
| Maintenance & Repairs | 832 | | 647 | | 811 | | 921 | |
| Management | 787 | 3.7% | 424 | 2.1% | 587 | 3.2% | 492 | 2.6% |
| Payroll | 1,528 | | 735 | | 1,582 | | 1,195 | |
| Security | 124 | | 7 | | 130 | | 118 | |
| Advertising | 396 | | 161 | | 243 | | 107 | |
| General Administration | 324 | | 239 | | 298 | | 104 | |
| **Total Expenses** | 7,976 | | 3,029 | | 6,546 | | 6,515 | |
| **Total Expenses w/o Taxes** | 5,496 | | 2,987 | | 4,760 | | 4,698 | |

Additionally, an annual survey of apartment operating property data is published by IREM (Institute of Real Estate Management). The most recent survey of such data was published in 2019, which contains 2018 operating data from 509 Garden apartment communities in the Region IX metropolitan area, representing a total of 113,193 units. According to the published data, the apartment communities surveyed average 222 dwelling units per property with an average unit size of 882 square feet. As is the case with the previous operating expense data, various methods of categorization—both by the property management and IREM—preclude an exact item-by-item comparison for all expenses. Nevertheless, the IREM data provides a good basis for comparison with regard to the general metropolitan market.

## EXPENSE PROJECTIONS

### Real Estate Taxes

This item covers the cost of ad valorem taxes and special assessments collected by the various taxing authorities. As discussed in the Property Tax Analysis section, our estimate of real estate taxes assumes a market sale of the property; therefore, this projection is based upon the stabilized value conclusion and the current ad valorem tax rate of 1.0000%. The future tax liability is projected to increase substantially over its current tax liability. Our estimate also includes direct assessments as reported on the subject's most recent tax bill.

### Insurance

This item covers the cost of fire and extended coverage premiums for the property. Since insurance underwriting parameters are generally based upon square footage of building area rather than the number of units, we have expressed insurance costs in accordance with the market.

| INSURANCE (PER SQ.FT.) | | | | | | | |
| Expense Comps | | | | | | | BBG |
| Range | Average | IREM | 2019 | 2020 | 2021 | Budget | Forecast |
|---|---|---|---|---|---|---|---|
| 0.25–0.83 | 0.45 | 0.27 | 0.58 | 0.54 | 0.39 | 0.22 | 0.40 |

We have projected insurance expenses of $0.40 per square foot, which is in line with the subject's pro forma. This equates to $325 per unit.

### Operating

The most reliable indicator for utility expenses is the history of the subject. The subject is reimbursed by tenants for water, sewer, and trash, but the reimbursement income is included as income. Repairs & Maintenance pertains to general upkeep of the property, whereas Painting & Decorating is specific to the normal turnover costs of units as they are vacated.

| OPERATING EXPENSES (PER UNIT) | | | | | | | |
| Expense Item | Expense Comps | | IREM | 2019 | 2020 | 2021 | Budget | BBG Forecast |
| | Range | Average | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utilities | 559–1,559 | 972 | 539 | 1,209 | 1,437 | 1,316 | 1,321 | 1,325 |
| Maintenance & Repairs | 647–921 | 803 | 1,119 | 381 | 940 | 1,436 | 575 | 750 |
| Total Operating | 1,206–2,480 | 1,775 | 1,658 | 1,590 | 2,377 | 2,753 | 1,896 | 2,075 |

We have projected all operating expenses to be in line with the subject's historical and pro forma operations, which are largely within the range indicated by the comparable data.

### Administrative

Administrative expenses are subcategorized into three separate expense items, as shown in the following table.

| ADMINISTRATIVE EXPENSES (PER UNIT) | | | | | | | |
| Expense Item | Expense Comps | | IREM | 2019 | 2020 | 2021 | Budget | BBG Forecast |
| | Range | Average | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Management | 424–787 | 572 | 462 | 515 | 686 | 624 | 406 | 629 |
| Payroll | 735–1,582 | 1,260 | 1,433 | 1,471 | 1,756 | 1,269 | 447 | 1,250 |
| Security | 7–130 | 95 | - | 33 | 105 | 51 | - | 50 |
| Advertising | 107–396 | 227 | - | 85 | 109 | 101 | 150 | 150 |
| General Admin. | 104–324 | 241 | 61 | 310 | 329 | 69 | 300 | 300 |
| Total Administration | 1,566–3,159 | 2,395 | 2,009 | 2,360 | 2,984 | 2,113 | 1,303 | 2,379 |

Management entails the cost of third-party management of the property. The market generally commands 2% to 5% of EGI for professional management of a property, depending upon the income levels of the property and the potential of the area. The expense sources are shown as a percentage of effective gross income.

| MANAGEMENT FEE (% of EGI) | | | | | | | |
| Expense Comps | | | | | | | BBG |
| Range | Average | IREM | 2019 | 2020 | 2021 | Budget | Forecast |
|---|---|---|---|---|---|---|---|
| 2.1%–3.7% | 2.9% | 3.2% | 2.6% | 3.7% | 3.2% | 1.9% | 3.0% |

Payroll expenses include the cost of office and maintenance salaries and wages, payroll taxes, workmen's compensation, and group insurance. An expense was projected which is consistent with the historical and comparable data, which includes rent allowances attributable to the employee unit.

Advertising expenses include the cost of advertising and marketing at the property. We conclude to an advertising expense that is consistent with the subject's historical expenses.

General Administration expenses include office expenses, licenses and permits, miscellaneous expenses as well as telephone, legal and accounting, security, fire alarm monitoring and advertising. An expense was projected which is consistent with the historical and comparable data.

### Replacement Reserves

This expense accounts for the eventual required replacement of short-lived items such as carpeting and drapes, ranges and refrigerators, flooring, disposals, pavement, and roofs. The subject was built in 1989, with an average unit size of 814 square feet. The property has been adequately maintained during the course of its operation.

According to the Q1 2021 PwC Real Estate Investor Survey, replacement reserves for Pacific Region apartment properties range from $200 to $400 per unit, with an average of $263 per unit. Based on our experience relative to the quality, age and the necessary maintenance, reserves for replacement were estimated at $250 per unit.

## TOTAL EXPENSES & REPLACEMENT RESERVES

For all expenses, we relied upon the subject's actual operating history and market data. In order to provide a more equitable basis of comparison, taxes and reserves are excluded from the comparable properties and the subject.

| EXPENSE COMPARISON* | | | |
|---|---|---|---|
| Source | $/SF | $/Unit | Expense Ratio |
| Expense Comps | $3.99–$8.23 | $2,987–$5,496 | 14.7%–26.1% |
| Average | $6.16 | $4,485 | 22.7% |
| IREM | $5.56 | $4,705 | 29.6% |
| 2019 | $5.43 | $4,420 | 24.4% |
| 2020 | $7.13 | $5,801 | 31.0% |
| 2021 | $6.37 | $5,186 | 26.7% |
| Budget | $4.15 | $3,381 | 15.8% |
| Forecast | $5.87 | $4,779 | 22.8% |

\* Taxes and replacement reserves are excluded as basis of comparison.

The forecast figures are in line with historical operations on a per square foot basis and a per unit basis. The forecast figures are also within the comparable data range. Overall, the forecasted expense ratio is supported by the historical operations of the property.

## NET OPERATING INCOME

Following is a summary of the income and expense projections for the subject as of the date of inspection, February 7, 2022, which is a summation of the preceding analysis. The subject property is currently operating at stabilized occupancy.

| DIRECT CAPITALIZATION - AS IS | | |
|---|---|---|
| Income | FY 2023 | $/Unit |
| Base Rental Income | $3,788,988 | $20,154 |
| Reimbursements | 235,000 | 1,250 |
| Miscellaneous | 122,200 | 650 |
| **Total Potential Gross Income** | **$4,146,188** | **22,054** |
| Vacancy & Collection Loss @ -5.0% | (207,309) | (1,103) |
| **Effective Gross Income** | **$3,938,879** | **$20,951** |
| Operating Expenses | | |
| Real Estate Taxes | $663,344 | $3,528 |
| Insurance | 61,100 | 325 |
| Utilities | 249,100 | 1,325 |
| Maintenance & Repairs | 141,000 | 750 |
| Management (3.0%) | 118,166 | 629 |
| Payroll | 235,000 | 1,250 |
| Security | 9,400 | 50 |
| Advertising | 28,200 | 150 |
| General Administration | 56,400 | 300 |
| Replacement Reserves | 47,000 | 250 |
| **Total Expenses** | **$1,608,710** | **$8,557** |
| **NET OPERATING INCOME (NOI)** | **$2,330,169** | **$12,395** |

# INCOME CAPITALIZATION

## MARKET DERIVATION

When adequate data is available, the overall rate is best derived from the comparable sales employed in the Sales Comparison Approach. The table on the following page summarized capitalization rates extracted from the comparable sales transactions.

| No. | Property / Location | Date of Sale | Year Built | Capitalization Rate |
|---|---|---|---|---|
| | **CAPITALIZATION RATE SUMMARY** | | | |
| 1 | Berkdale Apartments, Riverside, CA | Dec-21 | 1986 | 4.00% |
| 2 | ReNew on 14th, Riverside, CA | Nov-21 | 1986 | 4.44% |
| 3 | Sorelle Apartments, Moreno Valley, CA | Oct-21 | 1986 | 4.82% |
| 4 | ReNew Redlands, Redlands, CA | Oct-21 | 1982 | 3.60% |
| 5 | The Vue Apartment Homes, San Bernardino, CA | Oct-21 | 1989 | 3.99% |
| 6 | The District at Grand Terrace, Colton, CA | Apr-21 | 1979 | 4.20% |
| Low | | | | 3.60% |
| High | | | | 4.82% |
| Median | | | | 4.10% |
| Average | | | | 4.17% |

As shown in the above table, the comparable data ranges from 3.60% to 4.82%, and averages 4.17%. Sales 1, 2, 5 and 6 represent partially renovated properties, with some degree of below market rent. These are considered best indicators for the subject property. The high end of the range, Sale 3, represents an estimated cap rate based on market rents. The low end of the range (Sale 4) represents a value-add property with significant upside potential.

With most emphasis, on Sales 1 and 2, the most recent transactions that are considered most similar to the subject, we reconcile to an overall capitalization rate of 4.00% for the subject property.

## INVESTOR SURVEYS

| Survey/Investment Type | OAR Range | Average |
|---|---|---|
| **INVESTOR SURVEYS** | | |
| PwC Real Estate Investor Survey (4Q21) | | |
| Apartment | 3.00% - 7.00% | 4.42% |
| Pacific Region | 3.00% - 5.00% | 3.80% |
| Situs RERC Real Estate Report (3Q21) | | |
| Apartment | 3.50% - 6.00% | 4.50% |
| **Indicated OAR:** | **3.00% - 7.00%** | **4.24%** |

The investor survey data pertains primarily to institutional grade product, and has limited relevance to the subject property. Even so, the PwC data is considered to provide secondary support for a capitalization rate indication. Considering the subject's physical and locational characteristics, we anticipate that the subject would achieve a capitalization rate above the average of the range for the Pacific Region, or 4.00% to 5.00%.

## MARKET PARTICIPANT INTERVIEWS

Conversations with market participants active in the subject's investment market indicated OAR's from 4.00% to 4.75% for properties similar to that of the subject. The low end of this range would be non-renovated properties with below-market contract rents and additional upside via a renovation program and the high end of the range would be fully renovated Class B properties achieving renovated market rent on 100% of the units. We would expect an appropriate cap rate for the subject to be near the low end of this range due to its current below-market contract rent and additional upside that could be achieved through renovating the remaining unit interiors.

## CONCLUDED OVERALL RATE

Based upon the range of overall rates suggested by comparable sales, we reconciled an overall capitalization rate of Based on Most Probable Rate of 4.00% is appropriate for the subject property.

## VALUE INDICATION FROM DIRECT CAPITALIZATION

An opinion of market value is indicated by the Direct Capitalization Method by dividing the net operating income (NOI), derived earlier in this section by the appropriate capitalization rate. Our market conclusion via the Direct Capitalization Method is as follows:

| DIRECT CAPITALIZATION METHOD VALUE CONCLUSION | | |
|---|---|---|
| NET OPERATING INCOME | $2,330,169 | $12,395 |
| Based on Most Probable Rate of 4.00% | $58,254,225 | $309,863 |
| Rounded to nearest $100,000 | $58,300,000 | $310,106 |

# PROSPECTIVE MARKET VALUATION –STABILIZED AT MARKET RENTS

At the client's request, we have also prepared a prospective market value estimate based on market rents. According to the landlord, they expect to raise rents throughout 2022 as tenants renew or rollover. Thus, the prospective stabilization at market rents is expected to be achieved by March 1, 2023.

***Trending Methodology - Income***

It is projected that property will be at stabilized at market rents by March 1, 2023 and this is our prospective date of value.

Per CoStar, annual effective rental rates for apartments within the subject's San Bernardino multifamily submarket have increased at an average annual growth rate of 7.9% over the past three years (Q3 2018 – Q3 2021), and is expected to continue growing through Q3 2024 at a rate of 6.6% per year. According to the PwC Real Estate Investor Survey (Q4 2021) for the Pacific Region Apartment Market, investors anticipate annual market rent change ranging from 0.00% to 5.00%, with an average of 2.70%. Based on the foregoing, we have concluded to a market rent growth rate of 5% annually. A CPI-oriented growth rate of 3% is also applied to other income.

***Trending Methodology - Expenses***

Similar to income, expenses are projected to rise over the next three years as well. According to the PwC Real Estate Investor Survey (Q4 2021) for the Pacific Region Apartment Market, investors anticipate annual expense changes ranging from 2.00% to 3.00%, with an average of 2.75%. We have utilized an annual expense change figure of 3.00% in this analysis for all expenses, with the exception of real estate taxes and management. Real estate taxes are still based on our prospective value conclusion and management is still based on 3.0% of EGI. The remaining expenses are trended at 3% annually.

| DIRECT CAPITALIZATION – PROSPECTIVE – STABILIZED AT MARKET | | |
|---|---|---|
| Income | FY 2024 | $/Unit |
| Base Rental Income | $4,344,480 | $23,109 |
| Reimbursements | 242,050 | 1,288 |
| Miscellaneous | 125,866 | 670 |
| **Total Potential Gross Income** | **$4,712,396** | **25,066** |
| Vacancy & Collection Loss @ -5.0% | (235,620) | (1,253) |
| **Effective Gross Income** | **$4,476,776** | **$23,813** |
| Operating Expenses | | |
| Real Estate Taxes | $733,344 | $3,901 |
| Insurance | 62,933 | 335 |
| Utilities | 256,573 | 1,365 |
| Maintenance & Repairs | 145,230 | 773 |
| Management (3.0%) | 121,711 | 647 |
| Payroll | 242,050 | 1,288 |
| Security | 9,682 | 52 |
| Advertising | 29,046 | 155 |
| General Administration | 58,092 | 309 |
| Replacement Reserves | 48,410 | 258 |
| **TOTAL EXPENSES** | **$1,707,071** | **$9,080** |
| **NET OPERATING INCOME** | **$2,769,705** | **$14,732** |

An opinion of hypothetical market value is indicated dividing the prospective net operating income by an appropriate capitalization rate. As previously discussed, the comparable cap rate ranged 3.60% to 4.82%, with the low indicator representing a value-add transaction with upside potential and the high indicator an estimate based on market rent and expenses. As this prospective analysis considers the subject at market rents, we have concluded to a market capitalization rate of 4.25% for the subject property, a 25 basis points increase over the as is cap rate.

| DIRECT CAPITALIZATION METHOD VALUE CONCLUSION – PROSPECTIVE | | |
|---|---|---|
| **NET OPERATING INCOME** | **$2,769,705** | **($6,402)** |
| Based on Most Probable Rate of 4.25% | $65,169,529 | $346,646 |
| **Rounded to nearest  $100,000** | **$65,200,000** | **$346,809** |

# RECONCILIATION

## SUMMARY OF VALUE INDICATIONS

This appraisal employs the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that these approaches would be considered applicable and/or necessary for market participants. The subject's age makes it difficult to accurately form an opinion of depreciation and tends to make the Cost Approach unreliable. Investors do not typically rely on the Cost Approach when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach to develop an opinion of market value; this exclusion does not affect the credibility of the assignment results herein. The client also requires an insurable value of the improvements.

| VALUE INDICATIONS | | | |
|---|---|---|---|
| **As Is as of February 7, 2022** | | | |
| **Cost Approach** | Not Developed | | |
| Land Value | Not Developed | | |
| **Sales Comparison Approach** | $56,400,000 | $300,000 | Per Dwelling Unit |
| **Income Capitalization Approach** | | | |
| Direct Capitalization | $58,300,000 | $310,106 | Per Dwelling Unit |
| **Approach Reliance** | **Direct Capitalization** | | |
| **Value Conclusion - As Is** | **$58,300,000** | **$310,106** | **Per Dwelling Unit** |
| **Insurable Value** | $17,700,000 | | |
| **Exposure Time (Months)** | 3-6 | | |
| **Marketing Time (Months)** | 3-6 | | |
| **Stabilized At Market Rents as of March 1, 2023** | | | |
| **Cost Approach** | Not Developed | | |
| Land Value | Not Developed | | |
| **Sales Comparison Approach** | Not Developed | | |
| **Income Capitalization Approach** | | | |
| Direct Capitalization | $65,200,000 | $346,809 | Per Dwelling Unit |
| **Approach Reliance** | **Direct Capitalization** | | |
| **Value Conclusion - Stabilized At Market Rents** | **$65,200,000** | **$346,809** | **Per Dwelling Unit** |

The Cost Approach does not reflect the actions or motivations of the most likely buyer of a property such as the subject, which was constructed in 1989. Furthermore, the relevance of the Cost Approach is substantially weakened due to the subject's age, given that estimating depreciation in buildings as old as the subject is impractical, rendering the Cost Approach unreliable. Therefore, we have not employed the Cost Approach to develop an opinion of market value. The omission of the Cost Approach does not reduce the reliability or credibility of the appraisal report.

The Sales Comparison Approach is most often relied upon when there is adequate data reflecting recent and relevant comparable sales. It is frequently the primary approach for owner-users, as it directly accounts for pricing of competitive properties with similar utility. While there was adequate sales data available, the subject property's most likely purchaser is an investor who would give the Sales Comparison Approach secondary weight.

The Income Approach is the valuation method most commonly used by investors, as it considers the future income potential of the property. Reliance on direct capitalization or discounted cash flow analysis depends upon the specific income characteristics of a property, including length of existing leases, and anticipated cash flow patterns.

BBG

There was adequate data available to support income and expense assumptions, as well as rates of return. Moreover, the most likely purchaser of the subject property is an investor. As such, the income capitalization approach is given greatest weight in our reconciliation.

## FINAL OPINION OF VALUE

Based on our inspection of the property, the investigation and the analysis undertaken, subject to the assumptions and limiting conditions, certifications, extraordinary assumptions and hypothetical conditions, we have developed the following value opinion(s).

| MARKET VALUE CONCLUSION(S) | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Market Value As Is | Leased Fee | February 7, 2022 | $58,300,000 |
| Prospective Market Value - Stabilized at Market Rents | Leased Fee | March 1, 2023 | $65,200,000 |

## MARKETING TIME AND EXPOSURE TIME

We believe the concluded market value for the subject property is consistent with an anticipated marketing time and exposure time of 3-6 months. Our opinion of value is consistent with recent sales and the return parameters are considered adequate to generate investor interest in the property. Our estimate is reasonably consistent with historic exposure times, and is considered a reasonable estimate of the exposure time for the subject. Additionally, a time of 3-6 months is typically quoted as an adequate marketing time by area brokers, given proper pricing and an adequate commitment to marketing. Furthermore, market conditions are not expected to change dramatically in the short term, so a marketing time equal to the historic exposure time is considered a reasonable expectation. Based on these factors, our conclusion of 3-6 months for an adequate marketing time and exposure time is considered reasonable.

BBG

# INSURABLE VALUE

Insurable Value is directly related to the portion of the real estate which is covered under the asset's insurance policy. We have based this opinion on the building's replacement cost new (RCN) which has no direct correlation with its actual market value.

The replacement cost new is the total construction cost of a new building built using modern technology, materials, standards and design, but built to the same specifications of and with the same utility as the building being appraised. For insurance purposes, replacement cost new includes all direct costs necessary to construct the building improvements. Items which are not considered include land value, site improvements, indirect costs, accrued depreciation and entrepreneurial profit. To develop an opinion of insurable value, exclusions for below-grade foundations and architectural fees must be deducted from replacement cost new.

We developed an opinion of replacement cost new by using the Calculator Cost Method developed by Marshall Valuation Service, a nationally recognized cost estimating company which estimates construction costs for all types of improvements. Marshall Valuation Service revises its cost factors monthly and adjusts them to reflect regional and local cost variations.

| INSURABLE REPLACEMENT COST | | | |
|---|---|---|---|
| Replacement Cost New (RCN) | Area (SF) | $/SF | Subtotal |
| Building Improvements | | | |
| Base Cost | 169,312 | $78.50 | $13,290,992 |
| Balconies/Patios | 9,400 | $26.50 | 249,100 |
| Appliances | 188 | $1,130 | 212,440 |
| Garages | 2,000 | $16.65 | 33,300 |
| Carports | 34,300 | $13.96 | 478,657 |
| Subtotal | | | $14,264,489 |
| Multipliers | | | |
| Current Cost | | 1.220 | |
| Local Area | | 1.130 | |
| Area Multiplier | | 1.000 | |
| Story Height | | 1.000 | |
| Product of Multipliers | | | x 1.379 |
| Adjusted Base Building Cost | | | $19,670,730 |
| Less: Insurance Exclusions | | | |
| Total Insurance Exclusion Adjustment | | 10.00% | (1,967,073) |
| Insurable Replacement Cost | | | $17,703,657 |
| Rounded to nearest $100,000 | | | $17,700,000 |
| Source: Marshall Valuation Service | | | |
| Type: Multiple Residences | Section: 12 | Class: D | |
| Date: Jan-2022 | Page: 16 | Quality: Average | |

The opinion of insurable value is included at the request of the client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable

value purposes. The appraisers are not familiar with the definition of insurable value from the insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The appraisers are not cost experts in cost estimating for insurance purposes.

# CERTIFICATION

I certify that, to the best of my knowledge and belief:

1 The statements of fact contained in this report are true and correct.

2 The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3 I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved with this assignment.

4 I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5 My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6 My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7 This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

8 My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the state of .

9 The reported analyses, opinions, and Value Indications were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics, the Standards of Professional Practice of the Appraisal Institute.

10 The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11 As of the date of this report, Giselle Nguyen, MAI has  completed the continuing education program for Designated Members of the Appraisal Institute.

12 Giselle Nguyen, MAI has made a personal inspection of the property that is the subject of this report.

13 No one provided significant real property appraisal assistance to the person signing this certification.

14 Giselle Nguyen, MAI has not provided services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

Giselle Nguyen, MAI
CA Certified General Appraiser
License #: AG 043831
818-371-8910
gnguyen@bbgres.com

# STANDARD ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report has been made with the following general assumptions:

1) Notwithstanding that Appraiser may comment on, analyze or assume certain conditions in the appraisal, BBG, Inc. shall have no monetary liability or responsibility for alleged claims or damages pertaining to: (a) title defects, liens or encumbrances affecting the property; (b) the property's compliance with local, state or federal zoning, planning, building, disability access and environmental laws, regulations and standards; (c) building permits and planning approvals for improvements on the property; (d) structural or mechanical soundness or safety; (e) contamination, mold, pollution, storage tanks, animal infestations or other hazardous conditions affecting the property; and (f) other conditions and matters for which licensed real estate appraisers are not customarily deemed to have professional expertise. Accordingly:

   a) The Appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the Appraiser or the Appraiser's staff or was obtained or taken from referenced sources and is considered reliable. The Appraiser and BBG, Inc. shall not be monetarily liable or responsible for or assume the costs of preparation or arrangement of geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

   b) Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment. Further, unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Further, unless otherwise stated, it is assumed that there are no rights associated with extraction or exploration of such elements considered. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

   c) Any legal description or plats reported in the appraisal are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. BBG, Inc. has made no survey of the property and assumes no monetary liability or responsibility in connection with such matters.

   d) Title is assumed to be good and marketable, and in fee simple, unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated. Further, BBG, Inc. assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

   e) The appraisal report is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the appraisal report; additionally, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the appraisal report. Further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value opinion. Moreover, unless otherwise stated herein, it is assumed that there are no encroachments or violations of any zoning or other regulations affecting the subject property, that the utilization of the land and improvements is within the boundaries or property lines of the property described, and that there are no trespasses or encroachments.

   f) The American Disabilities Act (ADA) became effective January 26, 1992. The Appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity

with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative impact upon the value of the property. Since the Appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

g) No monetary liability or responsibility is assumed for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

h) It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein. Further, it is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

i) Unless otherwise stated within the appraisal report, the depiction of the physical condition of the improvements described therein is based on visual inspection. No monetary liability or responsibility is assumed for (a) the soundness of structural members since no engineering tests were conducted; (b) the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made; and (c) hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during the Appraiser's inspection.

j) If building improvements are present on the site, it is assumed that no significant evidence of termite damage or infestation was observed during physical inspection, unless so stated in the appraisal report. Further, unless so stated in the appraisal report, no termite inspection report was available. No monetary liability or responsibility is assumed for hidden damages or infestation.

k) Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No monetary liability or responsibility is assumed for such conditions or for engineering which may be required to discover them.

l) BBG, Inc. is not an expert in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. BBG, Inc. assumes no monetary liability or responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraiser is not qualified to detect such substances. The Client is urged to retain an expert in this field; however, Client retains such expert at Client's own discretion, and any costs and/or expenses associated with such retention are the responsibility of Client.

m) BBG, Inc. is not an expert in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. BBG, Inc. assumes no monetary liability or responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The Appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions contained within the appraisal repot based upon any subsequent endangered species impact studies, research, and investigation that may be provided. However, it is assumed that no environmental impact studies were either requested or made in conjunction with this analysis, unless otherwise stated within the appraisal report.

2) If the Client instructions to the Appraiser were to inspect only the exterior of the improvements in the appraisal process, the physical attributes of the property were observed from the street(s) as of the inspection date of the appraisal. Physical characteristics of the property were obtained from tax assessment records, available plans, if any, descriptive information, and interviewing the client and other knowledgeable persons. It is assumed the interior of the subject property is consistent with the exterior conditions as observed and that other information relied upon is accurate.

Case 8:25-bk-12319-SC    Doc 14    Filed 09/04/25    Entered 09/04/25 11:53:39    Desc
Main Document    Page 81 of 219

STANDARD ASSUMPTIONS AND LIMITING CONDITIONS 71

3) If provided, the estimated insurable value is included at the request of the Client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable value purposes. The Appraiser is not familiar with the definition of insurable value from the insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The Appraiser is not a cost expert in cost estimating for insurance purposes.

4) The dollar amount of any value opinion herein rendered is based upon the purchasing power and price of the United States Dollar as of the effective date of value. This appraisal is based on market conditions existing as of the date of this appraisal.

5) The value opinions reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value opinions, unless such proration or division of interests is set forth in the report. Any division of the land and improvement values stated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

6) Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are BBG, Inc.'s best estimate of current market thinking of what future trends will be. No warranty or representation is made that such projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

7) The Appraiser assumes no monetary liability or responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

8) Any proposed or incomplete improvements included in the appraisal report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

9) If the appraisal report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the Appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

10) Although the Appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the Appraiser either by the Client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the Appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or opinions of value.

11) The right is reserved by the Appraiser to make adjustments to the analyses, opinions, and conclusions set forth in the appraisal report as may be required by consideration of additional or more reliable data that may become available. No change of this report shall be made by anyone other than the Appraiser. The Appraiser shall have no monetary liability or responsibility for any unauthorized change(s) to the report.

12) The submission of the appraisal report constitutes completion of the services authorized and agreed upon. Such appraisal report is submitted on the condition the Client will provide reasonable notice and customary

TESORO APARTMENTS APPRAISAL

BBG

compensation, including expert witness fees, relating to any subsequent required attendance at conferences, depositions, or judicial or administrative proceedings. In the event the Appraiser is subpoenaed for either an appearance or a request to produce documents, a best effort will be made to notify the Client immediately. The Client has the sole responsibility for obtaining a protective order, providing legal instruction not to appear with the appraisal report and related work files, and will answer all questions pertaining to the assignment, the preparation of the report, and the reasoning used to formulate the opinion of value. Unless paid in whole or in part by the party issuing the subpoena or by another party of interest in the matter, the Client is responsible for all unpaid fees resulting from the appearance or production of documents regardless of who orders the work.

# BBG
**REAL ESTATE SERVICES**

## Overview

### BBG OVERVIEW

BBG is one of the nation's largest real estate due diligence firms with more than 45 offices across the country serving more than 3,000 clients. We deliver best-in-class valuation, advisory and assessment services with a singular focus of meeting our clients' needs.

Our professional team offers broad industry expertise and deep market knowledge to help clients meet their objectives throughout the real estate life cycle.

BBG clients include commercial real estate professionals, investors, lenders, attorneys, accountants and corporations.

### THE BBG DIFFERENCE

**National Footprint.** BBG is one of only two national firms offering in-house valuation and environmental and property condition assessment services for all commercial property types.

**Customer-focused Growth.** BBG is one of the largest national due diligence firms because we deliver best-in-class work product and provide excellent customer care.

**Qualified Team.** Over 50 percent of BBG appraisers are MAI designated and offer deep industry expertise gained through real-world experience.

**Unbiased Independence.** By focusing exclusively on due diligence services, BBG guarantees an independent perspective free from potential conflicts of interest.

**Innovative Technology.** BBG has made significant analytics and IT investments to continually improve our data and report quality.

## SERVICES

### Valuation
+ Single Asset Valuation
+ Portfolio Valuation
+ Institutional Asset Valuation
+ Appraisal Review
+ Appraisal Management
+ Lease and Cost Analysis
+ Insurance Valuation
+ Arbitration & Consulting
+ Feasibility Studies
+ Highest and Best Use Studies
+ Evaluation
+ Investment analysis
+ Tax appeals
+ Litigation Support
+ Manufactured Housing and Campgrounds

### Advisory
+ ASC 805 Business combinations
+ ASC 840 Leases
+ Purchase Price Allocations
+ Portfolio Valuations for reporting net asset values (NAV)
+ Public and non-traded REIT valuations
+ Valuations for litigation and litigation support
+ Sale-leaseback valuation analysis
+ Valuations for bankruptcy/fresh start accounting
+ Cost segregation analysis

### Assessment
+ Environmental due diligence
+ Property condition consulting
+ Small loan services
+ Energy consulting
+ Environmental consulting
+ Zoning
+ ALTA Surveys

## Valuation + Assessment

# ADDENDA

Appraiser Qualifications ................................................................................................................. A

Glossary .................................................................................................................................... B

Letter of Engagement ................................................................................................................ C

Title Report................................................................................................................................ D

Rent Roll .................................................................................................................................... E

Operating Statements................................................................................................................. F

Comparable Improved Sales ...................................................................................................... G

Comparable Rents ..................................................................................................................... H

# APPRAISER QUALIFICATIONS

BBG



**Giselle Nguyen, MAI**
Director
gnguyen@bbgres.com
818-371-8910

## Profile

Giselle Nguyen is a Director at BBG in the Los Angeles office. Responsibilities include performing valuation and consulting assignments on existing and proposed properties. Assignments include a wide range of commercial, office, retail, industrial, residential income, vacant land, and special purpose properties.

Experience includes commercial real estate appraisal and advisory assignments, diligence, valuation and market/feasibility studies for a range of owned and leased real property types. Most recently, Giselle was a Manager in the Transaction Real Estate practice at Ernst & Young, providing real estate valuation services and corporate real estate advisory.

## Professional Affiliations

<u>Appraisal Institute</u>
Designated Member, MAI

<u>General Certified Appraiser</u>
State of California (License No. AG 043831)
State of Washington (License No. 1102365)
State of Arizona (License No. 32203)
State of Nevada (License No. A0207477CG)
State of Oregon (License No. C001235)
State of Hawaii (License No. CGA 1165)

## Education

Bachelor of Arts in English Literature, University of California, Berkeley

**Valuation + Assessment**



Business, Consumer Services & Housing Agency
## BUREAU OF REAL ESTATE APPRAISERS
## REAL ESTATE APPRAISER LICENSE

### Giselle B. Nguyen

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    AG 043831

Effective Date:    March 24, 2020
Date Expires:    March 23, 2022

Jim Martin, Bureau Chief, BREA

3051510

THIS DOCUMENT CONTAINS A TRUE WATERMARK · HOLD UP TO LIGHT TO SEE "CHAIN LINK"

# GLOSSARY

**Assessed Value:** The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value. [1]

**Asset:**
  1.  Any item, the rights to which may have economic value, including financial assets (cash or bonds), business interests, intangible assets (copyrights and trademarks), and physical assets (real estate and personal property).
  [2]  In general business usage, something owned by a business and reflected in the owner's business sheet.

**Asset:**   A resource controlled by the entity as a result of past events and from which future economic benefits are expected to flow to the entity. [2]

**Capital Expenditure:** Investments of cash (or the creation of liability) to acquire or improve an asset, e.g., land, buildings, building additions, site improvements, machinery, equipment; as distinguished from cash outflows for expense items that are normally considered part of the current period's operations. [1]

**Cash Equivalency:** An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash or its equivalent. [1]

**Client:**
  1.  The individual, group, or entity who engages a valuer to perform a service (USPAP)
  2.  The party or parties who engage, by employment or contract, an appraiser in a specific assignment.   Comment:   The client may be an individual, group, or entity, and may engage and communicate with the appraiser directly or through an agent (USPAP, 2016-17-ed).
  3.  Generally the party or parties ordering the appraisal report.   It does not matter who pays for the work (CUSPAP, 2014-ed). [1]

**Condominium Ownership:** A form of fee ownership of separate units or portions of multiunit buildings that provides for formal filing and recording of a divided interest in real property. [3]

**Cost Approach:** A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive, deducting depreciation from the total cost, and adding the estimated land value. Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised. [1]

**Credible:**
  1.  Worthy of belief, supported by analysis of relevant information. Creditability is always measured in the context of intended use. (SVP)
  2.  Worthy of belief.   Comment:   Creditable assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use.   (USPAP, 2016-2017-ed.). [1]

**Deferred Maintenance:** Needed repairs or replacement of items that should have taken place during the course of normal maintenance. [1]

**Disposition Value:** The most probable price that a specified interest in real property should bring under the following conditions: 1) Consummation of a sale within a specific time, which is short than the typical exposure time for such a property in that market. 2) The property is subjected to market conditions prevailing as of the date of valuation. 3) Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under compulsion to sell. 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) An adequate marketing effort will be made during the exposure time. 8) Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration of the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms. [1]

**Economic Life:** The period over which improvements to real property contribute to property value. [1]

**Effective Date**: 1) The date on which the analyses, opinions, and advice in an appraisal, review, or consulting service apply. 2) In a lease document, the date upon which the lease goes into effect. [1]

**Effective Gross Income Multiplier (EGIM):** The ratio between the sale price (or value) of a property and its effective gross income. [1]

**Effective Rent:** Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions, the rent that is effectively paid by a tenant net of financial concessions provided by a landlord. [1]

**Exposure Time:** 1) The time a property remains on the market. 2) The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.   Comment:   Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market (USPAP 2016-2017-ed). [1]

**Extraordinary Assumptions:** An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property, or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2016-2017 ed). [1]

**Fair Market Value:**   In nontechnical usage, a term that is equivalent to the contemporary usage of market value. [1]

**Fair Share:** That portion of total market supply accounted for by a subject property.   For example, a 100-key hotel in 1,000-key market has a fair share of 10%. [1]

**Fair Value:**
  1.  The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. (FASB)
  2.  The estimated price for the transfer of an asset or liability between identified knowledgeable and willing parties that reflects the respective interests of those parties. (This does not apply to valuations for financial reporting.) (IVS). [1]

**Fair Value:**   The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. [2]

**Fee Simple Estate:** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. [1]

**Floor Area Ratio (FAR):** The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area. [1]

**Going-Concern Value:** 1) 73.   An established and operating business having an indefinite future life. 2) 74.   An organization with an indefinite life that is sufficiently long that, over time, all currently incomplete transformations [transforming resources from one form to a different, more valuable form] will be completed. [1]

**Gross Building Area (GBA):** 1) Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. 2) Gross leasable area plus all common areas. 3) 16. For residential space, the total area of all floor levels measured from the exterior of the walls and including the super structure and substructure basement; typically does not include garage space. [1]

**Highest and Best Use:** 1) The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. 2) The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (IVS). 3) [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions) [1]

**Hypothetical Condition:** 1) 117.A condition that is presumed to be true when it is known to be false. (SVP). 2) A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment:   Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2016-2017 ed.) [1]

**Income Capitalization Approach:** Specific appraisal techniques applied to develop a value indication for a property based on its earning capability and calculated by the capitalization of property income. [1]

**Inspection:** Personal observation of the exterior or interior of the real estate that is the subject of an assignment performed to identify the property characteristics that are relevant to the assignment, such as amenities, general physical condition, and functional utility. Note that this is not the inspection process performed by a licensed or certified building inspector. [1]

**Insurable Value:** A type of value for insurance purposes. [1]

**Intangible Assets:** 1) A nonmonetary asset that manifests itself by its economic properties. It does not have physical substance but grants rights and economic benefits to its owner. (IVS). 2) A nonphysical asset such as a franchise, trademark, patent, copyright, goodwill, equity, mineral right, security, and contract (as distinguished from physical assets) that grant rights and privileges, and have value for the owner. (ASA).   3) An identifiable nonmonetary asset without physical substance. An asset is a resource that is controlled by the entity as a result of past events (for ex-ample, purchase or self-creation) and from which future economic benefits (inflows of cash or other assets) are expected. [IAS 38.8] Thus, the three critical attributes of an intangible asset are: identifiability, control (power to obtain benefits from the asset), ·future economic benefits (such as revenues or reduced future costs). (IAS 38) [1]

**Intangible property:** Nonphysical assets, including but not limited to franchises, trademarks, patents, copyrights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment. (USPAP, 2016-2017 ed.) [1]

**Intended Use:** 1) The valuer's intent as to how the re-port will be used. (SVP) 2) The use or uses of an appraiser's reported appraisal or appraisal review assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment. (USPAP, 2016-2017 ed.) [1]

**Intended User:** 1) The party or parties the valuer intends will use the report. (SVP) 2) The client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser on the basis of communication with the client at the time of the assignment. (USPAP, 2016-2017 ed.) [1]

**Internal Rate of Return ("IRR"):** The annualized yield rate or rate of return on capital that is generated or capable of being generalized within an investment of portfolio over a period of ownership.   Alternatively, the indicated return of capital associated with a projected or pro forma income stream.   The discount rate that equates the present value of the net cash flows of a project with the present value of the capital investment.   It is the rate at which the Net Present Value (NPV) equals zero.   The IRR reflects both the return on invested capital and the return of the original investment, which are basic considerations of potential investors.   Therefore, deriving the IRR from analysis of market transactions of similar properties having comparable income

patterns is a proper method for developing market discount rates for use in valuations to arrive at Market Value.   Used in discounted cash flow analysis to find the implied or expected rate of return of the project, the IRR is the rate of return which gives a zero net present value (NPV). See also equity yield rate (YE); financial management rate of return (FMRR); modified internal rate of return (MIRR); yield rate (Y). [1]

**Investment Value:** 1) The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. 2) The value of an asset to the owner or a prospective owner for individual investment or operational objectives. (IVS) [1]

**Leasehold Interest:** The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. [1]

**Leased Fee Interest:** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [1]

**Liquidation Value:** The most probable price that a specified interest in real property should bring under the following conditions: 1) Consummation of a sale within a short time period; 2) The property is subjected to market conditions prevailing as of the date of valuation; 3) Both the buyer and seller are acting prudently and knowledgeably; 4) The seller is under extreme compulsion to sell; 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) A normal marketing effort is not possible due to the brief exposure time 8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms. [1]

**Load Factor:** A measure of the relationship of common area to useable area and therefore the quality and efficiency of building area layout, with higher load factors indicating a higher percentage of common area to overall rentable space than lower load factors; calculated by subtracting the amount of usable area from the rentable area and then dividing the difference by the usable area: [1]
Load Factor =

$$\frac{(Rentable\ Area - Useable\ Area)}{Usable\ Area}$$

**Market Value.** The major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined.*

1. The most widely accepted components of market value are incorporated in the following definition: The most probable price that the specified property interest should sell for in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress.

2. Market value is described, not defined, in the Uniform Standards of Professional Appraisal Practice (USPAP) as follows: A type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal.  Comment: Forming an opinion of market value is the purpose of many real property appraisal assignments, particularly when the client's intended use includes more than one intended user. The conditions included in market value definitions establish market perspectives for development of the opinion. These conditions may vary from definition to definition but generally fall into three categories:

- the relationship, knowledge, and motivation of the parties (i.e., seller and buyer);
- the terms of sale (e.g., cash, cash equivalent, or other terms); and
- the conditions of sale (e.g., expo- sure in a competitive market for a reasonable time prior to sale).

Glossary Page 2

USPAP also requires that certain items be included in every appraisal report. Among these items, the following are directly related to the definition of market value:
- Identifications of the specific property rights to be appraised.
- Statement of the effective date of the value opinion.
- Specification as to whether cash, terms equivalent to cash, or other precisely described financing terms are assumed as the basis of the appraisal.
- If the appraisal is conditioned upon financing or other terms, specification as to whether the financing or terms are at, below, or above market interest rates and/or contain unusual conditions or incentives. The terms of above- or below-market interest rates and/or other special incentives must be clearly set forth; their contribution to, or negative influence on, value must be described and estimated; and the market data supporting the opinion of value must be described and explained.

3.  The following definition of market
value is used by agencies that regulate federally insured financial institutions in the United States: The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

Buyer and seller are typically motivated;
Both parties are well informed or well advised, and each acting in what they consider their own best interests;
A reasonable time is allowed for exposure in the open market;
Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
·    The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
(12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

4. The International Valuation Standards Council defines market value for the purpose of international standards as follows: The estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion. (IVS)

5. The Uniform Standards for Federal Land Acquisitions defines market value as follows: Market value is the amount in cash, or on terms reason ably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal. (Uniform Appraisal Standards for Federal Land Acquisitions) [1]

**Market Value "As If Complete" On The Appraisal Date:**
Market value as if complete on the effective date of the appraisal is an estimate of the market value of a property with all construction, conversion, or rehabilitation hypothetically completed, or under other specified hypothetical conditions as of the date of the appraisal. With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of completion, this estimate of value should reflect the market value of the property as if complete and prepared for occupancy by tenants.

**Market Value "As Is" On The Appraisal Date:** Value As Is -The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning. See also effective date; prospective value opinion.

**Market Value of the Total Assets of the Business:** The market value of the total assets of the business is the market value of all of the tangible and intangible assets of a business as if sold in aggregate as a going concern.  This assumes that the business is expected to continue operations well into the future. [4]

**Marketing Time:** An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal.  Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property Market Value Opinions" address the determination of reasonable exposure and marketing time.). [1]

**Net Lease:** A lease in which the landlord passes on all expenses to the tenant. See also lease. [1]

**Net Rentable Area (NRA):** 1) The area on which rent is computed. 2) The Rentable Area of a floor shall be computed by measuring to the inside finished surface of the dominant portion of the permanent outer building walls, excluding any major vertical penetrations of the floor. No deductions shall be made for columns and projections necessary to the building. Include space such as mechanical room, janitorial room, restrooms, and lobby of the floor. [5]

**Penetration Ratio (Rate):** The rate at which stores obtain sales from within a trade area or sector relative to the number of potential sales generated; usually applied to existing facilities. Also called: penetration factor.[1]

**Prospective opinion of value.** A value opinion effective as of a specified future date.  The term does not define a type of value.  Instead it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy. [1]

**Reconciliation:** A phase of a valuation assignment in which two or more value indications are processed into a value opinion, which may be a range of value, a single point estimate, or a reference to a benchmark value. [1]

**Reliable Measurement:**  [The IAS/IFRS framework requires that] neither an asset nor a liability is recognized in the financial statements unless it has a cost or value that can be measured reliably.[2]

**Remaining Economic Life:** The estimated period over which existing improvements are expected to contribute eco-nomically to a property; an estimate of the number of years remaining in the economic life of a structure or structural components as of the effective date of the appraisal; used in the economic age-life method of estimating depreciation. [1]

**Replacement Cost:** The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design, and layout. [1]

**Retrospective Value Opinion:** A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." [1]

**Sales Comparison Approach:** The process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales is available. [1]

**Scope of Work:** 1) The type of data and the extent of research and analyses. (SVP).  2) The type and extent of research and analyses in an appraisal or appraisal review assignment. (USPAP, 2016~2017 ed.) [1]

**Stabilized value:** A value opinion that excludes from consideration any abnormal relationship between supply and demand such as is experienced in boom periods when cost and sale price may exceed the long-term value, or during periods of depression, when cost and sale price may fall short of long-term value. It is also a value opinion that excludes from consideration any transitory condition that may cause excessive construction costs, e.g., a premium paid due to a temporary shortage of supply.

**Substitution:** The principle of substitution states that when several similar or commensurate commodities, goods, services are available, the one with the lowest price will attract the greatest demand and widest distribution. This is the primary principle upon which the cost and sales comparison approaches are based. [5]

**Total Assets of a Business:**  Total assets of a business is defined by the Appraisal Institute as "the tangible property (real property and personal property, including inventory and furniture, fixtures and equipment) and intangible property (cash, workforce, contracts, name, patents, copyrights, and other residual intangible assets, to include capitalized economic profit)."

**Use Value:**
The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Use value may or may not be equal to market value but is different conceptually. [1]

[1] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute 2010). [2] Appraisal Institute, *International Financial Reporting Standards for Real Property Appraiser, IFRS Website, www.ifrs-ebooks.com/index.html*. [3] Appraisal Institute, *The Appraisal of Real Estate*, 13th ed. (Chicago: Appraisal Institute 2008). [4] This definition is taken from "Allocation of Business Assets Into Tangible and Intangible Components: A New Lexicon," Journal of Real Estate Appraisal, January 2002, Volume LXX, Number 1.  This terminology is to replace former phrases such as: value of the going concern.  [5] Financial Publishing Company, *The Real Estate Dictionary*, 7th ed.  [6] U.S. Treasury Regulations

# LETTER OF ENGAGEMENT



Date:           1/28/2022

To:             Mark Haskell
                BBG
                3070 Bristol Street, Suite 625, Costa Mesa, CA 92626
                mhaskell@bbgre.com

**Re:**         **Property Address**
                106 W. Pennsylvania Ave., Redlands, CA 92374
                APN# 0167-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

As a follow-up to our request, we are pleased to submit this engagement letter in connection with the above referenced subject property.  We request that the appraisal report be in compliance with the *Uniform Standards of Professional Appraisal Practice* (USPAP), Preferred Bank's Appraisal Standards, and Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA: 12 CFR Part 323).

**PROPERTY INFORMATION**
Borrower:           Tesoro Redlands DE LLC
Property Type:      Multi-Family Apartment Complex
Property Address:   106 W. Pennsylvania Ave., Redlands, CA 92374
Contact Person:     Michael Kluchin
Cell:               (440)666-5779
Email:              michael@continuumanalytics.com

**REPORT REQUIREMENTS**
Report Type:        ☒ Appraisal Report - USPAP 2.2 (a)
                    ☐ Restricted Report - USPAP 2.2 (b)

Property Rights:    ☐ Fee Simple   ☒ Leased Fee   ☐ Leasehold Interest

Valuation Premises: ☒ As-Is   ☐ As Completed   ☒ As Stabilized   ☐ Bulk/Discounted
                    ☐ Aggregate Gross Retail Proceeds   ☒ Replacement Value

Approaches to Value: ☐ Cost Approach   ☒ Sales Comparison Approach   ☒ Income Approach

Appraisal Must Analyze:   ☒ Current Market Sales listing   ☒ Current Market Rent listing

Appraisal Fee:      $12,000.00

Delivery Date:      On or before 2/9/2022

---

Intended Use:          Internal credit decision making purpose

Intended User:         Preferred Bank

Distribution:          Electronic copy delivered directly to the bank's designated review appraiser and
                       Credit Administration.  One original hard copy together with your billing invoice
                       delivered to the handling account officer.

**Electronic Copy Delivery**
Review Appraiser:      XXXX
Credit Administration: appraisals@preferredbank.com
Handling Officer(s):   carol.lee@preferredbank.com


**Hard Copy & Invoice Delivery**
Handling Officer:      Carol Lee
Address:               601 S Figueroa St. 47th Floor
                       Los Angeles, CA 90017


Documents uploaded at EDR Platform: XXXX

**COVID-19:**  The impact of COVID-19 on the economy and real estate markets continues to evolve.
All appraisal reports prepared for Preferred Bank must rely upon current market conditions to determine
a market value estimate as of the effective date of value.  It is not appropriate to use an extraordinary
assumption or disclaimer in place of analyzing current market conditions.  While the available market
data may add a degree of volatility, appraisals may analyze information that currently exists including
changes to exposure and marketing times, changes in the number of listings and number of transactions
closing, increased unemployment and-or other economic data, current buyer/seller/market participant
expectations and the appraiser's best judgement to develop a credible appraisal.

In order to ensure appraisal regulation compliance, any communication with Preferred Bank should be
directed to the undersigned.  All information and material provided for the purpose of conducting the
appraisal assignment shall be deemed confidential.  The appraisal will be considered final upon
satisfactory reviewed by the bank's designated review appraiser.

If you need additional information or have questions, please email appraisals@preferredbank.com.
Please include the handling officer on your correspondences.

Sincerely,

Sindy Shieh
Vice President
Credit Administration

**Appraiser's Acceptance & Signature:**

_Mark Haskell_
_____          _1/31/2022_____
Signature (appraiser)                      Date

Appraisal License #:__N/A_____          Expiration Date:__N/A_____

**Attachments:**
Preferred Bank's Check List Reporting Requirements

**Preferred Bank's Appraisal Requirements:**

Your report must conform to the Bank's appraisal guidelines including, but not limited to, the following requirements:

| | |
|---|---|
| 1. | Complies with USPAP Standards Rule 1. |
| 2. | Complies with USPAP Standards Rule 2-1, 2-2, and 2-3. |
| 3. | Provide the source(s) of information used in the analysis. |
| 4. | Provide the source(s) of verification for sale and rent comparables. |
| 5. | Include at least one current sale and one current rent listing in the subject market and provide discussion on market listings relevant to the subject in the valuation. |
| 6. | Clearly identify any extraordinary assumptions and/or hypothetical conditions. |
| 7. | Provide a site sketch outlining the footprint(s) of the building(s) as they relate on the parcel(s). |
| 8. | Provide the source of gross/net building area and reconcile any significant discrepancies in the building square footage with actual measurements. |
| 9. | Provide photographs of obvious deficiencies (i.e. deferred maintenance, structural issues, life safety issues, environmental concerns, vacant space, etc.) |
| 10. | Highest and best use must state the most probable buyer profile. |
| 11. | Provide strengths and weaknesses that focus on the subject property. |
| 12. | Borrower interview (if applicable). |
| 13. | Provide sales quantitative adjustment grid or qualitative grid. |
| 14. | Analyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units.  The report must contain an estimate of market value "as is".  If the appraisal report also includes estimates of value that are based on proposed changes these values must be clearly identified as "hypothetical" or "prospective" values.  The cost and timing of the proposed changes must be explained in the report. |
| 15. | If applicable, analyze agreement of sale, option and listing of the subject property. |
| 16. | If applicable, analyze all sales of the subject property that occurred within the three years prior to the effective date of the appraisal. |
| 17. | Provide an opinion of reasonable exposure time linked to the value opinion. |
| 18. | Provide ample photographs of the subject property (interiors, exteriors and streets) and photographs of all sales and rent comparables. |
| 19. | Provide sales and rent comparables location maps as applicable. |
| 20. | If applicable, identify and separately value any personal property, fixtures or intangible items that are not considered real property but are included in the appraisal.  Also, discuss the impact of their inclusion or exclusion on the estimate of market value(s). |
| 21. | If applicable, identify any necessary or pertinent information that was unobtainable to the appraiser in the normal course of business and a statement on the efforts undertaken by the appraiser to obtain such information. |

Any item(s) not applicable or not provided should be explained.  Also, please include copy of the signed engagement letter and Preferred Bank's Check List Reporting Requirements in the appraisal report.

---

# TITLE REPORT

# Chicago Title Company

4911 Birch Street, , Newport Beach, CA 92660
Phone: (949) 724-3117 ● Fax: (949) 258-5237

Issuing Policies of Chicago Title Insurance Company

ORDER NO.: **00128171-002-KAH-K27**

Chicago Title Company
4911 Birch Street
Newport Beach, CA 92660
ATTN: Kathleen Huntsman
Email: KHuntsman@ctt.com

Escrow/Customer Phone: **(949) 724-3100**

Title Officer: John Balassi/Jason Silva (OC/Comm)
Title Officer Phone: (949) 724-3117
Title Officer Fax: (949) 258-5237
Title Officer Email: CTCommercialTitleNewport@ctt.com

PROPERTY: **106 WEST PENNSYLVANIA AVENUE, REDLANDS, CA**

## PRELIMINARY REPORT

In response to the application for a policy of title insurance referenced herein, **Chicago Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company, a Florida corporation.

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.**

Chicago Title Company

By: _____
    Authorized Signature

By: _____
    President
    ATTEST

    Secretary

# Chicago Title Company

4911 Birch Street, , Newport Beach, CA 92660
Phone: (949) 724-3117 ● Fax: (949) 258-5237

## PRELIMINARY REPORT

**EFFECTIVE DATE:**           **May 26, 2021 at 7:30 a.m.**

**ORDER NO.:  00128171-002-KAH-K27**

The form of policy or policies of title insurance contemplated by this report is:

**ALTA Extended Loan Policy (6-17-06)**

1.      THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

**A FEE**

2.      TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS <u>VESTED IN</u>:

**TESORO REDLANDS DE, LLC, a Delaware limited liability company**

3.      THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

**See Exhibit A attached hereto and made a part hereof.**

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00128171-002-KAH-K27

## EXHIBIT "A"

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF REDLANDS, IN THE COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 3 OF PARCEL MAP NO. 9105, IN THE CITY OF REDLANDS, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 95, PAGES 98 AND 99 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 0167-151-24-0-000

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00128171-002-KAH-K27

## EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

A.    Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2021-2022.

B.    Intentionally Deleted.

C.    The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

1.    Water rights, claims or title to water, whether or not disclosed by the public records.

2.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

| | |
|---|---|
| Granted to: | Southern California Edison Company, a corporation |
| Purpose: | Public utilities |
| Recording Date: | November 10, 1949 |
| Recording No: | 166, Book 2486, Page 315, of Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

Limitations on the use, by the owners of said Land, of the easement area as set forth in the easement document shown hereinabove.

Reference is hereby made to said document for full particulars.

3.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

| | |
|---|---|
| Granted to: | Southern California Edison Company |
| Purpose: | Public utilities |
| Recording Date: | September 13, 1954 |
| Recording No: | 362, Book 3462, Page 69, of Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

Limitations on the use, by the owners of said Land, of the easement area as set forth in the easement document shown hereinabove.

Reference is hereby made to said document for full particulars.

4.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

| | |
|---|---|
| Granted to: | General Telephone Company of California |
| Purpose: | Public utilities |
| Recording Date: | April 9, 1969 |
| Recording No: | 580, Book 7211, Page 441, of Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

Limitations on the use, by the owners of said Land, of the easement area as set forth in the easement document shown hereinabove.

Reference is hereby made to said document for full particulars.

## EXCEPTIONS
### (Continued)

5.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

| | |
|---|---|
| Granted to: | Southern California Edison Company, a corporation |
| Purpose: | Public utilities |
| Recording Date: | February 13, 1987 |
| Recording No: | 87-049718, of Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

Limitations on the use, by the owners of said Land, of the easement area as set forth in the easement document shown hereinabove.

Reference is hereby made to said document for full particulars.

6.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

| | |
|---|---|
| Granted to: | General Telephone Company of California |
| Purpose: | Public utilities, ingress and egress |
| Recording Date: | March 18, 1987 |
| Recording No: | 87-084393, of Official Records |
| Affects: | A portion of said land as more particularly described in said document. |

Limitations on the use, by the owners of said Land, of the easement area as set forth in the easement document shown hereinabove.

Reference is hereby made to said document for full particulars.

7.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $195,500,000.00 |
| Dated: | November 16, 2018 |
| Trustor/Grantor | Tesoro Redlands DE, LLC, a Delaware limited liability company |
| Trustee: | Chicago Title Company, a California corporation |
| Beneficiary: | LoanCore Capital Credit REIT LLC, a Delaware limited liability company |
| Recording Date: | November 19, 2018 |
| Recording No: | 2018-0432755, of Official Records |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | LCC Warehouse I LLC, a Delaware limited liability company |
| Recording Date: | July 2, 2019 |
| Recording No: | 2019-0218231, of Official Records |

A notice of default under the terms of said trust deed

| | |
|---|---|
| Executed by: | Chicago Title Company (as Trustee) |
| Recording Date: | January 11, 2021 |
| Recording No: | 2021-0013549, of Official Records of San Bernardino County, California. |

# EXCEPTIONS
## (Continued)

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | LOANCORE CAPITAL CREDIT REIT LLC, a Delaware limited liability company |
| Recording Date: | May 14, 2021 |
| Recording No: | 2021-0225214 of Official Records |

An assignment of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | DIG PFSS LBCP HOLDING COMPANY, LLC, a Delaware limited liability company |
| Recording Date: | May 17, 2021 |
| Recording No: | 2021-0227610 of Official Records |

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

| | |
|---|---|
| Trustee: | Fidelity National Title Company |
| Recording Date: | May 18, 2021 |
| Recording No: | 2021-0229251 of Official Records |

A notice of trustee's sale under said deed of trust

| | |
|---|---|
| Executed by: | Fidelity National Title Company |
| Date, Time and Place of Sale: | County Courthouse, 351 North Arrowhead, Avenue, San Bernardino, CA 92401 |
| Recording Date: | May 18, 2021 |
| Recording No: | 2021-0229252 of Official Records |

8.  An assignment of all the moneys due, or to become due as rental, as additional security for the obligations secured by deed of trust shown as Item No. 7.

| | |
|---|---|
| Assigned to: | LoanCore Capital Credit REIT LLC, a Delaware limited liability company |
| Recording Date: | November 19, 2018 |
| Recording No: | 2018-0432756, of Official Records |

An Assignment of Assignment of Leases and Rents of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | LCC Warehouse I LLC, a Delaware limited liability company |
| Recording Date: | July 2, 2019 |
| Recording No: | 2019-0218232, of Official Records |

An Assignment of Assignment of Leases and Rents of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | LOANCORE CAPITAL CREDIT REIT LLC, a Delaware limited liability company |
| Recording Date: | May 14, 2021 |
| Recording No: | 2021-0225215 of Official Records |

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00128171-002-KAH-K27

## EXCEPTIONS
## (Continued)

An Assignment of Assignment of Leases and Rents of the beneficial interest under said deed of trust which names:

| | |
|---|---|
| Assignee: | DIG PFSS LBCP HOLDING COMPANY, LLC, a Delaware limited liability company |
| Recording Date: | May 17, 2021 |
| Recording No: | 2021-0227611 of Official Records |

9.    A financing statement as follows:

| | |
|---|---|
| Debtor: | Tesoro Redlands DE, LLC, a Delaware limited liability company |
| Secured Party: | LoanCore Capital Credit REIT LLC, a Delaware limited liability company |
| Recording Date: | November 19, 2018 |
| Recording No: | 2018-0432757, of Official Records |

A change to the above financing statement was filed

| | |
|---|---|
| Nature of Change: | Assignment |
| Recording Date: | July 2, 2019 |
| Recording No: | 2019-0218233, of Official Records |

A change to the above financing statement was filed

| | |
|---|---|
| Nature of Change: | Assignment to DIG PFSS LBCP HOLDING COMPANY, LLC |
| Recording Date: | May 14, 2021 |
| Recording No: | 2021-0225216 of Official Records |

10.   A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Serve U Property Solution |
| Amount: | $29,258.00 |
| Recording Date: | December 3, 2020 |
| Recording No: | 2020-0490666, of Official Records of San Bernardino County, California |

11.   Any other claims for mechanics' or materialman's liens that may be recorded, by reason of a recent work of improvement that is disclosed by the lien shown in the last above numbered item.

12.   Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

The Company will require, for review, a full and complete copy of any unrecorded agreement, contract, license and/or lease, together with all supplements, assignments and amendments thereto, before issuing any policy of title insurance without excepting this item from coverage.

The Company reserves the right to except additional items and/or make additional requirements after reviewing said documents.

14.   Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

## EXCEPTIONS
### (Continued)

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH
FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

**END OF EXCEPTIONS**

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00128171-002-KAH-K27

## REQUIREMENTS SECTION

1.  The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

    Limited Liability Company:         Tesoro Redlands DE, LLC, a Delaware limited liability company

    a)  A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

    b)  If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

    c)  If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

    d)  A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

    e)  If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

    f)  If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

    g)  Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

2.  Prior to the close of escrow, the Company requires a Statement of Information to be completed by the following party(s),

    Party(s):              All Parties

    The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

3.  Furnish for review a full and complete copy of any unrecorded agreement, contract, license and/or lease together with all supplements, assignments and amendments thereto, prior to the close of this transaction.

    The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.: 00128171-002-KAH-K27

## REQUIREMENTS
### (Continued)

4.   Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the closing of this transaction. Thank you.

The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit/Declaration.

---

**END OF REQUIREMENTS**

---

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.: 00128171-002-KAH-K27

# INFORMATIONAL NOTES SECTION

1.  None of the items shown in this report will cause the Company to decline to attach ALTA Endorsement Form 9 to an Extended Coverage Loan Policy, when issued.

2.  The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land Multiple Family Residence properties, known as 106 West Pennsylvania Avenue, located within the City of Redlands, California, 92374, to an Extended Coverage Loan Policy.

3.  Note: The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

4.  Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

5.  Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax. If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

6.  Note: There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

7.  Note:   Property taxes for the fiscal year shown below are PAID. For proration purposes the amounts were:

    Tax Identification No.:   0167-151-24
    Fiscal Year:              2020 - 2021
    1st Installment:          $189,570.21
    2nd Installment:          $189,570.19
    Land:                     $4,654,458.00
    Improvements:             $25,383,035.00
    Code Area:                005-000

---

## END OF INFORMATIONAL NOTES

John Balassi/Jason Silva (OC/Comm)/725

**WIRE SAFE**™ | Inquire before you wire!

## Wire Fraud Alert

This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complaint Center:*
*http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

**Chicago Title Company**

4911 Birch Street, , Newport Beach, CA 92660
Phone: (949) 724-3117 ● Fax: (949) 258-5237

## Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment.  Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate.  As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative.  These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount.  These discounts only apply to transactions involving services rendered by the FNF Family of Companies.  This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

| **FNF Underwritten Title Company** | **Underwritten by FNF Underwriters** |
|---|---|
| CTC – Chicago Title company | CTIC – Chicago Title Insurance Company |
| CLTC – Commonwealth Land Title Company | CLTIC - Commonwealth Land Title Insurance Company |
| FNTC – Fidelity National Title Company of California | FNTIC – Fidelity National Title Insurance Company |
| FNTCCA - Fidelity National Title Company of California | FNTIC - Fidelity National Title Insurance Company |
| TICOR – Ticor Title Company of California | CTIC – Chicago Title Insurance Company |
| LTC – Lawyer's Title Company | CLTIC – Commonwealth Land Title Insurance Company |
| SLTC – ServiceLink Title Company | CTIC – Chicago Title Insurance Company |

### Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be forty (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

## FIDELITY NATIONAL FINANCIAL, INC.
## PRIVACY NOTICE

Effective January 1, 2020

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:
- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites.  FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

### Use of Personal Information
FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

### When Information Is Disclosed
We may disclose your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

Copyright © 2020. Fidelity National Financial, Inc. All Rights Reserved
Order No. 00128171-002-KAH-K27

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We do share Personal Information among affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information
If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request by email, phone, or physical mail as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice. We may use comments or feedback that you submit to us in any manner without notice or compensation to you.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, send your requests to privacy@fnf.com, by phone to (888) 934-3354, or by mail to:

<div align="center">

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

</div>

# ATTACHMENT ONE (Revised 05-06-16)

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE

### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it.  This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

Attachment One – CA (Rev. 05-06-16)                                                                                                            Page 1

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

c.   that result in no loss to You; or
d.   that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5.   Failure to pay value for Your Title.
6.   Lack of a right:
     a.   to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
     b.   in streets, alleys, or waterways that touch the Land.
     This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.   The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8.   Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9.   Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
     •   For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1.   (a)   Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
           (i)    the occupancy, use, or enjoyment of the Land;
           (ii)   the character, dimensions, or location of any improvement erected on the Land;
           (iii)  the subdivision of land; or
           (iv)   environmental protection;
         or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
     (b)   Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.   Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.   Defects, liens, encumbrances, adverse claims, or other matters
     (a)   created, suffered, assumed, or agreed to by the Insured Claimant;
     (b)   not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
     (c)   resulting in no loss or damage to the Insured Claimant;
     (d)   attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
     (e)   resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
     (a)   a fraudulent conveyance or fraudulent transfer, or
     (b)   a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).
The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

{Except as provided in Schedule B - Part II,{ t{or T}his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

Attachment One – CA (Rev. 05-06-16)                                                                                         Page 2

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

## {PART I

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material not shown by the Public Records.}

## PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:}

## 2006 ALTA OWNER'S POLICY (06-17-06)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a)  a fraudulent conveyance or fraudulent transfer; or
    (b)  a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material not shown by the Public Records. }
7.  {Variable exceptions such as taxes, easements, CC&R's, etc. shown here.}

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

### ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
        (i)   the occupancy, use, or enjoyment of the Land;
        (ii)  the character, dimensions, or location of any improvement erected on the Land;
        (iii) the subdivision of land; or
        (iv)  environmental protection;
        or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any  other substances.

---

Attachment One – CA (Rev. 05-06-16)                                                                            Page 4

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.



This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.

# OWNER'S DECLARATION

Escrow No.:            00128171-002-KAH-K27
Property Address:      106 W Pennsylvania Ave
                       Redlands, CA

The undersigned hereby declares as follows:

1.    (Fill in the applicable paragraph and strike the other)

   a.    Declarant ("Owner") is the owner or lessee, as the case may be, of certain premises located at 106 W
         Pennsylvania Ave, Redlands, CA, further described as follows:  See Preliminary Report/Commitment No.  for
         full legal description (the "Land").

   b.    Declarant    is    the    _____    of    _____
         ("Owner"), which is the owner or lessee, as the case may be, of certain premises located at 106 W Pennsylvania
         Ave, Redlands, CA, further described as follows:  See Preliminary Report/Commitment No.  for full legal
         description (the "Land").

2.    (Fill in the applicable paragraph and strike the other)

   a.    During the period of six months immediately preceding the date of this declaration no work has been done, no
         surveys or architectural or engineering plans have been prepared, and no materials have been furnished in
         connection with the erection, equipment, repair, protection or removal of any building or other structure on the
         Land or in connection with the improvement of the Land in any manner whatsoever.

   b.    During the period of six months immediately preceding the date of this declaration certain work has been done
         and materials furnished in connection with _____ upon the Land in the approximate
         total sum of $_____, but no work whatever remains to be done and no materials remain to be furnished to
         complete the construction in full compliance with the plans and specifications, nor are there any unpaid bills
         incurred for labor and materials used in making such improvements or repairs upon the Land, or for the services
         of architects, surveyors or engineers, except as follows:
         Owner, by the undersigned Declarant, agrees to and does hereby indemnify and hold harmless Chicago Title
         Company against any and all claims arising therefrom.

3.    Owner has not previously conveyed the Land;  is not a debtor in bankruptcy (and if a partnership, the general partner
      thereof is not a debtor in bankruptcy); and has not received notice of any pending court action affecting the title to the
      Land.

4.    Except as shown in the above-referenced Preliminary Report/Commitment, there are no unpaid or unsatisfied mortgages,
      deeds of trust, Uniform Commercial Code financing statements, regular assessments, special assessments, periodic
      assessments or any assessment from any source, claims of lien, special assessments, or taxes that constitute a lien against
      the Land or that affect the Land but have not been recorded in the public records. There are no violations of the covenants,
      conditions and restrictions as shown in the above-referenced Preliminary Report/Commitment.

5.    The Land is currently in use as _____;  _____ occupy/occupies the Land;  and
      the following are all of the leases or other occupancy rights affecting the Land:

      _____

6.    There are no other persons or entities that assert an ownership interest in the Land, nor are there unrecorded easements,
      claims of easement, or boundary disputes that affect the Land.

7.    There are no outstanding options to purchase or rights of first refusal affecting the Land.

8.    Between the most recent Effective Date of the above-referenced Preliminary Report/Commitment and the date of
      recording of the Insured Instrument(s), Owner has not taken or allowed, and will not take or allow, any action or inaction
      to encumber or otherwise affect title to the Land.

This declaration is made with the intention that Chicago Title Company (the "Company") and its policy issuing agents will rely
upon it in issuing their title insurance policies and endorsements. Owner, by the undersigned Declarant, agrees to indemnify the
Company against loss or damage (including attorneys fees, expenses, and costs) incurred by the Company as a result of any untrue
statement made herein.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _____ at
_____.

Signature:        _____

# RENT ROLL

**Rent Roll**
**Properties:** 310 - Tesoro - Tesoro Redlands DE, LLC 106 W Pennsylvania Ave Redland, CA 92374
**As of:** 02/08/2022

| Unit | BD/BA | Tenant | Sq. Ft. | Rent | Lease From | Lease To |
|------|-------|--------|---------|------|-----------|----------|
| 0101 | 2/2.00 | Anthony Ramirez | 882 | 1,884.00 | 08/20/2020 | |
| 0102 | 2/2.00 | Monica Padilla | 882 | 1,946.00 | 02/01/2020 | |
| 0103 | 2/2.00 | Maintenance Staff Unit | 882 | | | |
| 0104 | 2/2.00 | Maria Oliveros | 882 | 1,790.00 | 07/08/2021 | 07/07/2022 |
| 0105 | 1/1.00 | Steve Gomez | 683 | 1,421.00 | 10/01/2020 | |
| 0106 | 1/1.00 | Jonathan Quirino | 683 | 1,600.00 | 09/27/2021 | 10/26/2022 |
| 0107 | 1/1.00 | Miya Arrington | 683 | 1,617.00 | 10/30/2020 | |
| 0108 | 1/1.00 | Donald R. Reser | 683 | 1,600.00 | 12/23/2021 | 01/22/2023 |
| 0201 | 2/2.00 | Veronica Salazar | 837 | 1,539.00 | 04/01/2021 | 04/30/2022 |
| 0202 | 2/2.00 | Gloria Aguilar | 837 | 1,695.00 | 05/15/2021 | 06/14/2022 |
| 0203 | 2/2.00 | Brianna Albertson | 837 | 1,629.00 | 07/12/2020 | |
| 0204 | 2/2.00 | Henry Gonzales | 837 | 1,628.00 | 03/07/2020 | |
| 0205 | 2/2.00 | Adam Long | 837 | 1,651.00 | 12/12/2020 | 12/11/2021 |
| 0206 | 2/2.00 | Laurin Bergmann | 837 | 1,614.00 | 09/07/2021 | 10/06/2022 |
| 0207 | 2/2.00 | Henry Macalma | 837 | 1,608.00 | 09/01/2019 | |
| 0208 | 2/2.00 | Dana Serrano | 837 | 1,590.00 | 08/17/2020 | |
| 0209 | 2/2.00 | Nancy Santos | 837 | 1,833.00 | 08/17/2021 | 08/16/2022 |
| 0210 | 2/2.00 | Mikayla Counce | 837 | 1,630.00 | 02/16/2021 | 03/15/2022 |
| 0301 | 2/2.00 | Charisse Conley | 837 | 1,603.00 | 02/25/2012 | 10/31/2022 |
| 0302 | 2/2.00 | | 837 | | | |
| 0303 | 2/2.00 | Model Unit | 837 | | | |
| 0304 | 2/2.00 | Brianna Dahlseid | 837 | 1,770.00 | 12/05/2019 | |
| 0305 | 2/2.00 | Cynthia Otero | 837 | 1,775.00 | 04/10/2021 | 05/09/2022 |
| 0306 | 2/2.00 | La Nesha Hunter | 837 | 1,715.00 | 08/01/2020 | |
| 0307 | 2/2.00 | Latoya Arnold | 837 | 1,502.00 | 06/07/2014 | 06/30/2022 |
| 0308 | 2/2.00 | Steven Weslowski | 837 | 1,775.00 | 10/08/2021 | 11/07/2022 |
| 0309 | 2/2.00 | Dale Villalpando | 837 | 1,600.00 | 10/25/2003 | |
| 0310 | 2/2.00 | Marlina Montoya | 837 | 1,705.00 | 02/17/2021 | 03/16/2022 |
| 0401 | 2/2.00 | Nosheen Sarfraz | 837 | 1,684.00 | 12/23/2016 | |
| 0402 | 2/2.00 | Elaina Jimenez | 837 | 1,590.00 | 08/07/2019 | |
| 0403 | 2/2.00 | Aubrey Eakins | 837 | 1,629.00 | 07/01/2019 | 07/31/2022 |
| 0404 | 2/2.00 | Senaida Anguiano | 837 | 1,715.00 | 08/19/2020 | 09/04/2022 |
| 0405 | 2/2.00 | Nazario Gonzalez | 837 | 1,593.00 | 12/07/2013 | |
| 0406 | 2/2.00 | Diana Campise | 837 | 1,710.00 | 12/01/2007 | |
| 0407 | 2/2.00 | | 837 | | | |
| 0408 | 2/2.00 | Jhavan Brownie | 837 | 1,574.00 | 04/07/2018 | 05/06/2022 |
| 0409 | 2/2.00 | Gabriel Jimenez | 837 | 1,629.00 | 07/13/2019 | 08/12/2022 |
| 0410 | 2/2.00 | Rogeri Campos | 837 | 1,575.00 | 07/15/2019 | |
| 0601 | 2/2.00 | Jkaire Gentry | 882 | 1,890.00 | 05/05/2021 | 06/04/2022 |
| 0602 | 2/2.00 | The Church Of Jesus Ol | 882 | 1,471.00 | 03/26/2016 | |
| 0603 | 2/2.00 | Ejaz Nadeem | 882 | 1,678.00 | 08/01/2019 | |
| 0604 | 2/2.00 | Andrew Mclaughlin | 882 | 1,825.00 | 03/13/2021 | 04/12/2022 |

**Rent Roll**

**Properties:** 310 - Tesoro - Tesoro Redlands DE, LLC 106 W Pennsylvania Ave Redland, CA 92374

**As of:** 02/08/2022

| Unit | BD/BA | Tenant | Sq. Ft. | Rent | Lease From | Lease To |
|------|-------|--------|---------|------|-----------|----------|
| 0605 | 1/1.00 | Jeffrey D. Boyle | 683 | 1,675.00 | 12/27/2021 | 01/26/2023 |
| 0606 | 1/1.00 | Walden Environment | 683 | 1,600.00 | 01/26/2020 | |
| 0607 | 1/1.00 | Dean Moering | 683 | 1,500.00 | 01/10/2021 | 01/09/2022 |
| 0608 | 1/1.00 | Christian Arriaga | 683 | 1,576.00 | 01/15/2021 | |
| 0701 | 2/2.00 | Jessica Savage | 882 | 1,740.00 | 04/02/2020 | 05/01/2022 |
| 0702 | 2/2.00 | Jasmine Otero | 882 | 1,850.00 | 01/27/2021 | |
| 0703 | 2/2.00 | Sulila Sio | 882 | 1,756.00 | 07/28/2018 | |
| 0704 | 2/2.00 | Brittney Monreal | 882 | 1,820.00 | 02/13/2021 | 03/12/2022 |
| 0705 | 1/1.00 | Nettisha Threadgill | 683 | 1,564.00 | 05/26/2021 | 06/25/2022 |
| 0706 | 1/1.00 | Youssef Tazi | 683 | 1,600.00 | 12/27/2021 | 01/26/2023 |
| 0707 | 1/1.00 | Randall Farmer | 683 | 1,446.00 | 11/25/2017 | 10/31/2020 |
| 0708 | 1/1.00 | Monica Najera | 683 | 1,582.00 | 02/11/2017 | 01/31/2022 |
| 0801 | 2/2.00 | Ashrie Matthews | 882 | 1,854.00 | 07/21/2021 | 08/20/2022 |
| 0802 | 2/2.00 | Dianna  White | 882 | 1,780.00 | 05/28/2021 | 06/27/2022 |
| 0803 | 2/2.00 | Christopher Harris | 882 | 1,739.00 | 06/17/2019 | 07/16/2022 |
| 0804 | 2/2.00 | Melvin Truesdale | 882 | 1,810.00 | 09/10/2021 | 10/09/2022 |
| 0805 | 1/1.00 | Eric  Mauger | 683 | 1,446.00 | 05/25/2017 | |
| 0806 | 1/1.00 | Taylor Williams | 683 | 1,494.00 | 08/06/2021 | 09/05/2022 |
| 0807 | 1/1.00 | Bryan Gilley | 683 | 1,600.00 | 06/11/2021 | 07/10/2022 |
| 0808 | 1/1.00 | | 683 | | | |
| 0901 | 2/2.00 | Kellie Rodgers | 837 | 1,608.00 | 07/03/2019 | |
| 0902 | 2/2.00 | Christian Bornilla | 837 | 1,775.00 | 09/18/2021 | 09/17/2022 |
| 0903 | 2/2.00 | Jan-Ette Behrends | 837 | 1,629.00 | 08/24/2017 | 06/30/2022 |
| 0904 | 2/2.00 | Joshua D. Jacques | 837 | 1,775.00 | 11/05/2021 | 12/05/2022 |
| 0905 | 2/2.00 | Christina Moreno | 837 | 1,792.00 | 01/27/2021 | |
| 0906 | 2/2.00 | Joshua Mckoy | 837 | 1,736.00 | 01/01/2021 | 12/31/2021 |
| 0907 | 2/2.00 | Keith Dabols | 837 | 1,737.00 | 02/10/2020 | 03/09/2022 |
| 0908 | 2/2.00 | Genie James | 837 | 1,716.00 | 12/19/2019 | |
| 0909 | 2/2.00 | Alexis Otero | 837 | 1,788.00 | 11/17/2020 | 11/16/2021 |
| 0910 | 2/2.00 | Marvin  Diaz | 837 | 1,890.00 | 01/31/2022 | 02/28/2023 |
| 1001 | 2/2.00 | Mia Hill | 837 | 1,765.00 | 03/06/2021 | 04/05/2022 |
| 1002 | 2/2.00 | Betty Wyatt | 837 | 1,536.00 | 03/15/2019 | |
| 1003 | 2/2.00 | Shaquawn Joyner | 837 | 0.00 | 09/22/2020 | |
| 1004 | 2/2.00 | Lucas Zucker | 837 | 1,688.00 | 01/12/2019 | |
| 1005 | 2/2.00 | Timothy Perez | 837 | 1,694.00 | 11/10/2017 | |
| 1006 | 2/2.00 | Marlin Advincula | 837 | 1,637.00 | 11/22/2016 | 11/30/2021 |
| 1007 | 2/2.00 | Breanna Leavel | 837 | 1,788.00 | 09/10/2020 | 09/09/2021 |
| 1008 | 2/2.00 | Saba Masih | 837 | 1,590.00 | 09/09/2017 | 09/30/2022 |
| 1009 | 2/2.00 | George  Chalouhi | 837 | 1,583.00 | 04/01/2021 | |
| 1010 | 2/2.00 | Ricki  Keener | 837 | 1,731.00 | 09/12/2020 | 09/11/2021 |
| 1101 | 2/2.00 | Alfred White | 837 | 1,726.00 | 07/23/2021 | 08/22/2022 |
| 1102 | 2/2.00 | Frank  Crosswhite | 837 | 1,648.00 | 07/31/2010 | 03/16/2022 |
| 1103 | 2/2.00 | Edmund Uy | 837 | 1,601.00 | 10/03/2006 | 05/04/2021 |

**Rent Roll**
**Properties:** 310 - Tesoro - Tesoro Redlands DE, LLC 106 W Pennsylvania Ave Redland, CA 92374
**As of:** 02/08/2022

| Unit | BD/BA | Tenant | Sq. Ft. | Rent | Lease From | Lease To |
|------|-------|--------|---------|------|-----------|---------|
| 1104 | 2/2.00 | Tristen Braden | 837 | 1,702.00 | 11/30/2019 | 11/29/2021 |
| 1105 | 2/2.00 | Jamie Griego | 837 | 1,771.00 | 06/11/2020 | 06/10/2021 |
| 1106 | 2/2.00 | Riley Tompkins | 837 | 1,680.00 | 05/12/2021 | 06/11/2022 |
| 1107 | 2/2.00 | Mumtaz Shahid | 837 | 1,875.00 | 01/14/2022 | 02/13/2023 |
| 1108 | 2/2.00 | | 837 | | | |
| 1109 | 2/2.00 | Sonja Brock | 837 | 1,706.00 | 02/03/2018 | 03/14/2022 |
| 1110 | 2/2.00 | Kristie Burgess | 837 | 1,551.00 | 05/01/2012 | 05/31/2022 |
| 1201 | 2/2.00 | Joel Gilkey | 837 | 1,629.00 | 07/27/2019 | 08/26/2022 |
| 1202 | 2/2.00 | Puneetuh Pahdocony | 837 | 1,457.00 | 06/16/2014 | |
| 1203 | 2/2.00 | Arian Lahijani | 837 | 1,645.00 | 08/03/2019 | 09/02/2022 |
| 1204 | 2/2.00 | Daniel Reynosa | 837 | 1,650.00 | 03/20/2021 | 04/19/2022 |
| 1205 | 2/2.00 | Edo Dove | 837 | 1,832.00 | 07/23/2021 | 08/22/2022 |
| 1206 | 2/2.00 | Joshua Smith | 837 | 1,590.00 | 03/04/2017 | 03/31/2022 |
| 1207 | 2/2.00 | Ricky Allen | 837 | 1,771.00 | 08/11/2020 | 09/10/2022 |
| 1208 | 2/2.00 | Alejandra Moreno | 837 | 1,680.00 | 05/08/2021 | 06/07/2022 |
| 1209 | 2/2.00 | Angel Garcia | 837 | 1,629.00 | 05/25/2018 | 06/24/2022 |
| 1210 | 2/2.00 | Heidi Vercaigne | 837 | 1,650.00 | 03/29/2019 | 04/28/2022 |
| 1301 | 2/2.00 | Sandra Beverly | 882 | 1,883.00 | 06/10/2020 | 07/09/2022 |
| 1302 | 2/2.00 | Michael Hooks | 882 | 1,787.00 | 11/19/2020 | |
| 1303 | 2/2.00 | David L. Salarda | 882 | 1,864.00 | 11/16/2021 | 12/15/2022 |
| 1304 | 2/2.00 | Duane Frevert | 882 | 1,575.00 | 11/15/1989 | 07/31/2022 |
| 1305 | 1/1.00 | Timothy Watson | 683 | 1,617.00 | 09/14/2020 | 10/13/2022 |
| 1306 | 1/1.00 | Verenice Rico | 683 | 1,675.00 | 01/17/2022 | 02/16/2023 |
| 1307 | 1/1.00 | Joshua Barraza | 683 | 1,603.00 | 08/09/2021 | 09/08/2022 |
| 1308 | 1/1.00 | | 683 | | | |
| 1401 | 1/1.00 | Justin Jonathan Acosta | 683 | 1,420.00 | 11/20/2009 | 12/31/2021 |
| 1402 | 1/1.00 | Cynthia Maynes | 683 | 1,442.00 | 09/24/2016 | |
| 1403 | 1/1.00 | Adriana Flores | 683 | 1,457.00 | 12/08/2001 | 09/29/2022 |
| 1404 | 1/1.00 | Bryan Ramirez | 683 | 1,422.00 | 08/15/2019 | 08/14/2021 |
| 1405 | 2/2.00 | Kristina Perez | 882 | 1,884.00 | 08/31/2020 | 09/29/2022 |
| 1406 | 2/2.00 | Blanca Gutierrez | 882 | 1,685.00 | 03/14/2020 | 04/13/2022 |
| 1407 | 2/2.00 | Samson Samuel | 882 | 1,644.00 | 07/01/2007 | |
| 1408 | 2/2.00 | Mayra Gomez | 882 | 1,933.00 | 03/05/2021 | 04/04/2022 |
| 1501 | 1/1.00 | Michael Martinez | 683 | 1,464.00 | 06/01/2019 | |
| 1502 | 1/1.00 | Elijah Claibome | 683 | 1,563.00 | 03/25/2021 | 04/24/2022 |
| 1503 | 1/1.00 | Samantha Almazan | 683 | 1,446.00 | 08/17/2012 | 09/30/2022 |
| 1504 | 1/1.00 | Krystal Taylor | 683 | 1,393.00 | 03/18/2009 | |
| 1505 | 2/2.00 | Debra Marks Anthony | 882 | 1,619.00 | 05/01/2014 | 05/31/2022 |
| 1506 | 2/2.00 | Rahema Gomez | 882 | 1,850.00 | 07/09/2021 | 08/08/2022 |
| 1507 | 2/2.00 | Tommy J. Moscorro | 882 | 1,721.00 | 11/22/2021 | 12/21/2022 |
| 1508 | 2/2.00 | Audrey Jimenez | 882 | 1,609.00 | 04/16/2009 | 09/30/2022 |
| 1601 | 1/1.00 | Hovhannes Ghazaryan | 683 | 1,602.00 | 06/19/2020 | 07/18/2022 |
| 1602 | 1/1.00 | Robbie Goins II | 683 | 1,494.00 | 09/25/2021 | 10/24/2022 |

**Rent Roll**
**Properties:** 310 - Tesoro - Tesoro Redlands DE, LLC 106 W Pennsylvania Ave Redland, CA 92374
**As of:** 02/08/2022

| Unit | BD/BA | Tenant | Sq. Ft. | Rent | Lease From | Lease To |
|------|-------|--------|---------|------|------------|----------|
| 1603 | 1/1.00 | Theresa Long | 683 | 1,464.00 | 10/15/2009 | 05/31/2022 |
| 1604 | 1/1.00 | Kevin Baker | 683 | 1,600.00 | 07/14/2021 | 08/13/2022 |
| 1605 | 2/2.00 | Sandra Avalos | 882 | 1,848.00 | 03/18/2021 | 04/17/2022 |
| 1606 | 2/2.00 | Alex  Martinez | 882 | 1,685.00 | 03/20/2020 | 04/22/2022 |
| 1607 | 2/2.00 | Lela E. Drummer | 882 | 1,950.00 | 12/13/2021 | 01/12/2023 |
| 1608 | 2/2.00 | Olly Rogahang | 882 | 1,780.00 | 07/22/2021 | 08/21/2022 |
| 1701 | 1/1.00 | Leesha Roberts | 683 | 1,617.00 | 10/19/2020 | |
| 1702 | 1/1.00 | David Romero | 683 | 1,494.00 | 07/03/2021 | 08/02/2022 |
| 1703 | 1/1.00 | Veronica Lee | 683 | 1,518.00 | 04/04/2020 | 05/03/2022 |
| 1704 | 1/1.00 | Telesia Tuifua | 683 | 1,441.00 | 02/12/2021 | 03/11/2022 |
| 1705 | 2/2.00 | Briana Castellanos | 882 | 1,884.00 | 08/15/2020 | |
| 1706 | 2/2.00 | Jaime Zachary | 882 | 1,811.00 | 11/20/2019 | 11/19/2021 |
| 1707 | 2/2.00 | Carmina Espinoza | 882 | 1,792.00 | 11/15/2010 | 12/31/2021 |
| 1708 | 2/2.00 | LaShaun Currie | 882 | 1,890.00 | 05/19/2021 | 06/18/2022 |
| 1801 | 2/2.00 | Brian Summers | 837 | 1,590.00 | 02/14/2018 | |
| 1802 | 2/2.00 | Melissa Lopez | 837 | 1,735.00 | 08/13/2021 | 09/12/2022 |
| 1803 | 2/2.00 | Paula Enriquez | 837 | 1,771.00 | 07/06/2020 | 08/05/2022 |
| 1804 | 2/2.00 | Ariel Downing | 837 | 1,583.00 | 06/10/2017 | |
| 1805 | 2/2.00 | Yvonne Rodriguez | 837 | 1,788.00 | 11/04/2020 | 11/02/2021 |
| 1806 | 2/2.00 | LDawn Johnson | 837 | 1,601.00 | 03/08/2019 | 04/07/2022 |
| 1807 | 2/2.00 | Allison Crawford | 837 | 1,629.00 | 07/08/2019 | |
| 1808 | 2/2.00 | Yvette Felipe | 837 | 1,490.00 | 04/01/2012 | |
| 1809 | 2/2.00 | Steven Evangelista | 837 | 1,788.00 | 09/08/2020 | 10/07/2022 |
| 1810 | 2/2.00 | Ginette Gagnon | 837 | 1,574.00 | 06/15/2019 | 07/14/2022 |
| 1901 | 2/2.00 | Johanna Donato | 837 | 1,678.00 | 04/10/2019 | |
| 1902 | 2/2.00 | Oscar Jimenez | 837 | 1,725.00 | 01/18/2019 | 02/17/2022 |
| 1903 | 2/2.00 | Jerry Lopez | 837 | 1,668.00 | 09/22/2018 | |
| 1904 | 2/2.00 | Trevahn Vance | 837 | 1,826.00 | 02/01/2020 | |
| 1905 | 2/2.00 | Phillip Sosa | 837 | 1,771.00 | 07/06/2020 | 08/05/2022 |
| 1906 | 2/2.00 | Vanessa Ortiz | 837 | 1,715.00 | 08/31/2020 | |
| 1907 | 2/2.00 | Shane Pope | 837 | 1,792.00 | 12/12/2020 | 01/11/2023 |
| 1908 | 2/2.00 | Alejandra  Juarez | 837 | 1,905.00 | 01/21/2022 | 02/20/2023 |
| 1909 | 2/2.00 | Kyle Gumpert | 837 | 1,690.00 | 04/01/2021 | 04/30/2022 |
| 1910 | 2/2.00 | Quintin Watson | 837 | 1,554.00 | 07/13/2019 | |
| 2001 | 2/2.00 | Claudia Mejia | 837 | 1,694.00 | 10/14/2019 | |
| 2002 | 2/2.00 | Matthew Valdivia | 837 | 1,715.00 | 08/21/2020 | |
| 2003 | 2/2.00 | Andrew  Veloz | 837 | 1,771.00 | 06/26/2020 | 07/25/2022 |
| 2004 | 2/2.00 | Brandon King | 837 | 1,585.00 | 04/05/2021 | 05/04/2022 |
| 2005 | 2/2.00 | Chalon Harding | 837 | 1,625.00 | 06/01/2017 | |
| 2006 | 2/2.00 | Markita Johnson | 837 | 1,715.00 | 07/31/2020 | 08/30/2022 |
| 2007 | 2/2.00 | Daniel  Escalante | 837 | 1,950.00 | 01/19/2022 | 02/18/2023 |
| 2008 | 2/2.00 | Stephen D. Miles | 837 | 1,775.00 | 11/15/2021 | 12/14/2022 |
| 2009 | 2/2.00 | Abel  Mondaca | 837 | 1,583.00 | 04/06/2018 | |

**Rent Roll**
**Properties:** 310 - Tesoro - Tesoro Redlands DE, LLC 106 W Pennsylvania Ave Redland, CA 92374
**As of:** 02/08/2022

| Unit | BD/BA | Tenant | Sq. Ft. | Rent | Lease From | Lease To |
|------|-------|--------|---------|------|------------|----------|
| 2010 | 2/2.00 | John Halder | 837 | 1,639.00 | 06/20/2015 | 02/17/2022 |
| 2201 | 1/1.00 | Walden Environment | 683 | 1,450.00 | 09/23/2014 | 04/30/2022 |
| 2202 | 1/1.00 | Taylor Martinez | 683 | 1,489.00 | 05/07/2020 | 06/04/2022 |
| 2203 | 1/1.00 | Llexsia Alamillo | 683 | 1,491.00 | 03/13/2020 | 04/12/2022 |
| 2204 | 1/1.00 | James Rodriguez | 683 | 1,600.00 | 07/09/2021 | 08/08/2022 |
| 2205 | 2/2.00 | Molly Zubia | 882 | 1,653.00 | 08/08/2015 | 09/30/2022 |
| 2206 | 2/2.00 | Lilliana Sandoval | 882 | 1,753.00 | 11/20/2018 | |
| 2207 | 2/2.00 | Joshua Fraser | 882 | 1,901.00 | 10/10/2020 | |
| 2208 | 2/2.00 | Dameon Cutrer | 882 | 1,810.00 | 08/13/2021 | 09/12/2022 |
| 2401 | 2/2.00 | Paulina Montoya | 837 | 1,764.00 | 02/12/2021 | 03/11/2022 |
| 2402 | 2/2.00 | Sanford Dunson | 837 | 1,678.00 | 10/24/2019 | |
| 2403 | 2/2.00 | Timothy Lee | 837 | 1,629.00 | 07/30/2019 | 08/29/2022 |
| 2404 | 2/2.00 | | 837 | | | |
| 2405 | 2/2.00 | | 837 | | | |
| 2406 | 2/2.00 | Mirna Iskander | 837 | 1,575.00 | 06/22/2019 | 07/21/2022 |
| 2407 | 2/2.00 | Thomas Hudson | 837 | 1,759.00 | 12/11/2018 | |
| 2408 | 2/2.00 | Michael Figone | 837 | 1,630.00 | 02/13/2021 | 03/12/2022 |
| **188 Units** | | **Total** | **152,996** | **297,499.00** | | |

| | Occupied | 145,726 95.25% | |
|---|----------|----------------|---|
| | Vacant* | 7,270 4.75% | |

*Including model unit and maintenance staff unit as vacant

# OPERATING STATEMENTS

**Tesoro**

**Operating Statement**

| | 2022 Budget |
|---|---|
| **Ordinary Income/Expense** | |
| Income | |
| Rent | 3,841,800.58 |
| Vacancy Gross up | 154,558.80 |
| Vacancy / Collection Loss | -384,180.06 |
| Other Income | 89,887.00 |
| Misc Income | 30,000.00 |
| Utilities Reimbursement | 300,048.00 |
| Total Income | 4,032,114.32 |
| Expense | |
| Insurance Expense | 34,216.00 |
| Taxes - Property | 350,515.93 |
| Management Fees | 76,340.83 |
| Payroll | 84,000.00 |
| Utilities | 248,385.11 |
| R&M | 108,100.00 |
| Marketing | 28,200.00 |
| Admin | 56,400.00 |
| Total Expense | 986,157.87 |
| Net Ordinary Income | 3,045,956.45 |

**Tesoro**

**Operating Statement**

| | 2019 | 2020 | 2021 |
|---|---|---|---|
| Ordinary Income/Expense | | | |
| Income | | | |
| Rent | 3,169,299.77 | 3,344,760.10 | 3,267,850.17 |
| Vacancy Gross up | 0.00 | 0.00 | 0.00 |
| Vacancy / Collection Loss | -119,874.79 | -205,875.90 | 0.00 |
| Other Income | 117,942.93 | 102,228.88 | 90,507.10 |
| Misc Income | 12,462.53 | 21,202.86 | 77,561.92 |
| Utilities Reimbursement | 222,783.19 | 254,385.93 | 222,096.76 |
| Total Income | 3,402,613.63 | 3,516,701.87 | 3,658,015.95 |
| Expense | | | |
| Insurance Expense | 88,309.28 | 82,636.31 | 60,160.59 |
| Taxes - Property | 304,711.35 | 346,133.56 | 494,986.46 |
| Security | 6,200.00 | 19,691.00 | 9,600.00 |
| Management Fees | 86,873.25 | 129,037.11 | 117,235.47 |
| Payroll | 276,515.60 | 330,087.42 | 238,509.72 |
| Utilities | 227,322.99 | 270,176.51 | 247,477.49 |
| R&M | 71,624.50 | 176,700.31 | 270,026.71 |
| Marketing | 15,949.44 | 20,413.79 | 19,070.87 |
| Admin | 58,172.29 | 61,817.10 | 0.00 |
| Other Expenses | 50.00 | 0.00 | 12,899.34 |
| Total Expense | 1,135,728.70 | 1,436,693.11 | 1,469,966.65 |
| Net Ordinary Income | 2,266,884.93 | 2,080,008.76 | 2,188,049.30 |

# COMPARABLE IMPROVED SALES

BBG



**Sale Comparable #1**
**Berkdale Apartments**
1234 West Blaine Street
Riverside, CA  92507
Riverside County
BBG Property #14961



## Property Data

### Improvement Details

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 33.982280 / -117.3380 |
| Parcel ID # | 250-200-013 | Number of Buildings | 26 |
| Year Built | 1986 | Year Renovated | 2021 |
| Quality | Average | Condition | Average/Good |
| Class | Class B | Construction Details | Wood frame, stucco exterior, pitched Spanish tile roof |
| Gross Building Area | 177,056 SF | Rentable Area | 171,334 SF |
| Multifamily Units | 291 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.34 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 465.00 |
| Parking | Surface: 215 | Ratio | 2.99:1,000 SF of Rentable Area |
| | Covered: 298 | | 1.73 Spaces per Unit |
| | Total: 513 | | |
| Site Size (Gross) | 515,829 SF (11.84 acres) | Site Size (Net) | 515,829 SF (11.84 acres) |
| Flood Designation | Zone X (Unshaded) | | |
| Project Amenities | Controlled Access, Fitness Center, BBQ/Picnic Area, Laundry Facilities, Spa | | |
| Unit Amenities | Air Conditioning, Dishwasher, Vinyl Tile/Plank Flooring, Ceiling Fans, Microwave | | |
| Comments | Improvements consist of 26, two-story residential buildings that contain 296 dwelling units. The property also features a one-story building that contains a fitness center and leasing office, and four, one-story laundry buildings. | | |

BBG

1

**BBG**

### Unit Mix

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 79 | 400 | Studio | |
| 94 | 515 | 1BR-1BA | |
| 116 | 729 | 2BR-1BA | |
| 2 | 1,229 | 3BR-2BA | |
| 291 | 573 SF Avg. | | |

### Sale Transaction Data for BBG Event #677632 on 12/16/2021

| | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 12/16/2021 | Consideration | $71,000,000 | $401.00 | $414.40 | $243,986 |
| Sale Status | Closed | Adjustments | $9,000,000 | $50.83 | $52.53 | $30,928 |
| Occupancy at TOS | 98% | Cash Equivalent Price | $80,000,000 | $451.83 | $466.92 | $274,914 |
| Property Rights | Leased Fee | | | | | |
| Grantor | Fairfield Copper Canyon LLC | | | | | |
| Grantee | 1234 W Blaine Street LLC | | | | | |
| Record Info | 0742373 | | | | | |
| Comments | The seller had lightly renovated 214 units and contract rents were near market assuming no additional units are renovated. The buyer intends to renovate all of the units to a higher standard. Assuming all of the units are renovated to a higher scope, contract rents were approximately 14% below market. The capitalization rate shown is derived using actual, in-place income and expenses. | | | | | |
| Verification | 12/30/2021 | | | | | |
| | Ryan Fitzpatrick of JLL | | | | | |

### Financial Attributes

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Rental Income | $5,353,771 | $31.25 | $18,398 | $0 | $0.00 | $0 |
| Other Income | $284,160 | $1.66 | $976 | $0 | $0.00 | $0 |
| Gross Annual Income | $5,637,931 | $32.91 | $19,374 | $0 | $0.00 | $0 |
| Vacancy Expense | $267,689 | $1.56 | $920 | $0 | $0.00 | $0 |
| Effective Gross Income | $5,370,242 | $31.34 | $18,454 | $0 | $0.00 | $0 |
| Expenses | $2,095,672 | $12.23 | $7,202 | $0 | $0.00 | $0 |
| Reserves | $74,000 | $0.43 | $254 | $0 | $0.00 | $0 |
| Net Operating Income | $3,200,570 | $18.68 | $10,999 | $0 | $0.00 | $0 |
| GIM | 14.19 | | | 0.00 | | |
| EGIM | 14.90 | | | 0.00 | | |
| Overall Rate | 4.00% | | | 0.00% | | |
| Operating Expense Ratio | 40.40% | | | 0.00% | | |

**BBG**

# BBG



**Sale Comparable #2**
**ReNew on 14th**
4555 Pine Street
Riverside, CA  92501
Riverside County
BBG Property #6660



## Property Data

### Improvement Details

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 33.978280 / -117.3887 |
| Parcel ID # | 217-040-020 and 217-030-008 | Number of Buildings | 15 |
| Year Built | 1986 | Year Renovated | N/A |
| Quality | Average | Condition | Good |
| Class | Class D | Construction Details | |
| Gross Building Area | 88,452 SF | Rentable Area | 87,480 SF |
| Multifamily Units | 100 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.49 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Surface: 76 | Ratio | 2.01:1,000 SF of Rentable Area |
| | Garage: 90 | | 1.76 Spaces per Unit |
| | Covered: 10 | | |
| | Total: 176 | | |
| Site Size (Gross) | 179,032 SF (4.11 acres) | Site Size (Net) | 179,032 SF (4.11 acres) |
| Project Amenities | Laundry Facilities, Pool, Hot Tub, Controlled Access, Courtyard, BBQ/Picnic Area | | |
| Unit Amenities | Central Air Conditioning, Ceiling Fans, Dishwasher, Patio/Balcony, Ceramic Tile Flooring, Vinyl Tile/Plank Flooring | | |

## Unit Mix

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 28 | 720 | 1BR-1BA | |
| 72 | 935 | 2BR-2BA | |
| 100 | 874 SF Avg. | | |

BBG

| Sale Transaction Data for BBG Event #667100 on 11/12/2021 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 11/12/2021 | Consideration | $31,411,000 | $355.12 | $359.06 | $314,110 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 99% | Cash Equivalent Price | $31,411,000 | $355.12 | $359.06 | $314,110 |
| Property Rights | Leased Fee | | | | | |
| Grantor | FPA6 Bridgeport LLC | | | | | |
| Grantee | Pine Village RIV LLC | | | | | |
| Record Info | 0674980 | | | | | |
| Comments | The seller had renovated 60 units (60%) prior to the date of sale. The capitalization rate shown is derived using actual, in-place income and expenses. Assuming all units are renovated, contract rents were approximately 20% below market | | | | | |
| Verification | 11/30/2021 | | | | | |
| | Alex Garcia of IPA 909-456-3447 | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Rental Income | $2,086,380 | $23.85 | $20,864 | $2,567,280 | $29.35 | $25,673 |
| Other Income | $151,000 | $1.73 | $1,510 | $151,000 | $1.73 | $1,510 |
| Gross Annual Income | $2,237,380 | $25.58 | $22,374 | $2,718,280 | $31.07 | $27,183 |
| Vacancy Expense | $104,319 | $1.19 | $1,043 | $128,364 | $1.47 | $1,284 |
| Effective Gross Income | $2,133,061 | $24.38 | $21,331 | $2,589,916 | $29.61 | $25,899 |
| Expenses | $714,785 | $8.17 | $7,148 | $735,247 | $8.40 | $7,352 |
| Reserves | $25,000 | $0.29 | $250 | $25,000 | $0.29 | $250 |
| Net Operating Income | $1,393,276 | $15.93 | $13,933 | $1,829,669 | $20.92 | $18,297 |
| GIM | 14.04 | | | 11.56 | | |
| EGIM | 14.73 | | | 12.13 | | |
| Overall Rate | 4.44% | | | 5.82% | | |
| Operating Expense Ratio | 34.68% | | | 29.35% | | |

**BBG**





Sale Comparable #3
**Sorelle Apartments**
12159 Calle Sombra
Moreno Valley, CA  92557
Riverside County
BBG Property #14062

## Property Data

### Improvement Details

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 33.944600 / -117.2568 |
| Parcel ID # | 292-260-025 | Number of Buildings | 33 |
| Year Built | 1986 | Year Renovated | N/A |
| Quality | Average | Condition | Average/Good |
| Class | | Construction Details | |
| Gross Building Area | 285,820 SF | Rentable Area | 283,320 SF |
| Multifamily Units | 330 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.39 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 424 |
| Parking | Surface: 341 | Ratio | 2.37:1,000 SF of Rentable Area |
| | Other: 330 | | 2.03 Spaces per Unit |
| | Total: 671 | | |
| Site Size (Gross) | 736,600 SF (16.91 acres) | Site Size (Net) | 736,600 SF (16.91 acres) |
| Project Amenities | Pool, Spa, Carport Parking, Lounge, Playground, Dog Park/Dog Run, Fitness Center, Business Center | | |
| Unit Amenities | Patio/Balcony, Laundry Appliances, Central Air Conditioning, Carpet, Vinyl Tile/Plank Flooring, Laminate Countertops, Stainless Steel Appliances, Stainless Steel Sink, Dishwasher, Microwave | | |

### Unit Mix

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 150 | 750 | 1BR-1BA | |
| 60 | 875 | 2BR-1BA | |
| 120 | 986 | 2BR-2BA | |
| 330 | 858 SF Avg. | | |

**BBG**

**BBG**

| Sale Transaction Data for BBG Event #657548 on 10/20/2021 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 10/20/2021 | Consideration | $85,000,000 | $297.39 | $300.01 | $257,576 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 99% | Cash Equivalent Price | $85,000,000 | $297.39 | $300.01 | $257,576 |
| Property Rights | Leased Fee | | | | | |
| Grantor | R&V Management | | | | | |
| Grantee | Tower 16 Capital Patners | | | | | |
| Comments | This off-market transaction was completed on behalf of the seller by Tyler Sinks, Ed Rosen, and John Chu, a brokerage team with Berkadia. This is a value-add deal and the buyer intends to spend $5M on renovations. The broker would not disclose the in-place capitalization rate. The capitalization rate shown is derived using asking rents reported by CoStar and pro forma expenses. | | | | | |
| Verification | 10/28/2021 | | | | | |
| | Tyler Sinks of Berkadia 858-257-4706 | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Rental Income | $6,779,520 | $23.93 | $20,544 | $0 | $0.00 | $0 |
| Other Income | $404,250 | $1.43 | $1,225 | $0 | $0.00 | $0 |
| Gross Annual Income | $7,183,770 | $25.36 | $21,769 | $0 | $0.00 | $0 |
| Vacancy Expense | $338,976 | $1.20 | $1,027 | $0 | $0.00 | $0 |
| Effective Gross Income | $6,844,794 | $24.16 | $20,742 | $0 | $0.00 | $0 |
| Expenses | $2,668,750 | $9.42 | $8,087 | $0 | $0.00 | $0 |
| Reserves | $82,500 | $0.29 | $250 | $0 | $0.00 | $0 |
| Net Operating Income | $4,093,544 | $14.45 | $12,405 | $0 | $0.00 | $0 |
| GIM | 11.83 | | | 0.00 | | |
| EGIM | 12.42 | | | 0.00 | | |
| Overall Rate | 4.82% | | | 0.00% | | |
| Operating Expense Ratio | 40.19% | | | 0.00% | | |

BBG



**Sale Comparable #4**
**ReNew Redlands**
1250 North University Street
Redlands, CA  92374
San Bernardino County
BBG Property #8939



## Property Data

### Improvement Details

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 34.069130 / -117.1660 |
| Legal | TRACT 10356 LOT 2 | | |
| Parcel ID # | 1212-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 thru 1212-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 (31 tax accounts, 32 lots - common area (Lot 32) is divided among the other 31 accounts) | Number of Buildings | 31 |
| Year Built | 1982 | Year Renovated | N/A |
| Quality | Average | Condition | Good |
| Class | Class B | Construction Details | Wood frame with stucco and painted cedar shingle or wood siding exterior and pitched roof with composition shingles |
| Gross Building Area | 174,964 SF | Rentable Area | 127,100 SF |
| Multifamily Units | 124 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.52 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 0084.01 |
| Parking | Surface: 64 Garage: 186 Total: 250 | Ratio | 1.97:1,000 SF of Rentable Area 2.02 Spaces per Unit |
| Site Size (Gross) | 339,172 SF (7.79 acres) | Site Size (Net) | 339,172 SF (7.79 acres) |
| Project Amenities | BBQ/Picnic Area, Attached Garage Parking, Detached Garage Parking, Package Lockers | | |
| Unit Amenities | Patio/Balcony, Laundry Appliances, Central Air Conditioning, Ceiling Fans, Carpet, Luxury Vinyl Tile/Plank Flooring, Laminate Countertops, Stainless Steel Sink, Stainless Steel Appliances, Dishwasher, Microwave | | |

# BBG

## Unit Mix

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 62 | 910 | 2BR-2BA | Detached, single-car garage |
| 62 | 1,140 | 2BR-2BA | TH; Attached two-car garage |
| 124 | 1,025 SF Avg. | | |

| Sale Transaction Data for BBG Event #658543 on 10/14/2021 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | **10/14/2021** | Consideration | $46,200,000 | $264.05 | $363.49 | $372,581 |
| Sale Status | **Closed** | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | **100%** | Cash Equivalent Price | $46,200,000 | $264.05 | $363.49 | $372,581 |
| Property Rights | **Leased Fee** | | | | | |
| Grantor | **FPA Multifamily LLC** | | | | | |
| Grantee | **SB Real Estate Partners** | | | | | |
| Comments | **SB Real Estate Partners "SBREP" has acquired ReNew Redlands. The property has been renamed Portola Redlands, and SBREP intends to execute a $2.5 million capital improvement program. Blake Rogers and Hunter Combs of Walker & Dunlop represented the seller. Capitalization rate reported at 3.60%.** | | | | | |
| Verification | **10/26/2021** | | | | | |
| | **Selling Broker** | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Net Operating Income | **$1,663,200** | **$0.00** | **$13,413** | **$0** | **$0.00** | **$0** |
| Overall Rate | **3.60%** | | | **0.00%** | | |

BBG



**Sale Comparable #5**
**The Vue Apartment Homes**
1660 Kendall Drive
San Bernardino, CA 92407
San Bernardino County
BBG Property #8934



## Property Data

### *Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 34.176050 / -117.3286 |
| Parcel ID # | 0266-601-01, 0266-601-02, and 0266-611-01 | Number of Buildings | 20 |
| Year Built | 1989 | Year Renovated | 2016 |
| Quality | Average | Condition | Average/Good |
| Class | Class B | Construction Details | Stucco exterior, wood frame, pitched roof |
| Gross Building Area | 173,958 SF | Rentable Area | 164,830 SF |
| Multifamily Units | 197 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.32 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 45 |
| Parking | Surface: 292 | Ratio | 2.97:1,000 SF of Rentable Area |
| | Other: 197 | | 2.48 Spaces per Unit |
| | Total: 489 | | |
| Site Size (Gross) | 539,991 SF (12.40 acres) | Site Size (Net) | 539,991 SF (12.40 acres) |
| Project Amenities | Clubhouse, Controlled Access, Laundry Facilities, Pool, Hot Tub, Sand Volleyball, Outdoor Basketball Court, Playground, On-Site Office, BBQ/Picnic Area | | |
| Unit Amenities | Air Conditioning, Patio/Balcony, Ceiling Fans, Vinyl Tile/Plank Flooring, Laminate Countertops, Laundry Hookups, Dishwasher, Standard Appliances | | |

BBG

BBG

### Unit Mix

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 72 | 800 | 2BR-1BA | |
| 4 | 800 | 2BR-1BA | Cottage |
| 103 | 830 | 2BR-2BA | |
| 14 | 1,030 | 3BR-2BA | |
| 4 | 1,030 | 3BR-2BA | Cottage |
| 197 | 836 SF Avg. | | |

| Sale Transaction Data for BBG Event #653112 on 10/6/2021 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 10/6/2021 | Consideration | $53,600,000 | $308.12 | $325.18 | $272,081 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 100% | Cash Equivalent Price | $53,600,000 | $308.12 | $325.18 | $272,081 |
| Property Rights | Leased Fee | | | | | |
| Grantor | Dalan Management | | | | | |
| Grantee | Tailwind Investment Group and The Roxborough Group, LLC | | | | | |
| Comments | Dean Zander and Eric Thompson of CBRE were the listing brokers for this transaction. Per the brokers, the buyer made a non-contingent offer prior to the property hitting the market. | | | | | |
| | The seller had lightly renovated 183 of the units prior to sale. The buyer intends to renovate all units to a higher quality than what the seller had done; thus, this is considered a value-add deal for the buyer. Actual, in-place income and expenses were used to calculate the capitalization rate. | | | | | |
| Verification | 10/15/2021 | | | | | |
| | Dean Zander/CBRE/310-550-2599 | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Rental Income | $3,714,312 | $22.53 | $18,854 | $0 | $0.00 | $0 |
| Other Income | $233,029 | $1.41 | $1,183 | $0 | $0.00 | $0 |
| Gross Annual Income | $3,947,341 | $23.95 | $20,037 | $0 | $0.00 | $0 |
| Vacancy Expense | $185,716 | $1.13 | $943 | $0 | $0.00 | $0 |
| Effective Gross Income | $3,761,625 | $22.82 | $19,095 | $0 | $0.00 | $0 |
| Expenses | $1,573,182 | $9.54 | $7,986 | $0 | $0.00 | $0 |
| Reserves | $49,250 | $0.30 | $250 | $0 | $0.00 | $0 |
| Net Operating Income | $2,139,193 | $12.98 | $10,859 | $0 | $0.00 | $0 |
| GIM | 13.58 | | | 0.00 | | |
| EGIM | 14.25 | | | 0.00 | | |
| Overall Rate | 3.99% | | | 0.00% | | |
| Operating Expense Ratio | 43.13% | | | 0.00% | | |

BBG

BBG



**Sale Comparable #6**
**The District at Grand Terrace**
1315 & 1316 South Meadow Lane
Colton, CA  92324
San Bernardino County
BBG Property #78275



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 34.046270 / -117.2998 |
| Parcel ID # | 0276-361-69, 0276-361-70, 0276-361-78, 0276-541-05 | Number of Buildings | 24 |
| Year Built | 1979 | Year Renovated | N/A |
| Quality | Average | Condition | Good |
| Class | Class B | Construction Details | |
| Gross Building Area | 311,012 SF | Rentable Area | 307,012 SF |
| Multifamily Units | 352 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.47 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Surface: 521 | Ratio | 1.70:1,000 SF of Rentable Area |
| | Total: 521 | | 1.48 Spaces per Unit |
| Site Size (Gross) | 657,495 SF (15.09 acres) | Site Size (Net) | 657,495 SF (15.09 acres) |
| Project Amenities | Business Center, Carport Parking, Clubhouse, Fitness Center, Hot Tub, Laundry Room, Playground, Pool, Security Gate | | |
| Unit Amenities | Patio/Balcony, Ceiling Fans, Dishwasher, Granite Countertops, Standard Appliances, Vinyl Flooring, Laundry Appliances | | |

BBG

## Unit Mix

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 56 | 788 | 1BR-1BA | District I |
| 87 | 810 | 1BR-1BA | District II |
| 81 | 830 | 2BR-1BA | District II |
| 88 | 958 | 2BR-2BA | District I |
| 40 | 1,022 | 3BR-2BA | District II |
| 352 | 872 SF Avg. | | |

## Sale Transaction Data for BBG Event #529528 on 4/8/2021

| | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 4/8/2021 | Consideration | $88,000,000 | $282.95 | $286.63 | $250,000 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 95% | Cash Equivalent Price | $88,000,000 | $282.95 | $286.63 | $250,000 |
| Property Rights | Leased Fee | | | | | |
| Grantor | Tower 16 Capital Partners | | | | | |
| Grantee | MG Properties Group | | | | | |
| Record Info | 159439 | | | | | |
| Comments | This is the sale of two apartment complexes totaling 352 units, located across the street from one another along Meadow Lane in Colton. The properties are managed and operated together. This was an off-market transaction. District I includes 144 units and District II includes 208 units. The property has been recently upgraded/renovated. 129 unit interiors have been renovated with new vinyl sheeting flooring, two-tone paint, re-glazed countertops, new kitchen cabinet faces, and updated hardware and fixtures. In addition, 38 of these renovated interiors include stainless-steel kitchen appliances. The remaining renovated units feature black kitchen appliances. The remaining 223 units are in original condition with dated appliances and fixtures. 208 units feature in-unit laundry appliances | | | | | |
| Verification | 2/10/2021 | | | | | |
| | Confidential | | | | | |

## Financial Attributes

| | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Rental Income | $6,331,536 | $20.62 | $17,987 | $6,331,536 | $20.62 | $17,987 |
| Other Income | $465,590 | $1.52 | $1,323 | $465,590 | $1.52 | $1,323 |
| Gross Annual Income | $6,797,126 | $22.14 | $19,310 | $6,797,126 | $22.14 | $19,310 |
| Vacancy Expense | $395,721 | $1.29 | $1,124 | $395,721 | $1.29 | $1,124 |
| Effective Gross Income | $6,401,405 | $20.85 | $18,186 | $6,401,405 | $20.85 | $18,186 |
| Expenses | $2,619,397 | $8.53 | $7,441 | $2,619,397 | $8.53 | $7,441 |
| Reserves | $88,000 | $0.29 | $250 | $88,000 | $0.29 | $250 |
| Net Operating Income | $3,694,008 | $12.03 | $10,494 | $3,694,008 | $12.03 | $10,494 |
| GIM | 12.95 | | | 12.95 | | |
| EGIM | 13.75 | | | 13.75 | | |
| Overall Rate | 4.20% | | | 4.20% | | |
| Operating Expense Ratio | 42.29% | | | 42.29% | | |

BBG

# COMPARABLE RENTS

BBG



**Multifamily Rent Comparable #1**
**Brookside Park**
1350 Milburn Avenue
Redlands, CA  92373
San Bernardino County
BBG Property #188892



## Property Data

### Improvement Details

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 34.048570 / -117.2033 |
| Parcel ID # | 0292-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 | Number of Buildings | 0 |
| Year Built | 1980 | Year Renovated | N/A |
| Quality | Average | Condition | Average/Good |
| Class | Class B | Construction Details | Stucco exterior, wood frame, flat roofs |
| Gross Building Area | 310,504 SF | Rentable Area | 310,504 SF |
| Multifamily Units | 324 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.00 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Surface: 324 | Ratio | 2.09:1,000 SF of Rentable Area |
| | Garage: 324 | | 2.00 Spaces per Unit |
| | Total: 648 | | |
| Site Size (Gross) | 0 SF (0.00 acres) | Site Size (Net) | 0 SF (0.00 acres) |
| Project Amenities | Indoor Basketball Court, Carport Parking, Clubhouse, Hot Tub, On-Site Office, Playground, Pool, Tennis Court, Volleyball Court, Attached Garage Parking | | |
| Unit Amenities | Patio/Balcony, Laundry Connections, Central Air Conditioning, Carpet, Ceiling Fans, Dishwasher, Standard Appliances, Vaulted Ceiling, Vinyl Flooring | | |

BBG

BBG

**Multifamily Rental Survey Details**

| | |
|---|---|
| Leasing Incentives | None |
| Rent Premiums | None |
| Utilities Paid By | Tenant pays Electric, Gas, Sewer, Trash, Water |
| Occupancy Rate | 99% |
| Confirmed By | 10/19/2021 |
| | 909-792-4850 |

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments | |
|---|---|---|---|---|---|---|---|---|---|
| 35 | 1BR/1BA | 650 | 0.00 | $1,900 | $1,900 | $1,900 | $1,900 | 1-car garage | |
| 127 | 2BR/2BA | 838 | 0.00 | $2,030 | $2,030 | $2,030 | $2,030 | 1-car garage | |
| 127 | 2BR/2BA | 1,074 | 0.00 | $2,140 | $2,140 | $2,140 | $2,140 | Townhome; garage | 2-car |
| 18 | 3BR/2BA | 1,274 | 0.00 | $2,245 | $2,245 | $2,245 | $2,245 | 2-car garage | |
| 17 | 3BR/2BA | 1,294 | 0.00 | $2,300 | $2,300 | $2,300 | $2,300 | Townhome; garage | 2-car |
| 324 | | 958 SF Avg. | | $2,085 Average per Unit | | $2,085 Average per Unit | | | |
| | | | | $2.18 Average PSF | | $2.18 Average PSF | | | |

BBG

BBG



**Multifamily Rent Comparable #2**
**Citrus Grove Apartments**
1210 East Lugonia Avenue
Redlands, CA  92374
San Bernardino County
BBG Property #3515



## Property Data

### Improvement Details

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 34.069140 / -117.1623 |
| Parcel ID # | 1212-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 | Number of Buildings | 24 |
| Year Built | 1988 | Year Renovated | N/A |
| Quality | Average | Condition | Average |
| Class | | Construction Details | |
| Gross Building Area | 170,116 SF | Rentable Area | 168,990 SF |
| Multifamily Units | 0 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.33 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 84 |
| Parking | Surface: 92 | | |
| | Garage: 69 | | |
| | Other: 225 | | |
| | Total: 386 | | |
| Site Size (Gross) | 511,394 SF (11.74 acres) | Site Size (Net) | 511,394 SF (11.74 acres) |

BBG

BBG

## Multifamily Rental Survey Details

| | |
|---|---|
| Leasing Incentives | None |
| Rent Premiums | Pet rent: $25-$50 per month |
| | Garage parking: $140 per month |
| Utilities Paid By | Tenant pays Electric, Gas, Sewer, Trash, Water |
| Occupancy Rate | 96% |
| Confirmed By | 2/2/2022 |
| | Leasing Office/909-798-0011 |

## Rental Unit Detail

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 6 | 1BR-1BA | 677 | 0.00 | $1,604 | $1,604 | $1,604 | $1,604 | |
| 192 | 2BR-2BA | 859 | 0.00 | $2,099 | $2,099 | $2,099 | $2,099 | |
| 198 | | 853 SF Avg. | | $2,084 Average per Unit | | $2,084 Average per Unit | | |
| | | | | $2.44 Average PSF | | $2.44 Average PSF | | |

BBG



**Multifamily Rent Comparable #3**
**Del Flora Apartments**
30598 Independence Avenue
Redlands, CA  92374
San Bernardino County
BBG Property #8876



## Property Data

### Improvement Details

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 34.060710 / -117.1369 |
| Parcel ID # | 0299-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 and 0299-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 | Number of Buildings | 23 |
| Year Built | 1985 | Year Renovated | 2017 |
| Quality Class | Average | Condition | Good |
| | | Construction Details | |
| Gross Building Area | 141,866 SF | Rentable Area | 135,200 SF |
| Multifamily Units | 152 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.44 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 0086.01 |
| Parking | Surface: 152 | Ratio | 2.25:1,000 SF of Rentable Area |
| | Other: 152 | | 2.00 Spaces per Unit |
| | Total: 304 | | |
| Site Size (Gross) | 322,537 SF (7.40 acres) | Site Size (Net) | 322,537 SF (7.40 acres) |
| Project Amenities | Business Center, Fitness Center, Pool, Spa, Laundry Facilities, Carport Parking, BBQ/Picnic Area, Playground, Clubhouse | | |
| Unit Amenities | Patio/Balcony, Laundry Appliances, Central Air Conditioning, Carpet, Vinyl Tile/Plank Flooring, Quartz Countertops, Designer Cabinets, Black Appliances, Dishwasher | | |

## Multifamily Rental Survey Details

| | |
|---|---|
| Leasing Incentives | None |
| Rent Premiums | None |
| Utilities Paid By | Tenant pays Electric, Gas, Sewer, Trash, Water |
| Occupancy Rate | 97% |
| Confirmed By | 2/2/2022 |
| | 833-399-0551 |

BBG

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 56 | 1BR-1BA | 700 | 0.00 | $1,850 | $1,850 | $1,850 | $1,850 | |
| 96 | 2BR-2BA | 1,000 | 0.00 | $2,200 | $2,200 | $2,200 | $2,200 | |
| 152 | | 889 SF Avg. | | $2,071 Average per Unit | | $2,071 Average per Unit | | |
| | | | | $2.33 Average PSF | | $2.33 Average PSF | | |

BBG



**Multifamily Rent Comparable #4**
**Countrywood Apartments**
1255 East Citrus Avenue
Redlands, CA  92374
San Bernardino County
BBG Property #8937



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 34.056150 / -117.1619 |
| Parcel ID # | 0170-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 | Number of Buildings | 14 |
| Year Built | 1972 | Year Renovated | 2011 |
| Quality | Average | Condition | Good |
| Class | Class B | Construction Details | |
| Gross Building Area | 183,865 SF | Rentable Area | 181,800 SF |
| Multifamily Units | 161 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.54 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 84 |
| Parking | Surface: 65 | Ratio | 1.68:1,000 SF of Rentable Area |
| | Garage: 126 | | 1.90 Spaces per Unit |
| | Other: 115 | | |
| | Total: 306 | | |
| Site Size (Gross) | 339,768 SF (7.80 acres) | Site Size (Net) | 339,768 SF (7.80 acres) |
| Project Amenities | Pool, Spa, BBQ/Picnic Area, Dog Park/Dog Run, Fitness Center, Playground, Detached Garage Parking, Laundry Facilities | | |
| Unit Amenities | Patio/Balcony, Central Air Conditioning, Ceiling Fans, Carpet, Luxury Vinyl Tile/Plank Flooring, Quartz Countertops, Designer Cabinets, Stainless Steel Sink, Farmhouse Sink, Stainless Steel Appliances, Microwave, Dishwasher | | |

BBG

BBG

**Multifamily Rental Survey Details**

| | |
|---|---|
| Leasing Incentives | None |
| Rent Premiums | None |
| Utilities Paid By | Tenant pays Electric, Gas |
| | Landlord pays Sewer, Trash, Water |
| Occupancy Rate | 98% |
| Confirmed By | 2/2/2022 |
| | 909-345-6279 |

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 39 | 1BR-1BA | 900 | 0.00 | $1,835 | $1,835 | $1,835 | $1,835 | |
| 30 | 2BR-1BA | 1,050 | 0.00 | $2,045 | $2,045 | $2,045 | $2,045 | |
| 80 | 2BR-2BA | 1,200 | 0.00 | $2,240 | $2,240 | $2,240 | $2,240 | |
| 12 | 3BR-3BA | 1,600 | 0.00 | $2,575 | $2,575 | $2,575 | $2,575 | |
| 161 | | 1,129 SF Avg. | | $2,131 Average per Unit | | $2,131 Average per Unit | | |
| | | | | $1.89 Average PSF | | $1.89 Average PSF | | |

# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 402** |

### NOTICE OF SUCCESSFUL BIDDER WITH
### RESPECT TO THE TESORO PROPERTY

**PLEASE TAKE NOTICE** that, on May 15, 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (A)(I) Approving Bidding Procedures for Tesoro Property, (II) Scheduling the Bid Deadlines,(III) Scheduling Hearings and Objection Deadlines with Respect to the Sale of the Tesoro Property, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief; and (B)(I) Approving the Sale of the Tesoro Property Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 402] (the "Bidding Procedures Order")[2] approving, among other things, the implementation of procedures by which the Debtors are authorized to solicit bids and sell (the "Sale") certain real property (the "Tesoro Property") owned by Debtor Tesoro Redlands DE, LLC ("Tesoro").

**PLEASE TAKE FURTHER NOTICE** that, the Debtors, in their reasonable business judgment, pursuant to the Bidding Procedures, designate Patrick Theodora as the Successful Bidder for the Tesoro Property.

**PLEASE TAKE FURTHER NOTICE** that the purchase and sale agreement for the Successful Bid is attached hereto as **Exhibit A** (the "PSA") and provides, among other things, cash consideration in the amount of $55,000,000 in exchange for the Tesoro Property.

---

[1]    The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], 837 Park Avenue, LLC [3229], and Terra Laguna Beach, Inc. [2344] (interim). The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of the Sale is scheduled for **June 10, 2025 at 10:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Motion [Docket No. 280], the Bidding Procedures [Docket No. 402-1], the Bidding Procedures Order [Docket No. 1402], and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://cases.stretto.com/MOMCA, or can be requested by calling the Debtors' claims and noticing agent, Stretto, at 855.559.0596 (Toll-Free) or 720.739.6551 (International).

Dated: June 2, 2025
      Wilmington, Delaware

Respectfully submitted,

*/s/ Sameen Rizvi*
Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
R. Stephen McNeill (No. 5210)
Gregory J. Flasser (No. 6154)
Sameen Rizvi (No. 6902)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
      astulman@potteranderson.com
      rmcneill@potteranderson.com
      gflasser@potteranderson.com
      srizvi@potteranderson.com

*Counsel to the Debtors and Debtors in Possession*

2

# EXHIBIT A

## PSA

Docusign Envelope ID: 46DC04C6-EE53-4563-B99D-2D9372B844F5

**PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS**

for

**106 West Pennsylvania Avenue, Redlands, California 92374**

**By and Between**

**TESORO REDLANDS DE, LLC,**

**a Delaware limited liability company**

**("Seller")**

**and**

**PATRICK THEODORA**

**an individual**

**("Buyer")**

**May 29, 2025**

1

BN 89627986v2

# TABLE OF CONTENTS

Page

1.  Defined Terms; Interpretation.................................................................1
    (a)  Defined Terms ...................................................................1
    (b)  Interpretation ...................................................................3
2.  Agreement to Purchase .....................................................................4
3.  Purchase Price ...............................................................................4
    (a)  Purchase Price ...................................................................4
    (b)  Earnest Money ...................................................................4
    (c)  Independent Contract Consideration.............................................5
4.  Escrow and Closing .........................................................................5
    (a)  Escrow ...........................................................................5
    (b)  Closing ...........................................................................6
    (c)  Seller Closing Deliveries .........................................................6
    (d)  Buyer Closing Deliveries .........................................................7
    (e)  IRS Form 1099-S Designation ...................................................7
    (f)  Return of Closing Deliveries .....................................................7
    (g)  Deliveries Outside of Escrow ...................................................8
    (h)  Deliveries Upon Close of Escrow ...............................................8
5.  Waiver of Due Diligence ...................................................................8
    (a)  Due Diligence ...................................................................8
    (b)  Return of Reports ...............................................................9
    (c)  Proprietary Information; Confidentiality.........................................9
    (d)  No Representation or Warranty by Seller .......................................10
    (e)  Buyer's Responsibilities .........................................................10
    (f)  Buyer's Agreement to Indemnify ...............................................11
6.  Seller's Conditions .........................................................................11
7.  Buyer's Conditions .........................................................................11
8.  Title And Survey.............................................................................12
    (a)  Title Report .....................................................................12
    (b)  Amended Commitment.........................................................12

i

9.   Closing Costs and Prorations ....................................................................................12
     (a)   Closing Costs ...............................................................................................12
     (b)   Prorations .....................................................................................................13
     (c)   Delinquent Rents ..........................................................................................13
     (d)   Deposits and Letters of Credit .....................................................................13
     (e)   Leasing Commissions and Tenant Inducements...........................................14
10.  Representations and Warranties ...............................................................................14
     (a)   Seller's Representations and Warranties .....................................................14
     (b)   Buyer's Representations and Warranties ......................................................16
     (c)   Disclaimers ..................................................................................................18
     (d)   Release ..........................................................................................................20
     (e)   Survival ........................................................................................................21
11.  Specific Rights and Obligations................................................................................21
     (a)   Maintenance of Insurance ............................................................................21
     (b)   Conduct of Business .....................................................................................21
     (c)   Leasing .........................................................................................................21
12.  Remedies .....................................................................................................................21
     (a)   SELLER'S REMEDIES ...............................................................................21
     (b)   Buyer's Remedies .........................................................................................22
     (c)   Limitation on Liability .................................................................................22
13.  Brokerage ...................................................................................................................23
14.  Possession ...................................................................................................................23
15.  Casualty and Condemnation .....................................................................................23
     (a)   Notice of Casualty or Condemnation............................................................23
     (b)   Casualty Losses ............................................................................................24
     (c)   Condemnation ...............................................................................................24
16.  Consequences of Termination ...................................................................................24
17.  Miscellaneous .............................................................................................................25
     (a)   Survival ........................................................................................................25
     (b)   Attorneys' Fees .............................................................................................25
     (c)   Notices ..........................................................................................................25
     (d)   Parties Bound ...............................................................................................26
     (e)   Construction .................................................................................................26

BN 89627986v2

| (f) | Counterparts | 26 |
| (g) | Entirety and Amendments | 26 |
| (h) | Invalidity | 27 |
| (i) | Assignment | 27 |
| (j) | Governing Law | 27 |
| (k) | No Liability of Related Parties | 27 |
| (l) | Waiver of Jury Trial | 27 |
| (m) | Time | 27 |
| (n) | Confidentiality | 27 |
| (o) | No Recordation | 28 |
| (p) | Further Assurances | 28 |
| (q) | Joint and Several Liability | 28 |
| (r) | Natural Hazards Disclosure | 28 |
| (a) | Electronic Signatures | 28 |

SCHEDULE AND EXHIBITS

| SCHEDULE 1 | LAND DESCRIPTION |
| SCHEDULE 9(e) | OUTSTANDING TENANT INDUCEMENT COSTS AND FREE RENT |
| EXHIBIT A | FORM OF GRANT DEED |
| EXHIBIT B | FORM OF BILL OF SALE |
| EXHIBIT C | FORM OF ASSIGNMENT OF LEASES AND RENTS |
| EXHIBIT D | NOTICE TO TENANTS |
| EXHIBIT E | FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT |
| EXHIBIT F | [RESERVED] |
| EXHIBIT G | LIST OF SERVICE CONTRACTS |

BN 89627986v2

Docusign Envelope ID: 46DC04C8-EE53-4563-B39D-26A37785A4EF

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement"), dated as of _____, 2025 (the "Effective Date"), is between TESORO REDLANDS DE, LLC, a Delaware limited liability company ("Seller"), and, PATRICK THEODORA, an individual ("Buyer").

1.    Defined Terms; Interpretation.

(a)    Defined Terms.   Definitions of certain defined terms are provided throughout the text of this Agreement.  Defined terms listed in this Section 1 have the meaning assigned to them below.

"Buildings" means the Improvements located on the Land situated in San Bernardino County, California and commonly known as 106 West Pennsylvania Avenue, Redlands, 92374.

"Business Day" means any day, Monday through Friday, that the national banks in San Bernardino County, California are open for business.  Whenever under the terms of this Agreement the time for performance of any act, covenant or condition or the expiration of any time period falls on a day that is not a Business Day, such expiration time or time for performance shall be extended to the next Business Day.

"Closing Date" has the meaning given that term in Section 4(b).

"Deposits" means refundable deposits under Leases and advance payments of Rent.

"Earnest Money Deposit" has the meaning set forth in Section 3(b).

"Environmental Law" means any law relating to the protection of the environment or, to the extent related to environmental conditions, human health or safety, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended; the Hazardous Materials Transportation Act, as amended; the Resource Conservation and Recovery Act, as amended; the Toxic Substances Control Act, as amended; the Federal Water Pollution Control Act, as amended; and similar laws of the State of California.

"Hazardous Materials" means (a) any substance that constitutes hazardous materials, hazardous waste or toxic waste within the meaning of any Environmental Law or that otherwise is subject to regulation under any Environmental Law and (b) regardless of whether it is so classified, any radioactive material, radon, mold, mildew, microorganisms, asbestos, any medical waste, polychlorinated biphenyls (PCBs), lead-based paint, urea formaldehyde foam insulation and petroleum or petroleum derivatives.

"Improvements" means all buildings, structures, fixtures, parking areas, sidewalks, landscaping and other improvements located on the Land.

"Information" means all information, documents, plans, specifications, pictures, projections and other written or verbal information and materials that is not in the public domain and that is furnished to Buyer or any of its subsidiaries or affiliates or any of their respective

1

Docusign Envelope ID: 46DC04C8-EE53-4563-B789-2983764D74A2
Case 25-11321-MFW    Doc 408-1    Page 7 of 63

employees, representatives or agents by Seller or its Related Entities or any partner, member, officer, director, trustee, agent, employee or other person acting or purporting to act on behalf of Seller or any of its Related Entities (including any materials delivered in accordance with <u>Section 5(a)</u>), together with any excerpt from or copy of such information that is prepared by Buyer or any of its subsidiaries or affiliates or any of their respective employees, agents or representatives and all written, diskettes or electronically stored or transmitted. documentation furnished to or prepared by Buyer or any of its subsidiaries or affiliates or any of their respective employees, agents or representatives based upon or derived from, reflecting or incorporating, in whole or in part, such information.

"<u>Intangibles</u>" means all right, title, interest and estate of Seller, if any, in, to and under (a) all Service Contracts, (b) all transferable permits, licenses, approvals, utility rights, development rights and similar rights related to the Property, if any, granted by governmental authorities, and (c) all right, title and interest of Seller in and to all assignable warranties and guaranties, covering all or any part of the Property (collectively, the "<u>Guaranties</u>"). Intangibles shall not include, and Buyer shall not utilize (i) any internet addresses or websites used in connection with the Property or (ii) the name Tesoro or any reference thereto or derivative thereof. The terms of the foregoing sentence shall survive Closing. Notwithstanding any other provision hereof, Seller makes no representation or warranty relating to the assignability of any of the Service Contracts, Guaranties or other Intangibles and shall not be required to obtain any consents relating to any such assignment.

"<u>Land</u>" means the tract or tracts of land described in <u>Schedule 1</u> attached hereto, including all riparian rights, privileges, and easements in any way pertaining thereto, all right, title and interest in and to any adjoining sidewalk and in and to any adjoining street or alley.

"<u>Leases</u>" collectively means the leases or other agreements permitting occupancy or use of any space in the Improvements or on the Land.

"<u>New Contracts</u>" means any contract executed by Seller after the Effective Date that is (i) terminable on not more than thirty (30) days' notice at no cost to Buyer, (ii) related to the operation, maintenance or management of the Property, and (iii) entered into by Seller with the consent of Buyer.

"<u>Permitted Exceptions</u>" means (a) preprinted standard exceptions on the Title Policy, (b) exceptions approved or deemed approved by Buyer pursuant to <u>Section 8(c)</u>of this Agreement, (c) rights of tenants as tenants under Leases, (d) any matters disclosed by the Survey, (e) property taxes and assessments which are not delinquent as of Closing, and (f) matters created by Buyer or any of its affiliates or any of their respective representatives, consultants or contractors.

"<u>Person</u>" means an individual, corporation, association, joint venture, partnership, limited liability company, association, trust or other entity or organization, including a governmental authority.

"<u>Personalty</u>" means all fixtures, equipment, machinery, building materials, supplies, inventory and other tangible property owned by Seller, used in connection with the ownership, maintenance, use, leasing, service or operation of the Land or Improvements, and located on the

BN 89627986v2

Land or to be located on the Land on the Closing Date, but specifically excluding (i) any personal property owned, financed or leased by any tenant, (ii) any personal property which is owned by Property Manager or any party to a Service Contract, and (iii) any computer software which either is licensed to Seller or Property Manager, or which Seller deems proprietary.

"Property" means, collectively, the Land, the Improvements, the Intangibles, the Personalty and the Related Assets.

"Property Management Agreement" means that certain property management agreement with Property Manager in connection with the Property, as amended and supplemented.

"Property Manager" means Vierergruppe Management, a California corporation.

"Purchase Price" means has the meaning given that term in Section 3(a).

"Related Assets" means all right, title, interest and estate of Seller in, to and under (a) all Leases and all guaranties of Leases, (b) all security deposits and Rents due after the Closing and (c) all Intangibles.

"Related Entities" or a "Related Entity" means, with respect to any Person, all direct and indirect affiliates and subsidiaries thereof, all entities related thereto and all partners, shareholders, members, directors, officers, trustees, managers, authorized agents and employees thereof.

"Rents" means all rents, revenues, income, profits and receipts due under Leases or otherwise receivable by the owner of the Property for use or occupancy of any of the Property.

"Seller Closing Documents" has the meaning given in Section 4(c).

"Seller's Trustee Counsel" shall mean Porter Anderson & Corroon LLP.

"Service Contracts" means the contracts to which Seller is a party relating to the operation, maintenance or management of the Property as of the Effective Date, including, any New Contracts, but excluding the Property Management Agreement.

"Title Commitment" has the meaning set forth in Section 8(a).

"Title Company" means Chicago Title Insurance Company, National Commercial Services, 3780 Kilroy Airport Way, Suite 100, Long Beach, CA 90806, Attn: John Balassi, Title Officer, Phone: (949) 724-3117, e-mail: ctcommtitlenpb@ctt.com; Jody Kelly, Commercial Escrow Officer, Phone: (213) 330-3027, e-mail: jody.kelly@ctt.com; Attention: Chris Miller, National Account Executive, Phone: (949) 724-3101, e-mail: chris.miller@ctt.com.

(b)  Interpretation. When the context so requires in this Agreement, words of one gender include one or more other genders, singular words include the plural, and plural words include the singular. Use of the words "include" and "including" are intended as an introduction to illustrative matters and not as a limitation. When either party is granted permission to exercise its discretion in this Agreement, there shall be no requirement, unless the Agreement expressly states to the contrary, to exercise such discretion reasonably or in accordance with commercial

3

Docusign Envelope ID: 46DC04C9-EE53-4563-B99D-2093728524D5

standards and instead such discretion may be exercised in the sole, absolute and unilateral discretion of such party. References in this Agreement to "Sections" are to the numbered subdivisions of this Agreement, unless another document is specifically referenced. The word "party" when used in this Agreement means either Buyer or Seller unless another meaning is required by the context. The word "person" includes individuals, entities and governmental authorities. The word "governmental authority" is intended to be construed broadly and includes federal, state and local governmental entities, commissions, councils, instrumentalities, bodies, boards, departments and officers and individuals acting in any official capacity. When used in this Agreement, the word "laws" is intended to be construed broadly and includes all codes, statutes, rules, regulations, ordinances, pronouncements, case law, requirements, orders, directives, decisions, decrees, judgments and formal or informal guidance or interpretations of any court or governmental authority having jurisdiction over the Property and construction and operation of the Improvements thereon (including but not limited to all Environmental Laws, the Americans with Disabilities Act and any local Board of Fire Underwriters).

2.    <u>Agreement to Purchase</u>.

Buyer agrees to purchase the Property from Seller, and Seller agrees to sell the Property to Buyer, all on the terms provided in this Agreement.

3.    <u>Purchase Price</u>.

(a)    <u>Purchase Price</u>. The purchase price for the Property shall be Fifty Five Million and No/100 Dollars ($55,000,000.00) (the "<u>Purchase Price</u>") and Buyer shall pay the balance of the Purchase Price, and such other funds as may be necessary in accordance with the terms hereof to pay for Buyer's share of closing costs and charges set forth in <u>Section 9</u> below and Buyer's share of prorations set forth on Buyer's closing statement delivered pursuant to <u>Section 4(d)(vi))</u> shall be due and payable by Buyer to Seller in immediately available funds at Closing (as defined below).

(b)    <u>Earnest Money</u>. Buyer agrees to deposit Three Million and No/100 Dollars ($3,000,000.00) as earnest money (the "<u>Earnest Money Deposit</u>") with Seller's Trustee Counsel concurrently with the execution of this Agreement by Buyer and Seller, receipt of which shall be acknowledged by Seller's Trustee Counsel and the Title Company. The Earnest Money Deposit shall also be referred to as the "<u>Earnest Money</u>" as and when Buyer delivers the same under this Agreement. Except as otherwise provided in the last paragraph of <u>Section 7</u>, <u>Section 12(b)</u>, <u>Section 15(b)</u> or <u>Section 15(c)</u>, the Earnest Money shall become non-refundable upon the issuance of the Approval Order (as defined in the Addendum to Purchase Agreement). The Earnest Money shall be applied as a credit to the Purchase Price at Closing. If the Approval Order is not issued in accordance with the terms herein or if Buyer elects to terminate this Agreement as permitted hereunder, the Earnest Money shall be returned to Buyer without any further instruction by either Buyer or Seller. In the event of a termination of this Agreement by either Seller or Buyer for any other reason, the Earnest Money shall be delivered to the party hereto entitled to same pursuant to the terms hereof on or before the fifth day following receipt by Seller's Trustee Counsel or the Title Company, as applicable, and the non-terminating party of written notice of such termination from the terminating party, unless the other party hereto notifies Seller's Trustee Counsel or the Title Company, as applicable, that it disputes the right of the other party to receive the Earnest

BN 89627986v2

Money prior to the end of the fourth (4th) day following receipt of termination.  In the event of such a dispute, Seller's Trustee Counsel or the Title Company, as applicable, may interplead the Earnest Money into a court of competent jurisdiction in the county in which the Earnest Money has been deposited.  All attorneys' fees and costs and Seller's Trustee Counsel's or the Title Company's, as applicable, costs and expenses incurred in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money, or if the Earnest Money is distributed in part to both parties, then in the inverse proportion of such distribution.  In the event Buyer fails to timely deliver the Earnest Money Deposit as provided in this Section, Seller may elect, in its sole and absolute discretion, and without any instruction from the Buyer, to terminate this Agreement and cancel any escrow opened in connection therewith.  Prior to the issuance of the Approval Order, Seller's Trustee Counsel shall be deemed to be the escrow agent and following the issuance of the Approval Order, Seller's Trustee Counsel shall transfer the Earnest Money Deposit to the Title Company who shall thereafter be escrow agent under this Agreement.  Seller's Trustee Counsel and the Title Company each acknowledge that so long as they are holding the Earnest Money Deposit, they shall be responsible for all escrow matters under this Agreement; provided, however, Seller's Trustee Counsel shall have no obligation to close the transactions contemplated herein with Closing being handled by the Title Company.

(c)    Independent Contract Consideration.  Buyer agrees that it shall expend significant time and material sums of money in connection with negotiating and executing this Agreement, and preparing for the Closing, all in reliance on Seller's obligations under this Agreement.  Accordingly, separate consideration exists to support Seller's obligations hereunder. Without limitation upon the foregoing, $100.00 of the Earnest Money (the "Independent Consideration") shall in all events be deemed earned by Seller upon execution and delivery of this Agreement by Seller and Buyer and shall be immediately released by the Title Company to Seller upon the Title Company's receipt of the initial Earnest Money. The Independent Consideration represents adequate, bargained for consideration for Seller's execution and delivery of this Agreement and Buyer's right to inspect the Property pursuant to the terms hereof. The Independent Consideration is in addition to and independent of any other consideration or payment provided for herein and is nonrefundable in all events.

4.    Escrow and Closing.

(a)    Escrow. Seller and Buyer shall promptly deliver a fully executed copy of this Agreement to the Title Company.  Seller and Buyer shall execute and deliver to the Title Company any additional or supplementary instructions as may be necessary or convenient to implement the terms of this Agreement and close the transactions contemplated hereby, provided such instructions are consistent with and merely supplement this Agreement and shall not in any way modify, amend or supersede this Agreement.  Such supplementary instructions, together with the escrow instructions set forth in this Agreement, as they may be amended from time to time by the parties, shall collectively be referred to as the "Escrow Instructions."  The Escrow Instructions may be amended and supplemented by such standard terms and provisions as the Title Company, as escrow holder, may request the parties hereto to execute; provided, however, that the parties hereto and the Title Company acknowledge and agree that in the event of a conflict between any provision of such standard terms and provisions supplied by the Title Company and the Escrow Instructions, the Escrow Instructions shall prevail.

BN 89627986v2

        (b)    Closing.   The closing of the transactions contemplated hereby (the "Closing") shall occur at the offices of the Title Company thirty (30) days following the Effective Date (the "Closing Date"), as may be extended by Seller hereunder.

        (c)    Seller Closing Deliveries.  As of or prior to the Closing Date, Seller will deposit with the Title Company the following items (collectively, the "Seller Closing Documents"):

        (i)    a grant deed (the "Deed"), in the form attached to this Agreement as Exhibit A, executed and acknowledged by Seller, conveying to Buyer the Land and the Improvements, which Deed shall be recorded by the Title Company in the official records of San Bernardino County, (the "Official Records"), on the Closing Date;

        (ii)    a bill of sale ("Bill of Sale"), in the form attached to this Agreement as Exhibit B, executed by Seller;

        (iii)    an Assignment and Assumption of the Leases and Rents, in the form attached to this Agreement as Exhibit C (the "Assignment of Leases"), executed by Seller;

        (iv)    a notice to the tenants ("Notice to Tenants") of the Property in the form of Exhibit D attached hereto, which Seller shall sign along with Buyer, notifying the tenant of the transfer of the Property and advising the tenant as to future payment of rent and that Buyer has assumed exclusive responsibility for Deposits made by such tenant;

        (v)    an Assignment and Assumption Agreement with respect to Service Contracts and other matters, in the form attached to this Agreement as Exhibit E (the "Assignment and Assumption Agreement"), executed by Seller;

        (vi)    a certificate of Seller ("Seller's Update Certificate"), dated as of the Closing, stating that the representations and warranties of Seller contained in Section 10(a) of this Agreement are true and correct in all material respects as of the Closing (with appropriate modifications of those representations and warranties made in Section 10(a) hereof to reflect changes in factual circumstances occurring from and after the Effective Date, or identifying any representation or warranty which is not, or no longer is, true and correct in any material respect and explaining the state of facts giving rise to the change). In no event shall Seller be liable to Buyer for, or be deemed to be in default hereunder by reason of, any breach of a representation or warranty which results from any change that (i) occurs between the Effective Date and the Closing and (ii) is permitted under the terms of this Agreement or is beyond the reasonable control of Seller to prevent; provided, however, that the occurrence of a change which is not permitted hereunder or is beyond the reasonable control of Seller to prevent shall, if the same materially impairs the value, use or occupancy of the Property, constitute the non-fulfillment of the condition set forth in Section 7(a). If, despite changes or other matters described in such certificate, the Closing occurs, Seller's representations and warranties set forth in this Agreement shall be deemed to have been modified by all statements made in Seller's Update Certificate;

        (vii)    An owner's affidavit on Title Company's standard form subject to commercially reasonable comments and modifications;

<div align="center">6</div>

BN 89627986v2

(viii)    such documents as the Title Company may reasonably require to establish the authority of Seller to complete the transfer of the Property contemplated by this Agreement;

(ix)    an affidavit, dated as of the Closing Date and executed by an appropriate representative of Seller under penalty of perjury, stating that Seller is not a person with respect to whom withholding is required under Section 1445 of the Internal Revenue Code of 1986, as amended (as well as any California state law equivalent form);

(x)    a closing statement; and

(xi)    any and all other items contemplated by the terms of this Agreement or reasonably required by the Title Company.

(d)    <u>Buyer Closing Deliveries</u>.  Buyer will deposit with the Title Company (i) the Purchase Price, net of credit for the Earnest Money and adjustments for prorations and other items charged or credited to Buyer in accordance with this Agreement on or before 11:00 am Pacific Time on the Closing Date, and (ii) at least one (1) Business Day prior to the Closing Date, the following documents (collectively, the "<u>Buyer Closing Documents</u>"):

(i)    such documents as the Title Company may require to complete the transfer of the Property contemplated by this Agreement to Buyer;

(ii)    executed counterpart of the Assignment and Assumption Agreement;

(iii)    executed counterpart of the Assignment of Leases;

(iv)    executed counterpart of the Notice to Tenants;

(v)    a duly executed Preliminary Change in Ownership Report, in a form approved by the Title Company;

(vi)    the closing statement; and

(vii)    any and all other items contemplated by the terms of this Agreement or reasonably required by the Title Company.

(e)    <u>IRS Form 1099-S Designation</u>.  In order to comply with information reporting requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder, the parties agree (i) to execute an IRS Form 1099-S Designation Agreement to designate the Title Company (the "<u>Designee</u>") as the party who shall be responsible for reporting the contemplated sale of the Property to the Internal Revenue Service (the "<u>IRS</u>") on IRS Form 1099-S; and (ii) to provide the Designee with the information necessary to complete Form 1099-S.

(f)    <u>Return of Closing Deliveries</u>.  Documents and funds deposited in escrow under <u>Section 4(c)</u> or <u>4(d)</u> will be returned to the Person who deposited them if Seller or Buyer

7

BN 89627986v2

terminates its obligation to complete the transfer of the Property contemplated by this Agreement under circumstances allowed by this Agreement.

(g)    <u>Deliveries Outside of Escrow</u>.  Promptly following the Closing (if not previously delivered to Buyer or located at the Property), Seller will deliver to Buyer, outside of the closing escrow, originals or, if originals are not in Seller's possession, copies of (i) any Leases, Service Contracts and files related thereto in the possession of Seller, and (ii) all keys to all locks on the Property in the possession of Seller.

(h)    <u>Deliveries Upon Close of Escrow</u>.  Upon the Closing, the Title Company shall promptly undertake all of the following: Disburse from funds deposited by Buyer with the Title Company towards payment of all items and costs (including, without limitation, the Purchase Price) chargeable to the account of Buyer pursuant hereto in payment of such items and costs;

(i)    Issue the Title Policy to Buyer;

(ii)    Deduct all items chargeable to the account of Seller pursuant to <u>Section 9</u>.  If, as the result of the net prorations and credits pursuant to <u>Section 9</u>, amounts are to be charged to the account of Seller, deduct the total amount of such charges from the Purchase Price (unless Seller elects to deposit additional funds for such items in escrow); and if amounts are to be credited to the account of Seller, disburse such amounts to Seller, or in accordance with Seller's instructions, at the Closing;

(iii)    Disburse the Purchase Price (or balance thereof) to Seller, or as otherwise directed by Seller, promptly upon the Closing, in accordance with Seller's wire transfer instructions;

(iv)    Cause the Deed, and any other documents which the parties hereto may direct, to be recorded in the Official Records in the order directed by the parties;

(v)    Deliver to Seller counterpart originals of the Assignment of Leases, the Assignment and Assumption Agreement, a copy of the Notice to Tenants executed by Buyer, a copy of the Bill of Sale, a conformed recorded copy of the recorded Deed, and copies of all other Seller Closing Documents not otherwise listed here; and

(vi)    Deliver to Buyer counterpart originals of the Assignment of Leases, Assignment and Assumption Agreement, Bill of Sale, Notice to Tenants, a conformed recorded copy of the Deed, the Title Policy, and copies of all other Seller Closing Documents not otherwise listed here.

5.    <u>Waiver of Due Diligence</u>.

(a)    <u>Due Diligence</u>.  Buyer expressly acknowledges that as of the Effective Date, Buyer has performed any and all inspections, investigations or tests of the Property and has satisfied itself in accordance with such due diligence.  Buyer hereby acknowledges that except as is otherwise expressly provided in this Agreement and subject to Seller's representations and warranties expressly set forth herein, or in any document executed by Seller, it is purchasing the Property in an "AS IS" "WHERE IS" AND "WITH ALL FAULTS" condition at Closing and that

BN 89627986v2

it shall have no right to terminate this Agreement for any reason related to the condition of the Property. Notwithstanding anything to the contrary in the foregoing, commencing on the Effective Date and continuing until Closing (or earlier termination of this Agreement), Buyer shall have reasonable access to the Land at all reasonable times during normal business hours, upon appropriate notice to tenants as permitted or required under the Leases, for the purpose of making copies of documents relating to the Property and conducting physical inspections and tests, including surveys and architectural, engineering, geotechnical and environmental inspections and tests, provided that (i) Buyer must give Seller 48 hours' prior telephone or written notice of any such inspection or test, and with respect to any intrusive inspection or test (i.e., core sampling) must obtain Seller's prior written consent (which consent may be given, withheld or conditioned in Seller's sole discretion), (ii) prior to performing any inspection or test, Buyer must deliver a certificate of insurance to Seller evidencing that Buyer and its contractors, agents and representatives have in place insurance with the following coverage: (1) a per occurrence limit of no less than One Million Dollars ($1,000,000); and (2) an aggregate limit of no less than Three Million Dollars ($3,000,000), which insurance shall cover Buyer's activities on the Land and any accident arising in connection with the presence of Buyer, its contractors, agents and representatives on the Land, and which insurance shall name Seller as an additional insured thereunder and (iii) all such tests shall be conducted by Buyer in compliance with Buyer's responsibilities set forth in this <u>Section 5</u>. Buyer shall bear the cost of all such inspections or tests. Subject to the provisions of this <u>Section 5</u>, Buyer or Buyer's representatives may meet with any tenant; provided, however, Buyer must contact Seller at least three (3) Business Days in advance to inform Seller of Buyer's intended meeting and to allow Seller the opportunity to attend such meeting if Seller desires.   Subject to the provisions of this <u>Section 5</u>, Buyer or Buyer's representatives may meet with any governmental authority for any good faith, reasonable purpose in connection with the transaction contemplated by this Agreement; provided, however, Buyer must contact Seller at least 24 hours in advance to inform Seller of Buyer's intended meeting and to allow Seller the reasonable opportunity to attend such meeting if Seller desires.

(b)     <u>Return of Reports</u>.  If this Agreement terminates for any reason, Buyer shall promptly return and/or deliver to Seller all Information and copies thereof.  Additionally, if this Agreement terminates for any reason other than Seller's default, then upon request by Seller, Buyer shall deliver to Seller copies of all third-party reports, surveys, investigations and studies relating to the Property (collectively, the "<u>Reports</u>" and, individually, a "<u>Report</u>") prepared for Buyer in connection with its due diligence review of the Property.  The Reports shall be delivered to Seller without any representation or warranty as to the completeness or accuracy of the Reports or any other matter relating thereto.  Buyer's obligation to deliver the Information and the Reports to Seller shall survive the termination of this Agreement.

(c)     <u>Proprietary Information; Confidentiality</u>.  Buyer acknowledges that the Information is proprietary and confidential and will be delivered to Buyer or made available for Buyer's review solely to assist Buyer in determining the feasibility of purchasing the Property. Buyer shall not use the Information for any purpose other than as set forth in the preceding sentence.  Buyer shall not disclose the Information to any person other than its Representatives who are responsible for determining the feasibility of Buyer's acquisition of the Property or financing thereof or brokers, attorneys, title and escrow companies and others as may be involved in the negotiation and consummation of this transaction and who have agreed to or are required to preserve the confidentiality of such information as required hereby (collectively, "<u>Permitted</u>

Outside Parties"). Buyer shall not divulge the Information except in strict accordance with the confidentiality standards set forth in this <u>Section 5(c)</u>. In permitting Buyer to review the Information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third party benefits or relationships of any kind, either express or implied, have been offered, intended or created. Notwithstanding any contrary provision of this Agreement, Buyer is permitted to disclose any Information otherwise deemed confidential under this paragraph (i) that was or becomes generally available to the public or otherwise available from a third party (other than as a result of the wrongful disclosure by Buyer or a party that received such confidential Information from Buyer), (ii) that was in the possession of or known to Buyer or the Permitted Outside Parties on a non-confidential basis prior to its disclosure by Seller, (iii) that is disclosed to Buyer or the Permitted Outside Parties on a non-confidential basis from a source other than Seller or Sellers's Parties, which source Buyer believes in good faith is entitled to make such disclosure, (iv) that is independently developed by Buyer or the Permitted Outside Parties without reference to or use of such confidential Information of Seller, (v) in connection with a court order or as otherwise required by applicable law or legal process, (vi) in connection with any litigation that may arise between the parties in connection with the transactions contemplated by this Agreement, or (vii) after the Closing, subject to restrictions reasonably necessary to comply with federal or state securities laws, Buyer or the Permitted Outside Parties may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment and tax structure.

(d)    <u>No Representation or Warranty by Seller</u>. Buyer acknowledges that, except as expressly set forth in this Agreement or the Seller Closing Documents, Seller has not made nor makes any warranty or representation regarding the truth, accuracy or completeness of the Information or the source(s) thereof. Buyer further acknowledges that some, if not all, of any such information was prepared by third parties other than Seller. Seller expressly disclaims any and all liability for representations or warranties, express or implied, statements of fact and other matters contained in such information, or for omissions from the information, or in any other written or oral communications transmitted or made available to Buyer. Buyer shall rely solely upon its own investigation with respect to the Property, concerning all matters related to the design, financing, development, entitlement, construction, maintenance, management, or performance of the Property, including, without limitation, the Property's physical, environmental or economic condition, compliance or lack of compliance with any ordinance, order, permit or regulation or any other attribute or matter relating thereto. Seller has not undertaken any independent investigation as to the truth, accuracy or completeness of the Information and is providing the Information or making the same available for Buyer's review solely as an accommodation to Buyer.

(e)    <u>Buyer's Responsibilities</u>. In conducting any inspections, investigations or tests of the Property and/or the Information, Buyer and its agents and representatives shall: (i) not unreasonably disturb the tenants or interfere with their use of the Property pursuant to their respective Leases; (ii) not unreasonably interfere with the operation and maintenance of the Property; (iii) not damage any part of the Property or any personal property owned or held by any tenant or any third party; (iv) not injure or otherwise cause bodily harm to Seller, Property Manager, or their respective agents, guests, invitees, contractors and employees or any tenants or their guests or invitees; (v) comply with all applicable laws; (vi) promptly pay when due the costs

of all tests, investigations and examinations done with regard to the Property, conducted by Buyer; (vii) not permit any liens to attach to the Property by reason of the exercise of Buyer's rights hereunder; (viii) repair any damage to the Property resulting directly or indirectly from any such inspection or tests caused by Buyer (or its agents and representatives); and (ix) not reveal or disclose prior to Closing any Information to anyone other than the Permitted Outside Parties, in accordance with the confidentiality standards set forth in Section 5(e), or except as may be otherwise required by law.

(f)     Buyer's Agreement to Indemnify.  Buyer indemnifies and holds Seller harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) arising out of Buyer's inspections or tests of the Property or any violation of the provisions of Section 5(a), Section 5(c) or Section 5(e); provided, however, the indemnity shall not apply to claims arising from (i) a diminution in value of the Property caused solely by the disclosure to Buyer, Seller or Permitted Outside Parties of Information regarding the discovery of any pre-existing Hazardous Materials at the Property, (ii) any release on or about the Property of any pre-existing Hazardous Materials at the Property, except and to the extent such release was contributed to or exacerbated by the negligence of Buyer or its Permitted Outside Parties, or (iii) any conditions on or about the Property in existence as of the Effective Date, except and to the extent contributed to or exacerbated by the negligence of Buyer or its Permitted Outside Parties.  Buyer's obligations under this Section 5(f) shall survive the termination of this Agreement and shall survive the Closing.

6.     Seller's Conditions.  Seller's obligation to sell the Property is conditioned on satisfaction or waiver in writing by Seller of each of the following conditions precedent:

(a)     all representations of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and on and as of the Closing (as if re-made on and as of the Closing);

(b)     Buyer shall have timely (i) executed, acknowledged (where required) and delivered to the Title Company all documents, instruments and agreements described in Section 4(d), and (ii) delivered to the Title Company, in immediately available funds and lawful monies of the United States of America, all funds required by Section 4(d) including, but not limited to, the balance of the Purchase Price in accordance with Section 4(d);

(c)     as of the Closing, Buyer shall have materially performed all of its other obligations hereunder; and

If any of the conditions in this Section 6 are not satisfied as of the Closing Date, Seller may elect to terminate this Agreement, in which case the Earnest Money shall be immediately disbursed by the Title Company to Seller pursuant to the terms and conditions of Section 12(a).

7.     Buyer's Conditions.  Buyer's obligation to purchase the Property is conditioned on satisfaction or waiver in writing by Buyer of the following conditions:

(a)     all representations of Seller contained in this Agreement are true and correct in all material respects at the time of the Closing;

11

(b)     the Title Company shall have issued at the Closing, or be unconditionally and irrevocably committed at the Closing to issue, to Buyer, an ALTA owner's title policy, on the Title Company's standard form issued in the State of California, showing title to the Property vested in Buyer, subject only to the Permitted Exceptions (the "Title Policy"); and

(c)     as of the Closing, Seller shall have materially performed all of its obligations hereunder.

If the conditions in this Section 7 are not satisfied as of the Closing Date and are not waived by Buyer, Seller may, by written notice to Buyer on or prior to the Closing Date, extend the Closing Date for up to fifteen (15) days to allow for correction of the matter and satisfaction of the condition(s) precedent to Buyer's Closing obligations, including, without limitation, changing title company to a title company of Seller's sole and absolute discretion to satisfy issuance of the Title Policy in accordance with (b) above.  If the conditions in this Section 7 are not satisfied as of the Closing Date (as extended by Seller, if applicable), Buyer may elect to terminate this Agreement and receive a refund of the Earnest Money or waive the condition and proceed to Closing.

8.     Title And Survey.

(a)     Title Report.  Prior to the Effective Date, the Title Company has delivered to Buyer (i) a current commitment for title insurance for a standard ALTA owner's policy on the Title Company's most current form issued by the Title Company in the State of California (the "Title Commitment"), and (ii) copies of all documents of record referred to in the Title Commitment as exceptions to title to the Land (collectively, the "Title Documents").

(b)     Amended Commitment.  If at any time prior to Closing, the Title Company gives Buyer written notice of a new title exception or exceptions not reflected in any of the initial Title Commitment (and not caused or consented to by Buyer) (a "New Title Defect"), then, within two (2) Business days after the giving of such notice, Buyer may submit to Seller a Title Objection Notice relating only to such new exceptions ("Buyer's Title Objection Notice"). Within two (2) Business Days after receipt of Buyer's Title Objection Notice, Seller shall notify Buyer pursuant to a revised Seller's Title Notice of Seller's election either to cure or not to cure a New Title Defect listed in Buyer's Title Objection Notice. Seller's failure to timely respond to a Buyer's Title Objection Notice shall be deemed a decision by Seller not to cure the New Title Defects listed in the Buyer's Title Objection Notice. Within three (3) days after Seller elects (or is deemed to have elected) not to cure a New Title Defect listed in a Buyer's Title Objection Notice, Buyer may, by written notice to Seller, elect as its sole remedy to either (i) waive the uncured New Title Defects or (ii) terminate this Agreement, in which event Buyer shall receive a return of the Earnest Money, and neither party shall have any further obligations to the other party. The outside Closing Date shall be extended if and to the minimum extent necessary to accommodate the time periods in this Section 8(b).

9.     Closing Costs and Prorations.

(a)     Closing Costs.  Buyer will pay (i) all recording costs, including the recording cost for the recordation of the Deed, (ii) the cost of any Survey, if Buyer elects to obtain one, (iii) all financing costs, including documentary stamps or tax on any note or mortgage

procured by Buyer, (iv) one-half of any escrow fee charged by the Title Company, (v) [intentionally omitted], and (vi) any inspection fee charged by the Title Company. Buyer and Seller each will pay its own attorneys' fees, subject to <u>Section 17(b)</u>. Seller will pay for (1) all state, county and local transfer taxes, and (2) one-half (1/2) of any escrow fee charged by the Title Company. Other costs will be paid by Seller or Buyer, as applicable, as specified by other provisions of this Agreement or, if no provision is made in this Agreement, in accordance with local custom in San Bernardino County, California

(b)     <u>Prorations</u>. Seller and Buyer will prorate collected Rents and all expenses of operation of the Property, if any (including utilities, personal property taxes and real property taxes and property assessments taking into account maximum discounts), except for insurance premiums, as of 11:59 PM (Pacific Time) on the day before the Closing. Amounts allocable to the Closing Date will be for the account of Buyer. If any expenses cannot be finally determined as of the Closing Date, such expense will be prorated on the best available information or, with respect to real property taxes, on the latest available tax bill from the San Bernardino County tax assessor. Adjustments to the prorations (other than the tax proration) will be made from time to time but not later than sixty (60) days after the Closing Date, to take into account final information as to expenses estimated as of the Closing Date or to adjust Rents or expenses that were not included in the prorations done at the Closing, and Buyer or Seller, as applicable, will pay the other, promptly on demand, such amounts as may be appropriate based on such adjustments, together with interest at 10% per annum from the date of demand if such amount remains unpaid more than ten (10) days after demand. Any reproration of expenses (other than taxes) or Rents must be completed not later than sixty (60) days after the Closing Date, and, subject to <u>Section 9(c)</u>, and except for real property taxes and assessments, neither Buyer nor Seller will be entitled to request a payment on account of reprorations after such date. The determination of real property taxes on the Closing Date under this <u>Section 9(b)</u> shall be conclusively binding upon Seller and Buyer without the requirement or burden of any post-Closing adjustment, "true-up" or reconciliation once the actual tax assessments are known.

(c)     <u>Delinquent Rents</u>. Rents delinquent as of the Closing Date will not be prorated. Rents collected after the Closing by Buyer must be applied first against Rents attributable to the period after the Closing, until all of such Rents have been collected, and then to Rents attributable to the period before the Closing. Buyer will remit to Seller any Rents collected by Buyer that, in accordance with this <u>Section 9(c)</u>, are allocable to the period before the Closing.

(d)     <u>Deposits and Letters of Credit</u>. Buyer will be entitled to a credit through the Closing Date for all Deposits held and retained by Seller as of the Closing Date. Nonrefundable deposits, fees and upfront payments will not be prorated, nor will Buyer be entitled to a credit on account of such amounts. Seller shall also transfer to Buyer any security deposits held in the form of a letter of credit at Buyer's cost (including Buyer's payment of any third party transfer fees and expenses); if the applicable letter of credit is not capable of being transferred at Closing, Seller shall request the applicable tenant to cause a new letter of credit to be issued in favor of Buyer in replacement thereof or Seller shall request the issuing bank to transfer the same to Buyer immediately after Closing, as applicable, and in the event a new letter of credit is not issued in favor of Buyer by Closing or such transfer is not effected by Closing, Buyer and Seller shall diligently pursue such replacement letter or transfer after Closing and Seller shall take all reasonable action, as directed by Buyer and at Buyer's expense, in connection with the presentment

13

Docusign Envelope ID: 46DC04E0-EE53-4564-B385-2601762E0063

of such letter of credit for payment as permitted under the terms of the applicable Lease, and in consideration of Seller's agreement as aforesaid, Buyer shall indemnify, defend and hold Seller harmless from any liability, damage, loss, cost or expense resulting from an alleged wrongful drawing upon any of the letters of credit after the Closing.

(e)     Leasing Commissions and Tenant Inducements.  Buyer shall be responsible for the payment of (A) all Tenant Inducement Costs (as defined below) and leasing commissions which become due and payable (whether before or after Closing) as a result of any new Leases first entered into after the Effective Date or any amendments, renewals, extensions or expansions of existing Leases first entered into or exercised after the Effective Date (collectively, "New Leases") and (B) all Tenant Inducement Costs and leasing commissions which become due and payable from and after the Closing Date with respect to the Leases. Notwithstanding the foregoing, Buyer will be entitled to a credit at Closing for any Tenant Inducement Costs and leasing commissions relating to the existing Leases as of the Effective Date with the tenants listed on Schedule 9(e) which have not been paid by Seller on or before the Closing Date.  If Seller has paid any Tenant Inducement Costs or leasing commissions prior to the Closing Date for which Buyer is responsible, Seller shall receive a credit for such amounts at Closing.  The payment or satisfaction of all leasing commissions and Tenant Inducement Costs which are not the responsibility of Buyer as described in the preceding three sentences or otherwise agreed to by the parties, shall be the responsibility of Seller.  For purposes hereof, the term "Tenant Inducement Costs" shall mean any out-of-pocket payments required under a Lease to be paid or incurred by the landlord or for the benefit of the tenant which is in the nature of a tenant inducement, including specifically, without limitation, tenant improvement costs, lease buyout costs, and moving, design and refurbishment allowances.   Notwithstanding anything to the contrary contained herein, (i) Buyer shall bear the loss resulting from any free, reduced or abated rent prior to the Closing Date under the Leases; and (ii) Buyer shall bear the loss resulting from any free, reduced or abated rent from and after the Closing Date for all Leases.

10.     Representations and Warranties.

(a)     Seller's Representations and Warranties.  In order to induce Buyer to enter into this Agreement and to complete the transfer of the Property contemplated by this Agreement, Seller represents and warrants to Buyer that, as of the date of this Agreement:

(i)     Seller has duly been organized and is validly existing under the laws of the State of Delaware.  Seller has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the transfer of the Property contemplated by this Agreement.  Seller has taken all action necessary to authorize the execution and delivery of this Agreement, the performance by Seller of its obligations under this Agreement and the completion of the transfer of the Property contemplated by this Agreement.

(ii)     This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity.

(iii)     To its knowledge, Seller and its subsidiaries have conducted and will conduct their businesses in compliance with (a) the Foreign Corrupt Practices Act of 1977 and

BN 89627986v2

Docusign Envelope ID: 46DC0480-EE53-4561-B389-A88172B4F5A4

any other applicable law, regulation, order, decree or directive having the force of law and relating to bribery or corruption (collectively, the "Anti-Corruption Laws"; (b) the applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act of 1970, as amended, applicable provisions of the USA PATRIOT Act of 2001, including all amendments thereto and regulations promulgated thereunder, and the anti-money laundering statutes, rules, regulations and guidelines of all jurisdictions to the extent applicable to Seller or any of its subsidiaries (collectively, the "Anti-Money Laundering Laws"); and (c) all sanctions administered or enforced by the United States Government (including the U.S. Department of the Treasury's Office of Foreign Assets Control and the U.S. Department of State) and any other relevant sanctions authority (collectively, "Sanctions").

(iv)    No investigation, inquiry, action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Seller or any of its subsidiaries with respect to the Anti-Corruption Laws, the Anti-Money Laundering Laws or Sanctions is pending or, to the knowledge of the Seller, threatened.

(v)    Seller will not knowingly, directly or indirectly, use the proceeds of the Purchase Price or lend, contribute or otherwise make available such proceeds to any Person, (i) to fund any activities or business of or with any Person or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions; (ii) to fund or facilitate any money laundering or terrorist financing activities; or (iii) in any other manner that would cause or result in a violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by any Person (including any party to this Agreement).

(vi)    To Seller's knowledge, the Service Contracts listed on Exhibit G attached hereto are all of the material contracts and agreements concerning the operation and maintenance of the Property entered into by Seller or Property Manager and affecting the Property. Notwithstanding anything to the contrary in this Agreement, Buyer and Seller acknowledge that Exhibit G does not include all amendments, modifications and supplements relating to those Service Contracts.

(vii)    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended and the Income Tax Regulations thereunder. Seller is exempt from withholding taxes under Section 18662 of the California Revenue and Taxation Code, as amended.

(viii)    As used in this Section 10(a), the phrase "to Seller's actual knowledge" and similar expressions means the actual knowledge of Mark Shinderman who is the individual at Seller most knowledge about the Property, without inquiry of any sort and without imputation of knowledge of others, and without any personal liability under or in connection with this Agreement.

Notwithstanding anything to the contrary in this Agreement, Seller shall have no liability, and Buyer shall make no claim against Seller, for (and Buyer shall be deemed to have waived any failure of a condition hereunder by reason of) a failure of any condition or a breach of any representation or warranty, covenant or other obligation of Seller under this Agreement or any closing document executed by Seller if (a) the failure or breach in question constitutes or results

15

from a condition, state of facts or other matter that was actually known to Buyer or (b) the failure or breach in question constitutes or results from a condition, state of facts or other matter that was actually known to Buyer prior to Closing and Buyer proceeds with the Closing.

(b)     <u>Buyer's Representations and Warranties</u>.  In order to induce Seller to enter into this Agreement and to complete the transfer of the Property contemplated by this Agreement, Buyer represents and warrants to Seller that, as of the date of this Agreement and as of the date of Closing:

(i)     Buyer has been duly organized and is validly existing under its state of formation.  Buyer has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the transfer of the Property contemplated by this Agreement. Buyer has taken all action necessary to authorize the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement and the completion of the transfer of the Property contemplated by this Agreement.

(ii)     Buyer and any equity holder or other financial backer of Buyer is a Qualified Bidder, as defined in that certain Order (I) Approving Bidding Procedures; (II) Scheduling the Bid Deadlines; (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale of Tesoro Property; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Contract Assumption and Assignment Procedures; and (VI) Granting Related Relief dated May 15, 2025 in connection with Bankruptcy Case No. 25-10321 (BLS) (the "<u>Tesoro Bid Procedures Order</u>") and Buyer has provided all requisite formation and corporate structure documentation in connection therewith.

(iii)     Buyer is not, and no equity holder or other financial backer of Buyer, a current or former officer, director or equity holder of the Seller, or any entity affiliated with any current or former officer, director or equity holder of the Seller.  Buyer has disclosed the names, contact information, and counsels for all equity holders or other financial backers and there are no undisclosed insiders, principals, equity holders, or financial backers of Buyer.

(iv)     Buyer has (a) in addition to the Leases, identified any executory contracts and unexpired leases to be assumed and assigned in connection with the proposed transactions, (b) provided for the payment of all cure costs related to such executory contracts and unexpired leases, and (iii) demonstrated that it can provide adequate assurance of future performance under all executory contracts and unexpired leases, including the Leases.

(v)     Buyer shall abide by and honor the terms of the bidding procedures as set forth in the Tesoro Bid Procedures Order.

(vi)     Buyer disclaims any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, Buyer agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(vii)     Buyer acknowledges and representations that it: (a) has not engaged in any collusion with respect to the transactions described herein; and (ii) is a good-faith purchaser and has made a good-faith *bona fide* offer.

16

BN 89627986v2

(viii)    This Agreement has been duly executed and delivered by Buyer and constitutes a valid, binding and enforceable obligation of Buyer, subject to bankruptcy and other debtor relief laws and principles of equity.

(ix)    The execution and delivery of this Agreement by Buyer, the performance by Buyer of its obligations under this Agreement and the completion of the transfer of the Property contemplated by this Agreement will not result in (1) a breach of, or a default under, any contract, agreement, commitment or other document or instrument to which Buyer is party or by which Buyer is bound or (2) a violation of any law, ordinance, regulation or rule of any governmental authority applicable to Buyer or any judgment, order or decree of any court or governmental authority that is binding on Buyer.

(x)    Except for consents, approvals, authorizations and filings already completed, Buyer is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement or the completion of the transfer of the Property contemplated by this Agreement.

(xi)    In connection with this Agreement and to its knowledge, neither Buyer nor any of its affiliates nor any brokers or other agents of same, have engaged in any dealings or transactions, (a) directly or indirectly, with any Prohibited Person (defined below), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person, (b) in contravention of any applicable money laundering laws or regulations, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the USA Patriot Act of 2001, the Trading with the Enemy Act (50 U.S.C. §1 et seq., as amended), or any enabling legislation or executive order relating thereto, (c) in contravention of Executive Order no. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), as may be amended or supplemented from time to time ("Anti-Terrorism Order") or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the Office of Foreign Assets Control of the U.S. Department of Treasury ("OFAC"), or (d) that violate the U.S. Foreign Corrupt Practices Act . In connection with this Agreement, neither Buyer nor any of its affiliates nor, to its knowledge, any brokers or other agents of same are or will be conducting any business or engaging in any transaction with any person appearing on OFAC's list of Specially Designated Nationals List. As used herein, the following terms shall have the following meanings: (1) "Prohibited Person" means any Person that is now or shall be at any time until Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("Financial Institution"), is prohibited from transacting business of the type contemplated by this Agreement, under United States law, including regulations, executive orders and lists administered, enforced or published by OFAC; and (2) "U.S. Person" means a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories.

17

Docusign Envelope ID: 46DC04C0-EF53-4563-B389-29837CF314F6

(xii)    (a) in connection with this Agreement, Buyer and its subsidiaries have maintained compliance with all Anti-Money Laundering Laws and Anti-Corruption Laws; and (b) Buyer and its subsidiaries have instituted and maintained and will continue to maintain policies and procedures reasonably designed to promote and achieve compliance with the Anti-Money Laundering Laws and the Anti-Corruption Laws.

(xiii)    Buyer is not an employee benefit plan as defined in Section 3(3) of ERISA.  Buyer is not acquiring the Property with assets that constitute "plan assets" within the meaning of the plan asset regulations promulgated by the U.S. Department of Labor at 29 C.F.R. 2510.3-101 et seq., as amended or modified from time to time.

(xiv)    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under federal or state bankruptcy laws in pending against or contemplated by Buyer or its general partner(s) or controlling shareholders or members.

(c)    Disclaimers.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN SECTION 10(a) AND ANY SELLER CLOSING DOCUMENT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PROPERTY OR ITS CONDITION OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY AND BUYER ACCEPTS SUCH DISCLAIMERS. THE DISCLAIMERS IN THIS SECTION 12(c) SPECIFICALLY EXTEND TO (1) MATTERS RELATING TO HAZARDOUS MATERIALS AND COMPLIANCE WITH ENVIRONMENTAL LAWS, (2) GEOLOGICAL CONDITIONS, INCLUDING SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND STREAMS AND RESERVOIRS AND OTHER UNDERGROUND WATER CONDITIONS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER, EARTHQUAKE FAULTS, AND MATTERS RELATING TO FLOOD PRONE AREAS, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARDS, (3) STORMWATER DETENTION, RETENTION, DISCHARGE OR DRAINAGE, (4) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF UNSTABLE SOILS, CONDITIONS OF SOIL FILL, SUSCEPTIBILITY TO LANDSLIDES, AND THE SUFFICIENCY OF ANY UNDERSHORING, (5) ZONING AND SUBDIVISION AND COMPLIANCE WITH ZONING AND SUBDIVISION LAWS, (6) THE VALUE AND PROFIT POTENTIAL OF THE PROPERTY, (7) DESIGN, CONSTRUCTION, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY AND PHYSICAL CONDITION OF THE PROPERTY AND (8) COMPLIANCE OF THE PROPERTY WITH ANY LAWS (INCLUDING BUILDING CODES AND SIMILAR LAWS, THE AMERICANS WITH DISABILITIES ACT OF 1990 AND THE FAIR HOUSING AMENDMENTS ACT OF 1988). BUYER REPRESENTS AND WARRANTS TO SELLER AND ITS RELATED ENTITIES THAT BUYER IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED BUYER OF REAL ESTATE.

BN 89627986v2

BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN <u>SECTION 10(a)</u> AND ANY SELLER CLOSING DOCUMENT, BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY STATEMENT OF SELLER OR ANY OF ITS RELATED ENTITIES OR ANY OFFICER, DIRECTOR, TRUSTEE, AGENT, EMPLOYEE OR OTHER PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER OR ANY OF ITS RELATED ENTITIES. BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED OR WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS AS TO THE CONDITION OF THE PROPERTY AND ALL MATTERS BEARING UPON THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS AND DETERMINE THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN <u>SECTION 10(a)</u> AND ANY SELLER CLOSING DOCUMENT, <u>BUYER IS ACQUIRING THE PROPERTY "AS IS" AND "WHERE IS" AND SUBJECT TO ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS, WHETHER PATENT OR LATENT</u>. UPON CLOSING, BUYER WILL ACCEPT THE PROPERTY SUBJECT TO BOTH PATENT AND LATENT ADVERSE STRUCTURAL, PHYSICAL, ECONOMIC OR ENVIRONMENTAL CONDITIONS OR DEFECTS THAT MAY THEN EXIST, WHETHER OR NOT REVEALED BY THE INSPECTIONS AND INVESTIGATIONS CONDUCTED BY BUYER. BUYER SPECIFICALLY WAIVES AND RELEASES (1) ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (<u>INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY SELLER BUT EXCLUDING THE REPRESENTATIONS AND WARRANTIES IN SECTION 10(a) AND ANY SELLER CLOSING DOCUMENTS</u>) WITH RESPECT TO THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AND (2) EXCEPT FOR ANY BREACH BY SELLER UNDER THIS AGREEMENT OR ANY SELLER CLOSING DOCUMENT, ALL RIGHTS, REMEDIES, RECOURSE OR OTHER BASIS FOR RECOVERY (<u>INCLUDING ANY RIGHTS, REMEDIES, RECOURSE OR BASIS FOR RECOVERY BASED ON NEGLIGENCE OR STRICT LIABILITY</u>) THAT BUYER WOULD OTHERWISE HAVE AGAINST SELLER OR ANY OF ITS RELATED ENTITIES, ANY PERSON WHO HOLDS A DIRECT OR INDIRECT OWNERSHIP INTEREST IN SELLER OR ANY RELATED ENTITY AND THE RESPECTIVE MEMBERS, PARTNERS, OFFICERS, DIRECTORS, TRUSTEES, AGENTS AND EMPLOYEES OF EACH SUCH PERSON IN RESPECT OF THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS

19

AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS.  BUYER ACKNOWLEDGES AND AGREES THAT: (i) THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c) ARE AN INTEGRAL PART OF THIS AGREEMENT, (ii) SELLER WAS MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT AND SELL THE PROPERTY TO BUYER IN MATERIAL RELIANCE UPON SUCH DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c), (iii) SELLER WOULD NOT HAVE AGREED TO COMPLETE THE SALE ON THE TERMS PROVIDED IN THIS AGREEMENT, WITHOUT THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c).  THE PROVISIONS OF THIS SECTION 10(c) AND THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH HEREIN SHALL EXPRESSLY INCLUDE AND BE FOR THE BENEFIT OF ALL RELATED ENTITIES AND ALL RELATED ENTITIES ARE EXPRESSLY THIRD PARTY BENEFICIARIES OF THIS SECTION 10(c).

(d)    Release.  (a)  In furtherance of the "AS IS, WHERE IS" nature of the sale, Buyer shall rely solely upon Buyer's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition.  Except with respect to Seller's representations and warranties under Section 10(a) or in the Seller Closing Documents, Buyer and anyone claiming by, through or under Buyer hereby waives its right to recover from and fully and irrevocably releases Seller and the Seller Related Entities from any and all Claims that it may now have or hereafter acquire against any of the Seller Related Entities arising from or related to any construction defects, errors, omissions or other conditions, latent or otherwise, including environmental matters, affecting the Property, or any portion thereof.  This release includes Claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Seller.  From and after the Closing, in connection with the above release, Buyer specifically waives the provision of, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that from and after the Closing, Buyer nevertheless hereby intends to release, discharge and acquit Seller from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.

BN 89627986v2

Docusign Envelope ID: 46DC04B0-EF53-4563-B389-26927E2F31AE

Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this <u>Section 10(d)</u>. Buyer has initialed this <u>Section 10(d)</u> to further indicate its awareness and acceptance of each and every provision hereof. This <u>Section 10(d)</u> shall survive any termination of this Agreement and the Closing.

BUYER'S INITIALS: _____

        (e)    <u>Survival</u>.  The representations and warranties in <u>Section 10(a)</u> and <u>Section 10(b)</u> will survive Closing, but only for a period (the "<u>Survival Period</u>") of three (3) months, and no claim shall be allowed on any such representation or warranty unless notice of the claim and a detailed statement of the basis for the claim is delivered by the claimant to the other party within such three-month Survival Period.  Nothing in this <u>Section 10(e)</u> limits the disclaimers, waivers, releases and other provisions in <u>Section 10(c)</u>, all of which will survive Closing without limit as to time.

    11.    <u>Specific Rights and Obligations</u>.

        (a)    <u>Maintenance of Insurance</u>.  Seller agrees that it will maintain all insurance in effect as of the date of this Agreement with respect to the Property (or, if such insurance is cancelled or expires, comparable insurance to the extent it is available on commercially reasonable terms) until the earlier of the Closing or the termination by Buyer or Seller of its obligation to complete the transfer of the Property contemplated by this Agreement.

        (b)    <u>Conduct of Business</u>.  Until the earlier of the Closing Date or the termination by Buyer or Seller of its obligation to complete the transfer of the Property, Seller will carry on its business with respect to maintaining and operating the Property in a manner that is consistent with Seller's past practices, subject to changes in asset management and leasing parameters as Seller considers desirable or necessary to meet market conditions in the exercise of its reasonable discretion.

        (c)    <u>Leasing</u>.  Seller will not enter into any New Leases without Buyer's prior written consent, which consent may be withheld in Buyer's reasonable discretion, and which consent will be deemed to have been given by Buyer if Buyer does not notify Seller in writing to the contrary within three (3) Business Days after Seller provides written notice to Buyer of such proposed New Lease.

    12.    <u>Remedies</u>.

        (a)    <u>SELLER'S REMEDIES</u>.  IF BUYER FAILS TO PURCHASE THE PROPERTY IN VIOLATION OF THIS AGREEMENT, THEN SELLER, AS ITS SOLE AND EXCLUSIVE REMEDY, MAY TERMINATE ITS OBLIGATION TO COMPLETE THE TRANSFER OF THE PROPERTY AND, UPON SO DOING, WILL BE ENTITLED TO RECEIVE THE EARNEST MONEY AS LIQUIDATED DAMAGES.  SELLER WAIVES ALL REMEDIES FOR BUYER'S FAILURE TO COMPLETE THE TRANSFER OF THE PROPERTY, EXCEPT THOSE SPECIFICALLY PROVIDED FOR IN THIS <u>SECTION 12(a)</u>. SELLER AND BUYER ACKNOWLEDGE THAT SELLER'S DAMAGE WOULD BE DIFFICULT OR IMPOSSIBLE TO ASCERTAIN IN THE EVENT OF BUYER'S DEFAULT IN ITS OBLIGATION TO PURCHASE THE PROPERTY AND THAT THE LIQUIDATED

BN 89627986v2

DAMAGES PROVIDED FOR IN THIS <u>SECTION 12(a)</u> ARE A REASONABLE ESTIMATE OF SELLER'S DAMAGES. SELLER AND BUYER ACKNOWLEDGE THAT THE AMOUNT OF THE LIQUIDATED DAMAGES HAS BEEN SET TAKING INTO ACCOUNT VARIOUS FACTORS, INCLUDING THE POTENTIAL FOR CHANGE IN VALUE OF THE PROPERTY. THE REMEDIES PROVIDED IN THIS <u>SECTION 12(a)</u> ARE EXCLUSIVE, PROVIDED, HOWEVER, THAT NOTHING IN THIS <u>SECTION 12(a)</u> LIMITS SELLER'S ABILITY TO COLLECT ATTORNEYS' FEES UNDER SECTION 17(b), REMEDIES FOR ANY BREACH BY BUYER OF ANY REPRESENTATION, WARRANTY, OBLIGATION, UNDERTAKING OR INDEMNITY THAT SURVIVES THE TERMINATION OF THIS AGREEMENT, AS EXPRESSLY SET FORTH IN THIS AGREEMENT.  IF CLOSING IS CONSUMMATED, THEN SELLER SHALL HAVE ALL REMEDIES AVAILABLE AT LAW OR IN EQUITY IF BUYER FAILS TO PERFORM ANY OBLIGATION OF BUYER UNDER THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTION 3275 OR 3369 (AND ANY CORRESPONDING PROVISIONS OF THE LAWS OF OTHER JURISDICTIONS, IF APPLICABLE), BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677 (AND ANY CORRESPONDING PROVISIONS OF THE LAWS OF OTHER JURISDICTIONS, IF APPLICABLE).  THE PARTIES HAVE SET FORTH THEIR INITIALS BELOW TO INDICATE THEIR AGREEMENT WITH THE LIQUIDATED DAMAGES PROVISION CONTAINED IN THIS SECTION.

BUYER ___*PM*___     SELLER ___*MS*___ [Initial]

(b)  <u>Buyer's Remedies</u>.  If the Closing does not occur solely as a result of Seller's failure to materially perform any of its obligations under this Agreement, such failure shall constitute a Seller default, and if such default is not cured within fifteen (15) days after written demand for performance delivered to Seller by Buyer, then Buyer may either (i) terminate its obligation to complete its purchase of the Property, in which event Buyer shall be entitled to the Earnest Money, or (ii) enforce specific performance of Seller's obligation; provided, however, that the remedy of specific performance shall only be available if  (i) Seller has willfully and intentionally breached its obligation to close under this Agreement, (ii) Buyer has deposited with the Title Company, prior to the Closing Date, all documents and funds required to be deposited by Buyer under this Agreement in order to close the transactions contemplated under this Agreement, and (iii) any suit for specific performance is filed and served by Buyer no later than thirty (30) days after the Closing Date (and if Buyer fails to commence and serve a suit for specific performance within such thirty (30)-day period, Buyer will be deemed to have irrevocably waived its right to bring suit for specific performance at any later date).  The remedies provided in this <u>Section 12(b)</u> are exclusive, and Buyer expressly waives all other remedies, claims and causes of action (including any right to obtain lost profits or actual, consequential, special or any other damages from Seller) for Seller's failure in performance prior to Closing or for any inaccuracy of Seller's representations and warranties that is discovered by Buyer prior to Closing.

(c)  <u>Limitation on Liability</u>. Notwithstanding anything to the contrary contained elsewhere herein, no claim for any breach by Seller of any representation, warranty, covenant, indemnity or obligation of Seller under this Agreement, or under any document, instrument or

BN 89627986v2

Docusign Envelope ID: 46DC04E0-EF53-4564-B389-3D6178291444
Case 25-10321   Claim 8   Document 1   Page 28 of 63

agreement delivered by Seller at the Closing (including any Seller Closing Documents), which is asserted by Buyer after the Closing, shall be actionable or payable unless each of the following conditions is satisfied: (i) the breach in question results from or is based on a condition, state of facts or other matter which was not known to Buyer prior to Closing, (ii) the valid claims for all such breaches, if any, collectively aggregate more than Fifty Thousand Dollars ($50,000), in which event the amount of claims in excess of such amount shall be actionable subject to the Cap (defined below); and (iii) written notice containing a description of the specific nature of such breach shall have been given by Buyer to Seller prior to the expiration of the Survival Period, and an action shall have been commenced by Buyer against Seller within thirty (30) days after the termination of the Survival Period. Buyer agrees to first seek recovery under any insurance policies, the Title Policy and the Service Contracts prior to seeking recovery from Seller, and Seller shall not be liable to Buyer if Buyer's claim is satisfied from such insurance policies, Title Policy or Service Contracts.  In addition, and notwithstanding anything to the contrary contained in this Agreement or any document or certificate executed in connection with this Agreement (including the Seller Closing Documents), the aggregate liability of Seller and Seller Related Entities arising directly or indirectly pursuant to or in connection with the representations and warranties (whether express or implied), covenants, indemnities and other obligations of Seller under this Agreement and all documents and certificates executed in connection with this Agreement (including the Seller Closing Documents) shall be limited to $250,000 (the "Cap"), regardless of whether any such liability arises from the actual or alleged negligent, willful or intentional act or omission of Seller or any Related Entity. The provisions of this Section 12(c) shall survive Closing and any earlier termination of this Agreement.

13.     Brokerage.

Seller represents and warrants that it has been represented by Marcus & Millichap with respect to the transaction contemplated hereby.  Subject to the preceding sentence, Seller and Buyer each agrees to indemnify and defend the other and hold the other harmless against any claim for a commission, finder's fee or similar compensation asserted by any person retained by or claiming through the indemnifying party or its affiliates in connection with the transfer of the Property or the execution of this Agreement, and all related loss, damage, liability, obligation, claim, suit, cause of action, judgment, settlement, penalty, fine or cost or expense (including fees and disbursements of attorneys and other professionals and court costs).  The provisions of this Section 13 shall survive the Closing and any termination of this Agreement.

14.     Possession.

Seller will deliver possession of the Property to Buyer at the time of Closing, subject to the Permitted Exceptions.

15.     Casualty and Condemnation.

(a)     Notice of Casualty or Condemnation.  Seller will notify Buyer within ten (10) days after receiving notice of, or otherwise becoming aware of, (1) any Casualty Loss (as defined below) or (2) the commencement of any proceedings for the taking by eminent domain of all or any part of the Property.

23

BN 89627986v2

(b)     <u>Casualty Losses</u>.  If, prior to Closing, the Property is damaged by fire, windstorm, rioting or other civil disturbance, acts of war, earthquake or other casualty (a "<u>Casualty Loss</u>") and the cost to repair the related damage is more than $5,000,000 (a "<u>Material Casualty Loss</u>"), then Buyer, at its option, may terminate its obligation to complete the transfer of the Property contemplated by this Agreement upon notice to Seller of Buyer's intent to terminate within five (5) days after receiving notice from Seller of such Casualty Loss, in which case the Earnest Money will be returned to Buyer.  If Buyer elects to complete the transfer of the Property notwithstanding a Material Casualty Loss, then Seller will deliver to Buyer at Closing, through the closing escrow, all insurance proceeds previously received by Seller and an assignment of Seller's rights with respect to all uncollected insurance proceeds and Seller will cooperate with Buyer after Closing in making claim for, and collecting, all available insurance proceeds.  All amounts payable under this <u>Section 15(b)</u> shall be less the proceeds of rental loss and business interruption insurance allocable to the period through the Closing Date, amounts expended by Seller to stabilize or repair the Property and costs incurred by Seller in making proof of loss or settling claims with insurers. If the Casualty Loss is not a Material Casualty Loss, then Buyer shall not have the right to terminate this Agreement, and Seller will deliver to Buyer at Closing, through the closing escrow, all insurance proceeds previously received by Seller, together with an assignment of Seller's rights with respect to all uncollected insurance proceeds, and Seller, at no cost or expense to Seller, will cooperate with Buyer after Closing in making claim for, and collecting, all available insurance proceeds.

(c)     <u>Condemnation</u>.  If, prior to Closing, all or a "material part" of the Property is taken by eminent domain or any proceedings for the taking by eminent domain of all or a material part of the Property are commenced or Seller and the condemning authority enter into discussions regarding Seller's delivery of a deed in lieu thereof, then Buyer, at its option within five (5) days after receiving notice thereof from Seller, may terminate its obligation to complete the transfer of the Property, in which case the Earnest Money will be returned to Buyer.  If Buyer elects to complete the transfer of the Property notwithstanding a taking by eminent domain or proceeding therefore or deed in lieu thereof, Seller will deliver to Buyer at Closing, through the closing escrow, all condemnation proceeds previously received by Seller and an assignment of Seller's rights with respect to all uncollected condemnation proceeds (in either case, net of proceeds allocable to loss of use of the Property for the period through the Closing Date and costs reasonably incurred by Seller in connection with such proceedings) and such documents as Buyer may reasonably request to substitute itself for Seller in any pending eminent domain proceedings. For purposes of this <u>Section 15(c)</u>, a "material part of the Property" shall mean the loss of any material means of access or any other portion of the Property that will result in a loss of more than 10,000 square feet of space within the Improvements or cost more than $5,000,000 to repair.

16.     <u>Consequences of Termination</u>.

If Buyer or Seller terminates its obligation to complete the transfer of the Property under circumstances permitted by this Agreement, neither Buyer nor Seller will have any further liability or obligation under this Agreement, except indemnity provisions and obligations under <u>Section 5(f)</u>, <u>Section 12</u> (if applicable) and <u>Section 13</u> and any other term that expressly survives the termination of this Agreement. Nothing in this <u>Section 16</u> is intended to limit the obligations of the Title Company or the provisions of this Agreement dealing with the disposition of funds or documents held in escrow following termination of the obligations of Buyer or Seller.  If Buyer or

24

Docusign Envelope ID: 46DC04E0-EF53-4561-B389-2B847729D7DE

Seller terminates its obligation to complete the transfer of the Property, Buyer will deliver the Information to Seller. Return of materials as required by this <u>Section 16</u> will not limit Buyer's obligations under <u>Section 5(f)</u>.

17.    <u>Miscellaneous</u>.

(a)    <u>Survival</u>. Except as specifically provided for in <u>Section 9(b)</u>, <u>Section 10(e)</u> and <u>Section 12(c)</u>, all disclaimers, waivers, releases, covenants, undertakings and obligations under this Agreement and all representations and warranties contained in this Agreement will survive the Closing and will not be merged into the Deed or other documents delivered pursuant to this Agreement.

(b)    <u>Attorneys' Fees</u>. If litigation is commenced by Buyer or Seller against the other party in connection with this Agreement or the Property, the party prevailing in the litigation will be entitled to collect from the other party the expense (including fees, costs and disbursements of attorneys, experts and other professionals and court costs) incurred in connection with the litigation, both prior to and during any appellate proceedings. The terms and conditions of this <u>Section 17(b)</u> shall survive Closing and any termination of this Agreement.

(c)    <u>Notices</u>. Any notice or other communication to any party given under this Agreement will be effective only if in writing delivered to whichever of the following addresses is applicable:

| If to Seller: | Tesoro Redlands DE, LLC<br>c/o FTI Consulting<br>350 S. Grand Avenue, Suite 3000<br>Los Angeles, CA 90071<br>Attention: Mark Shinderman<br>Phone: (213) 402-1628<br>Email: mark.shinderman@fticonsulting.com |
|---|---|
| With a copy to: | Buchalter<br>1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, CA 90017<br>Attention: David Hitchcock, Esq. and William S. Brody<br>Phone: (213) 891-0700<br>Email: dhitchcock@buchalter.com; wbrody@buchalter.com |
| If to Buyer: | Patrick Theodora<br>43 Malaga Cove, Suite A<br>Rancho Palos Verdes, CA 90274<br>Phone: (310) 612-8015<br>Email: patthcodora@gmail.com |
| If to Seller's Trustee Counsel: | Potter Anderson & Corroon LLP<br>1313 N. Market Street, 6th Floor<br>Wilmington, DE 19801 |

BN 89627986v2

| | Attn: Aaron H. Stulman, Esq.<br>Phone: (302) 984-6081<br>Email: astulman@potteranderson.com |
|---|---|
| If to Title Company: | Chicago Title Insurance Company<br>National Commercial Services<br>3780 Kilroy Airport Way, Suite 100<br>Long Beach, CA 90806<br>Jody Kelly, Commercial Escrow Officer<br>Phone: (213) 330-3027<br>Email: jody.kelly@ctt.com |

Any notice or other communication will be deemed received only upon delivery to the address provided for in this Section 17(c) or rejection of delivery at such address. Notice may be given by (i) a national overnight delivery service in which event delivery shall be deemed to occur the next Business Day after depositing the notice with such delivery service, or (ii) by facsimile transmission or electronic mail transmission in which event notice shall be deemed to occur the same day if given before 5:00 p.m. San Bernardino County, California time on a Business Day and, if not so received, the next Business Day. The addresses and addressees to which notice is to be given may be changed by written notice given in the manner specified in this Section 17(c) and actually received by the addressee. Counsel to any party to this Agreement may, on behalf of its client, give any notice which may be, or is required to be, given by its client under this Agreement (and any notice so given by such counsel shall be as effective as if given by its client).

(d)   Parties Bound. This Agreement will be binding upon and will inure to the benefit of Buyer and Seller and their respective successors and permitted assigns. Neither the Title Company nor any broker is a third-party beneficiary of this Agreement, nor may the Title Company or any broker enforce this Agreement or any obligation under this Agreement.

(e)   Construction. Prior to Closing, Buyer shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written consent of Seller; provided, however, that Buyer may, subject to the provisions of Section 5(c), make disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Buyer.

(f)   Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which, taken together, will constitute one instrument. Buyer and Seller may execute different counterparts of this Agreement and, if they do so, the signature pages from the different counterparts may be combined to provide one integrated document.

(g)   Entirety and Amendments. This Agreement embodies the entire agreement and understanding between Buyer and Seller with respect to its subject matter and supersedes all prior agreements and understandings, written and oral, between Buyer and Seller related to that subject matter, including any letter of intent. This Agreement and the obligations of the parties under this Agreement may be amended, waived and discharged only by an instrument in writing

26

BN 89627986v2

executed by the party against which enforcement of the amendment, waiver or discharge is sought. Joinder of the Title Company and any broker will not be necessary to make any amendment, waiver or discharge effective between Buyer and Seller.

(h)     Invalidity.   The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or enforceability of the remaining provisions or of that provision under other circumstances.  Any invalid or unenforceable provision will be enforced to the maximum extent permitted by law.

(i)     Assignment.  Buyer shall not sell, transfer, convey, encumber or otherwise dispose of all or any part of this Agreement without the prior written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion.   For purposes of this Section 17(i), Buyer shall be deemed to have transferred its right, title and interest under this Agreement if any direct and/or indirect ownership interest in Buyer is sold, assigned, conveyed, transferred, encumbered or otherwise disposed of, in whole or in part, voluntarily or involuntarily. Notwithstanding the foregoing, Buyer may, at any time prior to the date which is ten (10) Business Days prior to the Closing, upon advance written notice to Seller, assign this Agreement without Seller's consent to a wholly-owned affiliate of Buyer.  In the event of any assignment by Buyer, Buyer shall continue to remain fully liable hereunder as totally and completely as if such assignment had not occurred.

(j)     Governing Law.  This Agreement will be governed by the laws of the State of California, without giving effect to principles of conflicts of law.

(k)     No Liability of Related Parties.  No Related Entity, nor any person who holds a direct or indirect ownership interest in Seller or any Related Entity, nor any of the respective officers, directors, trustees, agents and employees of any such person shall have any liability, directly or indirectly, under or in connection with this Agreement, any document or certificate executed in connection with this Agreement (including the Seller Closing Documents) or any amendment of any of the foregoing made at any time, whether prior to, contemporaneous with or after this Agreement.  Buyer and its successors and assigns, as well as all other persons, may look solely to Seller's assets for the payment of any claim or any performance, and Buyer, on behalf of itself and its successors and assigns, hereby waives any and all other claims, demands, causes of action and liability.

(l)     Waiver of Jury Trial.  BUYER AND SELLER EACH WAIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION BETWEEN THEM RELATED TO THIS AGREEMENT, THE TRANSACTION CONTEMPLATED HEREBY OR THE PROPERTY. The provisions of this Section 17(l) shall survive the Closing and any termination of this Agreement.

(m)     Time.  Time is of the essence in the performance of this Agreement.

(n)     Confidentiality.     Prior to Closing, Buyer shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written consent of Seller; provided, however, that Buyer may make

disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Buyer.

(o)     No Recordation.  Without the prior written consent of Seller, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining hereto, and any such recordation of this Agreement or memorandum or affidavit by Buyer without the prior written consent of Seller shall constitute a default hereunder by Buyer, whereupon Seller shall have the remedies set forth in Section 12(a).

(p)     Further Assurances.  In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Buyer.

(q)     Joint and Several Liability.  In the event there are multiple assignees of Buyer who take title to the Property, the liability of such assignees with respect to the obligations of Buyer under this Agreement shall be joint and severable.

(r)     Natural Hazards Disclosure.  Buyer and Seller acknowledge that Seller may be required under California law to disclose if the Property lies within the following natural hazard areas or zones:  (i) a special flood hazard area designated by the Federal Emergency Management Agency; (ii) an area of potential flooding; (iii) a very high fire hazard severity zone; (iv) a wild land area that may contain substantial forest fire risks and hazards; (v) an earthquake fault zone; or (vi) a seismic hazard zone.  Buyer acknowledges that Seller will employ the services of the Title Company or another third party selected by Seller ("Natural Hazard Expert") to examine the maps and other information specifically made available to the public by government agencies for the purposes of enabling Seller to fulfill Seller's disclosure obligations, and to report the result of the Natural Hazard Expert's examination to Buyer and Seller in writing.  The written reports prepared by the Natural Hazard Expert regarding the results of the Natural Hazard Expert's examination fully and completely discharge Seller from Seller's disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1103.4 regarding non-liability of Seller for errors or omissions not within Seller's personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of the Natural Hazard Expert's expertise with respect to the examination and written report regarding the natural hazards referred to above.

(a)     Electronic Signatures.  The facsimile, email, PDF signature or electronic signature (including, without limitation, DocuSign or similar electronic signature technology) of any party on this Agreement will be deemed an original for all purposes. The contract formation pursuant to this Agreement and record-keeping of this Agreement though electronic means shall have the same legal validity and enforceability as a manually executed or paper-based recordkeeping system to the fullest extent permitted by applicable law, including, without limitation, the Federal Electronic Signatures in Global and National Commerce Act, the Uniform

28

Electronic Transactions Act or any similar state law, and the parties to this Agreement hereby
waive any objection to the contrary.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLER**:

**TESORO REDLANDS DE, LLC,**
a Delaware limited liability company

By: _Mark Shinderman_____
Name: _Mark Shinderman_____
Title: _Chief Restructuring Officer_____

S-1

Case 8:25-bk-12319-SC   Doc 14   Filed 09/04/25   Entered 09/04/25 11:53:39   Desc
Case 25-10321   Main Document   Page 190 of 219   Page 36 of 63

Docusign Envelope ID: 46DC04C0-EF53-4563-B389-1D637?2R514E

**BUYER:**

PATRICK THEODORA, an individual

ACKNOWLEDGEMENT AND AGREEMENT

The Title Company (as defined in Section 1 above) hereby acknowledges that it has received this Agreement executed by Seller and Buyer and accepts the obligations of and instructions for the Title Company set forth in this Agreement.  The Title Company, as escrow holder, agrees to receive, disburse and/or handle the Earnest Money, the Purchase Price and all closing documents in accordance with this Agreement.

CHICAGO TITLE INSURANCE COMPANY


By:      _____
Name:  _____
Title:   _____

BN 89627986v2

Docusign Envelope ID: D4D8208A-4AE1-43BB-A716-04E910495217

## ACKNOWLEDGEMENT AND AGREEMENT

Seller's Trustee Counsel (as defined in Section 1 above) hereby acknowledges that it has received this Agreement executed by Seller and Buyer and accepts the obligations of and instructions for the Seller's Trustee Counsel set forth in this Agreement. Seller's Trustee Counsel, as escrow holder, agrees to receive, disburse and/or handle the Earnest Money in accordance with this Agreement.

POTTER ANDERSON & CORROON LLP

By: _____
Name: _Aaron Stulman_____
Title: _Partner_____

S-4

SCHEDULE 1

LEGAL DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF REDLANDS, COUNTY OF SAN
BERNARDINO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL 3 OF PARCEL MAP NO. 9105, IN THE CITY OF REDLANDS, COUNTY OF SAN BERNARDINO, STATE OF
CALIFORNIA, AS PER MAP FILED IN BOOK 95, PAGES 98 AND 99, OF PARCEL MAPS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY.

APN: 0167-151-24-0-000

Schedule 1

Docusign Envelope ID: 46DC04B0-EF53-4561-B389-A003752FD44F

SCHEDULE 9(e)

OUTSTANDING TENANT INDUCEMENT COSTS AND FREE RENT

Any leasing commissions due to Property Manager in connection with the Leases prior to the Closing Date.

## EXHIBIT A

## FORM OF DEED

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

MAIL TAX STATEMENTS TO:

APN: _____

The undersigned grantor(s) declare(s):                SPACE ABOVE THIS LINE FOR RECORDER'S USE
DOCUMENTARY TRANSFER TAX IS $_____

**[Enter R&T Code exemption, if any (otherwise delete)]**

....... Computed on the consideration or value of property conveyed; OR
....... Computed on the consideration or value less liens or encumbrances remaining at time of sale.
....... Unincorporated area; ....... City of _____.

### GRANT DEED

FOR VALUE RECEIVED, _____, a _____
("Grantor"), grants to _____, a _____, all that
certain real property (the "Property") situated in the County of San Bernardino, State of California,
described on  Exhibit A attached hereto and by this reference incorporated herein.

THE PROPERTY IS CONVEYED TO GRANTEE SUBJECT TO:

(i)    the lien of all real estate taxes and assessments not yet delinquent as
of the date hereof;

(ii)    all local, state and federal laws, rules, ordinances and governmental
regulations, including but not limited to, building and zoning laws, rules, ordinances and
regulations now or hereafter in effect relating to the Property; and

(iii)    all items appearing of record and all matters which would be
disclosed by an accurate survey of the Property.

Exhibit A
Page 1

BN 89627986v2

DATED as of this ___ day of _____, 20__.


              **TESORO REDLANDS DE, LLC,**
              a Delaware limited liability company


              By: _____
              Name: _____
              Title: _____

BN 89627986v2

Docusign Envelope ID: 46DC04B0-EF53-4561-B389-1CBB7E3D4E43

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                     )
                                        ) ss
County of _____             )

On _____, 20__ before me,

_____, a Notary Public, personally

appeared _____, who proved to me on the basis of

satisfactory evidence to be the person (s) whose name (s) is/are subscribed to the within

instrument and acknowledged to me that he/she/they executed the same in his/her their

authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person (s),

or the entity upon behalf of which the person (s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the

foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____                     (SEAL)]

Exhibit A
Page 3

BN 89627986v2

EXHIBIT A TO DEED
Legal Description

Exhibit A
Page 4

Docusign Envelope ID: 46DC04B0-EF53-4561-B389-1D3375E5A4F5

## EXHIBIT B
## FORM OF BILL OF SALE

For good and valuable consideration, _____, a _____ ("Seller"), sells and conveys to _____, a _____ ("Buyer"), the following (collectively, "Personalty"): all fixtures, equipment, machinery, building materials, supplies, inventory and other tangible property owned by Seller and located on the Land (as defined below). This Bill of Sale expressly excludes Personalty located on the Land that is leased or rented.

EXCEPT AS SET FORTH HEREIN OR IN THE PURCHASE CONTRACT, (A) THE PERSONALTY IS TRANSFERRED TO BUYER "AS IS" AND "WHERE IS" AND WITH ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS, AND (B) SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PERSONALTY OR ITS CONDITION. CONVEYANCE OF THE PERSONALTY IS SUBJECT TO ALL DISCLAIMERS, WAIVERS, RELEASES AND LIMITATIONS CONTAINED IN THE PURCHASE CONTRACT (AS DEFINED BELOW).

As used herein, (1) "Land" means that certain real property in San Bernardino County, California, as described on Exhibit A attached to and made a part of this Bill of Sale for all purposes; and (2) "Purchase Contract" means the Purchase and Sale Agreement and Joint Escrow Instructions, dated as of _____, 20___, between Seller and Buyer.

BN 89627986v2

IN WITNESS WHEREOF, the Seller has executed this Bill of Sale this _____ day of
_____, 20___.

_____,
a _____

By:      _____
Name:    _____
Title:   _____

Exhibit B
Page 6

EXHIBIT A TO BILL OF SALE
Legal Description

Exhibit B
Page 7

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES AND RENTS**

THIS ASSIGNMENT AND ASSUMPTION OF LEASES AND RENTS (this "Assignment"), made as of the _____ day of _____, 20__, by and between _____, a _____ ("Assignor"), and _____, a _____ ("Assignee").

WHEREAS, Assignor is the landlord under the leases set forth on Schedule A attached hereto and made a part hereof (the "Leases"), pursuant to which Leases Assignor has demised to the tenants thereunder a portion of certain premises located in San Bernardino County, California, and more particularly described in Schedule B attached hereto (the "Premises");

WHEREAS, Assignor and Assignee are parties to the Purchase and Sale Agreement and Joint Escrow Instructions, dated as of _____, 20___ (the "Agreement"), pursuant to which Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, the Premises; and

WHEREAS, in connection with the Agreement (i) Assignor is required to assign, transfer and convey to Assignee all of Assignor's right, title and interest in, to and under the Leases, together with any and all right, title, estate and interest of Assignor in and to such security deposits and prepaid Rents, if any, as have been paid to Assignor pursuant to such Leases (collectively, the "Deposits"), and (ii) Assignee is required to accept such assignment and to assume Assignor's obligations under the Leases and the Deposits from and after the Closing Date.

NOW, THEREFORE, in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Unless otherwise stated herein, all capitalized terms used in this Assignment shall have the meanings specified in the Agreement.

2.      Subject to the terms of the Agreement, Assignor hereby assigns, transfers, releases and sets over unto Assignee all of the right, title and interest of Assignor in and to (i) the Leases and all guarantees of the Leases and (ii) the Deposits not otherwise applied to the payment of rent under the applicable Leases.

3.      Assignee hereby accepts the foregoing assignment and hereby assumes (a) all of the obligations of Assignor under the Leases from and after the Closing Date and (b) all obligations of Assignor with respect to the Deposits actually received by Assignee, including, without limitation, the obligation to return same to the tenants under the Leases in accordance with the terms of such Leases.

4.      This Assignment may not be amended, modified or terminated except by an instrument in writing executed by the parties hereto.

Exhibit C
Page 1

BN 89627986v2

Docusign Envelope ID: 46DC04B0-EF53-4561-B389-1GBA1782D1AE

5.      This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.      This Assignment may be executed in counterparts, each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

7.      This Assignment shall not in any way affect, limit, modify or amend the disclaimers, waivers and releases benefiting Assignor and the Seller Related Entities set forth in the Agreement.

Exhibit C
Page 2

Docusign Envelope ID: 46DC0460-EF53-4563-B389-0BB3783B34AE

IN WITNESS WHEREOF, intending to be legally bound the parties hereto have executed this Assignment as of the day and year first above written.

TESORO REDLANDS DE, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____


_____,
a _____

By: _____
Name: _____
Title: _____

Exhibit C
Page 3

Schedule A to Assignment and Assumption of Leases and Rents

Exhibit C
Page 4

Docusign Envelope ID: 46DC0480-EF53-4562-B389-0061728F9dAE

Schedule B to Assignment and Assumption of Leases and Rents

Premises

Exhibit C
Page 5

**EXHIBIT D**

**FORM OF NOTICES TO TENANT**

_____, 20___

*VIA UPS & EMAIL*

[TENANT]

RE:    Lease Agreement dated [_____], between Seller and Tenant (collectively, the "Lease"), for property located at _____ ("Premises").

Dear Tenant:

We are pleased to advise you that the real property and improvements located _____, has been acquired by _____ ("Purchaser") effective as of the date set forth above.  Your lease agreement has been assigned to and accepted by Purchaser and Seller has agreed to transfer any security deposit or Letter of Credit, if any, currently held under the Lease to Purchaser.  Purchaser has assumed and agreed to perform all of the landlord's obligations under the Lease (including any obligations set forth in the Lease to repay or account for any security deposits or Letter or Credit) arising after the date hereof.  Purchaser has received and is responsible for your security deposit under the Lease in the amount of $_____.

All future correspondence relating to your tenancy, as well as rent checks and other charges, should be made to:

_____
_____
_____
_____
Attn: _____

All future rent payments should be sent to the following address:

By U.S. Mail:

_____
_____
_____
_____
Attn: _____

Exhibit D
Page 1

BN 89627986v2

Docusign Envelope ID: 46DC04C0-EF53-4563-B389-4D917528514E

Electronically:

_____
_____
_____
_____
Attn: _____

     Lastly, please notify your insurance carrier and request that they change the name of the additional insured under any policies of insurance required in the Lease to _____ and their affiliated companies, successors and assigns.

     Thank you for your cooperation.

               Very truly yours,

BN 89627986v2

Docusign Envelope ID: 46DC04C0-EF53-4563-B289-1D917F3BD445

**EXHIBIT E**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

       This Assignment and Assumption Agreement (this "<u>Agreement</u>"), dated _____, 20\_\_\_, is executed by and between _____, a _____ ("<u>Buyer</u>"), and _____, a _____ ("<u>Seller</u>").

       1.     <u>Background</u>.  Seller and Buyer have entered into a Purchase and Sale Agreement and Joint Escrow Instructions, dated as of _____, 20\_\_\_ (the "<u>Purchase Contract</u>"), pursuant to which Seller is conveying to Buyer the real property commonly known as _____ (the "<u>Property</u>"), located in the _____.  All capitalized terms in this Agreement, if not defined in this Agreement, will have the meaning ascribed to them in the Purchase Contract.  Buyer has agreed to execute and deliver this Agreement pursuant to the Purchase Contract and this Agreement shall survive Closing under the Purchase Contract.

       2.     <u>Assignment</u>.  Seller assigns Buyer the following (collectively, the "<u>Miscellaneous Assets</u>"): (a) all right, title and interest of Seller in, to and under any assignable contract listed in Exhibit A attached to and by reference made a part of this Assignment (collectively, "<u>Assigned Contracts</u>"); (b) all right, title and interest of Seller in and to all transferable permits, licenses, approvals, utility rights, development rights and similar rights related to the Property, if any, whether granted by governmental authorities or private persons; and (c) all right, title and interest of Seller in and to all assignable warranties and guaranties covering all or any part of the Property, excluding warranties or guaranties provided by Seller or any Related Entity, it being the intent of the parties hereto that no such warranties or guaranties are being provided by Seller or any Related Entity.  The Miscellaneous Assets shall not include (i) any internet addresses or websites used in connection with the Property or (ii) the name Tesoro and the logo including such names and any brochures, marketing materials, other branded items of personal property and signage in connection with the Property.  Seller makes no representation or warranty relating to any of the Miscellaneous Assets or the assignability thereof and shall not be required to obtain any consents relating to such assignment.

       EXCEPT FOR REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THE PURCHASE CONTRACT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (<u>INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER</u>) WITH RESPECT TO THE MISCELLANEOUS ASSETS OR THE ASSIGNABILITY OF THE MISCELLANEOUS ASSETS.  CONVEYANCE OF THE MISCELLANEOUS ASSETS IS SUBJECT TO ALL DISCLAIMERS, WAIVERS, RELEASES AND OTHER LIMITATIONS CONTAINED IN THE PURCHASE CONTRACT.

       3.     <u>Assumption</u>.  Buyer hereby assumes and agrees to pay and perform all of the terms, covenants, conditions and obligations of Seller or the owner of the Property under or with respect to the Assigned Contracts to the extent those terms, covenants, conditions and obligations are to be performed on or after the date of this Agreement.

<div align="center">Exhibit E<br>Page 1</div>

BN 89627986v2

4.  <u>Purchase Contract Not Affected</u>.  The obligations of Buyer under this Agreement have no effect on any obligations (whether similar or dissimilar) that Buyer has under the Purchase Contract.  The undertakings of Buyer in this Agreement and the Purchase Contract shall be independent of each other.  This Agreement shall not in any manner affect, limit, modify or amend the disclaimers, waivers and releases benefiting Seller and the Related Entities set forth in the Purchase Contract.

Exhibit E
Page 2

Docusign Envelope ID: 46DC04C0-EF53-4564-B389-0B8172FF54A5

    IN WITNESS WHEREOF, the parties have executed this Assumption and Assumption Agreement this __ day of _____, 20__.

TESORO REDLANDS DE, LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

Docusign Envelope ID: 46DC04CO-EF53-4562-B389-3D4372B3D44E
Case 25-10321MBB Document 1    Page 212/219

_____,

a _____

By:        _____
Name:   _____
Title:    _____

BN 89627986v2

Docusign Envelope ID: 46DC04C0-EF53-4561-B389-07B37E2F0AF5

Exhibit A to Assignment and Assumption Agreement

Assigned Contracts

BN 89627986v2

**EXHIBIT F: RESERVED**

Exhibit F-2
Page 1

BN 89627986v2

Docusign Envelope ID: 46DC0480-EF53-4561-B389-1061782B9445

# EXHIBIT G

## LIST OF SERVICE CONTRACTS

| Contract Counterparty | Contract Description | Cure Amount |
|---|---|---|
| Hook Private Security Service | Continuing Service Agreement | $9,751.13 |
| Liberty Landscaping, Inc. | Continuing Service Agreement | $24,833.32 |

BN 89627986v2

## ADDENDUM TO PURCHASE AND SALE AGREEMENT

This Addendum (this "**Addendum**") is part of and modifies and supplements the attached Purchase and Sale Agreement dated as of May 29, 2025 (the "**Agreement**") by and between TESORO REDLANDS DE, LLC, a Delaware limited liability company, as debtor and debtor in possession ("**Seller**") and PATRICK THEODORA, an individual ("**Buyer**" and collectively with Seller, the "**Parties**" and each a "**Party**").

The Parties acknowledge, affirm, and agree as follows:

1.      Addendum.  This Addendum modifies, deletes, and amends certain terms and conditions set forth in the Agreement.  Any inconsistency, conflict, or ambiguity between this Addendum and the Agreement is resolved by giving precedence and effect to this Addendum. Except as explicitly amended by this Addendum, all of the terms and conditions of the Agreement remain in full force and effect.  The Agreement, as amended by this Addendum, constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof and thereof, and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  All initially capitalized terms used but not defined herein have the meanings assigned to such terms in the Agreement.

2.      Bankruptcy Case.

a.      Seller is a debtor in a bankruptcy case (the "**Bankruptcy Case**") filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which is jointly administered under the bankruptcy case entitled *In re MOM CA Investco LLC, et al.*, Case No. 25-10321 (BLS) (the "Lead Case").

b.      The Property is an asset of Seller's bankruptcy estate in the Bankruptcy Case (the "**Bankruptcy Estate**").

c.      Seller is in possession of the assets of its Bankruptcy Estate and is administering its Bankruptcy Estate, including the Property, as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      Court Approval; Effective Date. This Agreement and the Parties' obligations to perform and liability under this Agreement (other than Seller's obligation under this section to request the approval of this Agreement by the Bankruptcy Court and to use reasonable efforts to obtain such approval as provided herein) is subject to and shall become effective and binding on the Parties only upon entry by the Bankruptcy Court of a final, non-appealable order in the Lead Case (the "**Approval Order**") approving: (i) this Agreement, and (ii) the sale of the Property by Seller to Buyer pursuant section 363 of the Bankruptcy Code, including the assumption and assignment to Buyer of the Leases and Service Contracts pursuant to section 365 of the Bankruptcy Code (the "**Effective Date**"). The Parties anticipate that, assuming no appeal or other challenge to the Approval Order, the Effective Date will be not later than fifteen days after the entry of the Approval Order by the Bankruptcy Court. Seller shall use its reasonable efforts to request entry of

Addendum to Purchase and Sale Agreement
Page 1

the Approval Order by the Bankruptcy Court as promptly as practicable after the execution by Seller and Buyer of the Agreement.  This Agreement shall be null and void and of no legal effect if the Approval Order is not entered by the Bankruptcy Court within sixty (60) days of the date of full execution of this Agreement (the "**Approval Deadline**"), unless extended in writing by the Parties. Seller shall have no obligation or liability to Buyer in the event that the Approval Order is not timely entered by the Bankruptcy Court and is final and non-appealable prior to the Approval Deadline, other than that the Earnest Money shall be returned to Buyer promptly following the Approval Deadline without any further instruction by either Buyer or Seller.

4.    <u>Assumption and Assignment of Leases and Service Contracts</u>.  Seller will request authority from the Bankruptcy Court through the Approval Order to assume and assign Leases and Service Contracts to Buyer or reject Service Contracts, as applicable.  Notwithstanding anything in the Agreement to the contrary, the Parties agree that: (i) all Leases shall be assumed and assigned to Buyer pursuant to the Agreement, and Buyer agrees to assume all obligations to the tenants thereunder; and (ii) on or prior to the Closing Date, Buyer will advise Seller in writing of which Service Contracts it will assume and which Service Contracts Buyer requests that Seller reject in accordance with the Approval Order.  Buyer shall be deemed to have elected to assume all Service Contracts if Buyer fails to specify in writing to Seller which, if any, Service Contracts Buyer wishes to assume and/or reject prior to the Closing Date.  Buyer shall be solely liable for and shall cure any monetary defaults under Service Contracts Buyer elects or is deemed to have elected to assume ("**Assumed Service Contracts**") in accordance with the Approval Order and assumes the obligations arising from and after the Closing Date under the New Contracts and the Assumed Service Contracts.

5.    <u>Exclusive Jurisdiction</u>. The Parties agree that notwithstanding any other term in the Agreement to the contrary, the Bankruptcy Court shall have exclusive jurisdiction over any and all disputes between the Parties, whether in law or equity, arising out of this Agreement, or any provision thereof, and the Parties hereby consent to and submit to the jurisdiction of the Bankruptcy Court for any such action.

6.    <u>Seller Representations</u>.  Seller's representations regarding its power and authority to enter into this Agreement or consummate the transactions contemplated hereunder are expressly subject to and conditioned upon the approval of this Agreement by the Bankruptcy Court.

TESORO REDLANDS DE, LLC,
a Delaware limited liability company

By: _Mark Shinderman_
Name: Mark Shinderman
Title: Chief Restructuring Officer

PATRICK THEODORA, an individual

Addendum to Purchase and Sale Agreement
Page 2

BN 89627986v2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
9454 Wilshire Blvd., 6th Fl., Beverly Hills, CA 90012

A true and correct copy of the foregoing document entitled (*specify*): **RESPONSE TO MOTION REGARDING THE AUTOMATIC STAY AND DECLARATION(S) IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 9/3/2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Michael Jay Berger    michael.berger@bankruptcypower.com,**
  **yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com**
- **Michael J Gomez    mgomez@frandzel.com, dmoore@frandzel.com,autodocket@frandzel.com**
- **Kristin T Mihelic    kristin.t.mihelic@usdoj.gov**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**
- **Gerrick Warrington    gwarrington@frandzel.com, achase@frandzel.com,autodocket@frandzel.com**

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On 9/3/2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 9/3/2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/3/2025 | Peter Garza | /s/ Peter Garza |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

2. **SERVED BY UNITED STATES MAIL**:

Tesoro Redlands DE, LLC
520 Newport Center Drive, Ste 480
Newport Beach, CA 92660

Tesoro Redlands DE, LLC
2108 N Street, Suite C
Sacramento, CA 95816
Attn: California Corporate Agents, Inc., Agent for Service of Process

**Creditor's Attorneys for Preferred Bank:**

Preferred Bank
c/o Michael J. Gomez, Esq.
c/o Gerrick M. Warrington, Esq.
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427

**Petitioning Creditor:**

Kotzeff Construction
Attn: James Kobzeff, Officer
5062 Vallecito Avenue
Westminster, CA 92683

**Petitioning Creditor:**

Coastline Santa Monica Investments, LLC
Attn: Ioannis Xilikakis, Officer
520 Newport Center Dr., #480
Newport Beach, CA 92660

**Petitioning Creditor:**

Vierengruppe Management Inc.
Attn: Jennifer Lovelace, Officer
1932 E. Deere Ave, Ste 150
Santa Ana, CA 92705

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.